RECORD NO. 13-7032

ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED

In The

# United States Court of Appeals
### For The District of Columbia Circuit

## IN RE: APA ASSESSMENT FEE LITIGATION

-------------------------------------------------------------------------------------------------------------------

### ELLEN G. LEVINE, RUTH FALLENBAUM, and ERIC S. ENGUM, on behalf of themselves and all others similarly situated,

*Plaintiffs – Appellants*,

**v.**

### AMERICAN PSYCHOLOGICAL ASSOCIATION and AMERICAN PSYCHOLOGICAL ASSOCIATION PRACTICE ORGANIZATION,

*Defendants – Appellees*.

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

—————————

### BRIEF OF APPELLANTS

—————————

Hassan A. Zavareei
Lorenzo B. Cellini
TYCKO & ZAVAREEI LLP
2000 L Street, NW, Suite 808
Washington, DC  20036
(202) 973-0900

*Counsel for Appellants*

Edward A. Wallace
Amy E. Keller
WEXLER WALLACE LLP
55 West Monroe Street, Suite 3300
Chicago, Illinois  60603
(312) 589-6272

*Counsel for Appellants*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Plaintiffs-Appellants' undersigned counsel hereby provide the following information:

## PARTIES AND AMICI CURIAE

The following are all parties who appeared before the district court:

Ellen G. Levine

Ruth Fallenbaum

Eric S. Engum

American Psychological Association, Inc.

American Psychological Association Practice Organization

There are no intervenors or *amici curiae* that appeared in the District Court below.  There are no intervenors or *amici curiae* appearing in this Court.

## RULINGS UNDER REVIEW

The following rulings are under review:

1.      The May 30, 2012 Memorandum Opinion and Order granting Defendants' Motion To Dismiss and setting briefing schedule, entered by Judge John D. Bates in the United States District Court for the District of Columbia in Civil Action No. 10-1780, at Docket Nos. 27, 28.  This ruling can be found in the Joint Appendix at JA 282-305.  The official citation of this decision is *Levine v. American Psychological Association, Inc.*, 862 F. Supp. 2d 1 (D.D.C. 2012).

i

2.      The February 1, 2013 Memorandum Opinion and Order denying leave to amend and dismissing action with prejudice, entered by Judge John D. Bates in the United States District Court for the District of Columbia in Civil Action No. 10-1780, at Docket Nos. 32, 33.  This ruling can be found in the Joint Appendix at JA 306-313.  There is no reported memorandum or other official citation to this decision.  The citation for the unreported opinion is *Levine v. American Psychological Association, Inc.*, No. 10-cv-1780, 2013 WL 385311 (Feb. 1, 2013).

## RELATED CASES

This case was originally filed in the United States District Court for the District of Columbia, *Levine et al., v. American Psychological Association, Inc. et al.*, Civil Action No. 10-cv-1780.  Appellants are not aware of any related cases currently pending in this Court or any other court involving substantially the same parties and the same or similar issues as defined in Circuit Rule 28(a)(1)(C).  Another class action lawsuit against Defendants and involving substantially the same issues has been filed in the United States District Court for the Southern District of California.  *See Grossman v. American Psychological Association et al.*, No. 13-cv-00736 (S.D. Cal. Mar. 27, 2013).

ii

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

TABLE OF CONTENTS........................................................................ iii

TABLE OF AUTHORITIES ................................................................ vii

GLOSSARY OF ABBREVIATIONS ....................................................xiv

I.     JURISDICTIONAL STATEMENT ...............................................1

II.    STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ..................2

III.   STATUTES AND REGULATIONS ...............................................4

IV.    STATEMENT OF THE CASE ....................................................5

V.     STATEMENT OF FACTS .........................................................9

       A.    The APA Admitted That Payment Of The Practice Assessment
             Was Not Required For APA Membership And That Its
             Statements Misled Its Members .........................................10

       B.    Defendants' False Representations That Payment Of The
             Practice Assessment Was Mandatory For APA Membership ............13

             1.    The APA's Annual Dues Statements.......................................13

             2.    The APA's Website .................................................17

       C.    The APA's Bylaws And Rules Say Nothing About Payment Of
             The Practice Assessment And Would Not Have Put A
             Reasonable Person On Notice That Payment Was Not Required.......18

VI.    SUMMARY OF THE ARGUMENT .........................................20

VII.   ARGUMENT....................................................................24

A.   Standard of Review ..........................................................................24

B.   The District Court Erroneously Dismissed Plaintiffs' Unjust
     Enrichment Claims ...........................................................................25

     1.   The APA's Membership Contract Cannot Bar Plaintiffs'
          Unjust Enrichment Claims Because It Does Not Cover
          The Practice Assessment...........................................................27

     2.   Questions As To The Validity Of Any Contract Covering
          The Practice Assessment Further Preclude Dismissal of
          Plaintiffs' Unjust Enrichment Claims ......................................29

C.   The District Court Erred In Concluding That Under A Choice-
     of-Law Analysis, The District of Columbia Had A Greater
     Interest Than California In Applying Its Non-Applicable
     Consumer Protection Act To California Residents Harmed In
     California ..........................................................................................31

     1.   A "False" Conflict Exists Between The Laws Of The
          District Of Columbia And California ......................................32

     2.   The District Of Columbia's "Modified Governmental
          Interest" Choice-Of-Law Analysis Under Restatement
          (Second) Conflict Of Laws § 148 Weighs In Favor Of
          Applying California Law ........................................................39

          a.   The Place Where Plaintiff Relied On Defendant's
               Misrepresentation ..........................................................42

          b.   The Place Where Plaintiff Received The
               Misrepresentation ..........................................................43

          c.   The Place Where Defendant Made The
               Misrepresentation ..........................................................43

          d.   The Domicile And Place Of Incorporation And
               Place Of Business Of The Parties...................................45

iv

e.     The Place Where The Tangible Thing Which Is The Subject Of The Transaction Between The Parties Was Situated At The Time ..................................45

f.     The Place Where Plaintiff Is To Render Performance Under The Contract Which He Has Allegedly Been Induced To Enter By Fraud .................46

5.     The Factors Under Restatement § 145 Also Favor California ......................................................................46

a.     The Place Where The Injury Occurred ...........................47

b.     The Place Where The Conduct Causing The Injury Occurred .....................................................................47

c.     The Domicile, Residence, Nationality, Place Of Incorporation And Place Of Business Of The Parties ..............................................................................48

d.     The Place Where The Relationship Is Centered .............48

D.     The District Court Erred In Refusing To Allow Plaintiffs To Amend The Consolidated Complaint To Allege A Claim For Fraudulent Inducement On The Basis That Plaintiffs' Reliance On Defendants' Misrepresentations Was Unreasonable As A Matter Of Law ...................................................................................49

1.     Reasonable Reliance Is Not An Element Of A Fraudulent Inducement Claim Involving Non-Commercial Transactions ............................................................................50

2.     In Any Event, Plaintiffs' Reliance On Defendants' Misrepresentations Was Reasonable, Or At A Minimum, Whether Their Reliance Was Reasonable Is An Issue Of Fact ......................................................................................52

3.      An Investigation Of The Documents Available To
         Plaintiffs Would Not Have Confirmed That Payment Of
         The Practice Assessment Was Not Required For APA
         Membership; It Would Have Indicated The Opposite.............53

E.      The District Court Erred In Holding That Plaintiffs Were
         Barred From Amending The Consolidated Complaint To State
         A Rescission Claim ...........................................................................56

        1.      Full Contractual Performance Does Not Bar a Rescission
                 Claim ........................................................................................57

        2.      Inability To Return The Parties To Their Pre-contractual
                 Status Quo Does Not Preclude A Rescission Claim Either......59

F.      The District Court Erred In Refusing To Allow Plaintiffs To
         Amend The Consolidated Complaint To Allege A Claim For
         Negligent Misrepresentation ..............................................................61

VIII.   CONCLUSION..............................................................................................63

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*4934, Inc. v. D.C. Dep't of Emp't Servs.*,
   605 A.2d 50 (D.C. 1992) ..............................................................25

*America Online, Inc. v. Superior Court of Alameda County*,
   108 Cal. Rptr. 2d 699 (App. 2001) ........................................33, 34

*Aral v. Earthlink, Inc.*,
   36 Cal. Rptr. 3d 229 (App. 2005) .................................................34

*\*Armenian Assembly of Am., Inc. v. Cafesjian*,
   597 F. Supp. 2d 128 (D.D.C. 2009)...............................................26

*Baney Corp. v. Agilysys NV, LLC*,
   773 F. Supp. 2d 593 (D. Md. 2011)...............................................60

*Barrer v. Women's Nat'l Bank*,
   761 F.2d 752 (D.C. Cir. 1985).......................................................30

*Biscoe v. Arlington County*,
   738 F.2d 1352 (D.C. Cir. 1984).....................................................33

*Brannen v. Nat'l R.R. Passenger, Corp.*,
   403 F. Supp. 2d 89 (D.D.C. 2005).................................................39

*Busby v. Capital One, N.A.*,
   772 F. Supp. 2d 268 (D.D.C. 2011)...............................................35

*\*Cassidy v. Owen*,
   533 A.2d 253 (D.C. 1987) .............................................................52

_____

*\*Chief Authorities are Designated by an Asterisk*

*Circle Click Media LLC v. Regus Mgmt. Grp. LLC*,
 No. 12-cv-04000, 2013 WL 1739451 (N.D. Cal. Apr. 22, 2013) .................34

*Dean v. Garland*,
 779 A.2d 911 (D.C. 2001) ....................................................................57, 58

*Delta Investing Corp. v. Moore*,
 366 F.2d 516 (6th Cir. 1966) ........................................................................60

*Doe 1 v. AOL LLC*,
 552 F.3d 1077 (9th Cir. 2009) ......................................................................33

*Dresser v. Sunderland Apts. Tenants Ass'n, Inc.*,
 465 A.2d 835 (D.C. 1983) .............................................................................57

*Eli Lilly & Co. v. Home Ins. Co.*,
 764 F.2d 876 (D.C. Cir. 1985).......................................................................33

*Erickson v. Pardus*,
 551 U.S. 89 (2007).........................................................................................24

*Fennell v. AARP*,
 770 F. Supp. 2d 118 (D.D.C. 2011)...............................................................56

*Firestone v. Firestone*,
 76 F.3d 1205 (D.C. Cir. 1996).......................................................................25

*Foman v. Davis*,
 371 U.S. 178 (1962).......................................................................................25

*Fresh Start Indus., Inc. v. ATX Telecomms. Servs.*,
 295 F. Supp. 2d 521 (E.D. Pa. 2003).............................................................36

*Funger v. Mayor & Council of Town of Somerset*,
 244 Md. 141, 223 A.2d 168 (Md. 1966) .......................................................60

*GEICO v. Feisoff*,
 958 F.2d 1137 (D.C. Cir. 1992)...............................................................32, 39

*Greene v. Gibraltar Mortg. Invest. Corp.*,
   488 F. Supp. 177 (D.D.C. 1980)...................................................................30

*Grossman v. American Psychological Association et al.*,
   No. 13-cv-00736 (S.D. Cal. Mar. 27, 2013).......................................... ii

*Hanson v. Hoffman*,
   628 F.2d 42 (D.C. Cir. 1980).........................................................................62

*Harrington v. Trotman*,
   983 A.2d 342 (D.C. 2009) .............................................................................30

*\*Harrison v. Rubin*,
   174 F.3d 249 (D.C. Cir. 1999).............................................................24, 62

*\*Hercules & Co. v. Shama Rest. Corp.*,
   613 A.2d 916 (D.C. 1992) ............................................................................50

*Hercules & Co., Ltd. v. Shama Rest. Corp.*,
   566 A.2d 31 (D.C. 1989) ...............................................................................32

*Howard v. Riggs Nat'l Bank*,
   432 A.2d 701 (D.C. 1981) ............................................................................52

*\*In re Bridgestone/Firestone, Inc.*,
   288 F.3d 1012 (7th Cir. 2002) ....................................................................37

*In re Brown*,
   319 B.R. 278 (Bankr. D.D.C. 2004) ...........................................................50

*\*In re Estate of McKenney*,
   953 A.2d 336 (D.C. 2008) .....................................................................52, 56

*In re Grand Theft Auto Video Game Consumer Litig.*,
   251 F.R.D. 139 (S.D.N.Y. 2008)..................................................................37

*In re U.S. Office Prods. Co. Secs. Litig.*,
   251 F. Supp. 2d 77 (D.D.C. 2003)..............................................................50

*Johns Hopkins Univ. v. Hutton*,
    488 F.2d 912 (4th Cir. 1973) ........................................................55

*\*Kent Homes, Inc. v. Frankel*,
    128 A.2d 444 (D.C. 1957) ......................................................57, 58

*Kitt v. Capital Concerts, Inc.*,
    742 A.2d 856 (D.C. 1999) ...........................................................50

*\*Klein v. Arkoma Prod. Co.*,
    73 F.3d 779 (8th Cir. 1996) ..................................................... 28-29

*Levine v. American Psychological Association, Inc.*,
    No. 10-cv-1780, 2013 WL 385311 (Feb. 1, 2013)..................................... ii, 7

*Levine v. American Psychological Association, Inc.*,
    862 F. Supp. 2d 1 (D.D.C. 2012)......................................................i

*\*Long v. Sears Roebuck & Co.*,
    877 F. Supp. 8 (D.D.C. 1995).........................................................33

*Meshel v. Ohev Sholom Talmud Torah*,
    869 A.2d 343 (D.C. 2005) ............................................................28

*Mobile Satellite Commc'ns, Inc. v. Intelsat USA Sales Corp.*,
    646 F. Supp. 2d 124 (D.D.C. 2009)....................................................40

*Moore v. Ronald Hsu Constr. Co.*,
    576 A.2d 734 (D.C. 1990) ...........................................................32

*Motor City Bagels, L.L.C. v. American Bagel Co.*,
    50 F. Supp. 2d 460 (D. Md. 1999)....................................................61

*Muir v. Navy Fed. Credit Union*,
    529 F.3d 1100 (D.C. Cir. 2008)......................................................24

*Regan v. Taxation with Representation*,
    461 U.S. 540 (1983).................................................................28

x

*Schiff v. AARP*,
    697 A.2d 1193 (D.C. 1997) ...........................................................................38

*Siegel v. Shell Oil Co.*,
    256 F.R.D. 580 (N.D. Ill. 2008) *aff'd*,
    612 F.3d 932 (7th Cir. 2010) .......................................................................37

*Snowder v. Dist. Of Columbia*,
    949 A.2d 590 (D.C. 2008) .............................................................................35

*Southwest Marine, Inc. v. Triple A Mach. Shop, Inc.*,
    720 F. Supp. 805 (N.D. Cal. 1989)...............................................................34

*St. John's Univ., New York v. Bolton*,
    757 F. Supp. 2d 144 (E.D.N.Y. 2010)..........................................................26

*Stickland v. Ayers*,
    165 S.E. 387 (Va. 1932) .........................................................................58-59

*\*Sununu v. Philippine Airlines, Inc.*,
    638 F. Supp. 2d 35 (D.D.C. 2009)...........................................................29, 30

*Taylor v. Reilly*,
    685 F.3d 1110 (D.C. Cir. 2012).....................................................................24

*Tolliver v. Christina Sch. Dist.*,
    564 F. Supp. 2d 312 (D. Del. 2008) .............................................................26

*United States v. Rosen*,
    487 F. Supp. 2d 721 (E.D. Va. 2007) ...........................................................28

*Value House, Inc. v. MCI Telecomms. Corp.*,
    917 F. Supp. 5 (D.D.C. 1996).......................................................................43

*Vertex Const. Corp. v. T.F.J. Fitness L.L.C.*,
    No. 10-cv-683, 2011 WL 5884209 (E.D.N.Y. Nov. 23, 2011).....................26

*Washkoviak v. Student Loan Mktg. Ass'n*,
    900 A.2d 168 (D.C. 2006) ................................................24, 32, 40, 42, 43

*Wiley v. Glassman*,
    511 F.3d 151 (D.C. Cir. 2007)................................................................62, 63

*Williams v. Rawlings Truck Line, Inc.*,
    357 F.2d 581 (D.C. Cir. 1965)......................................................................33

**STATUTES**

28 U.S.C. § 1332......................................................................................................1

28 U.S.C. § 1291......................................................................................................1

Cal. Bus. & Prof. Code §17200 *et seq.* ...........................................................5, 34

Cal. Bus. & Prof. Code §17500 *et seq.* ...........................................................5, 34

D.C. Code § 28-3901(a)(2) ...............................................................................35

D.C. Code § 28-3901(a)(3) ...............................................................................35

D.C. Code § 28-3905(k)(5) ...............................................................................38

IRC § 501(c)(3)..................................................... 2, 9, 10, 11, 13, 20, 27

IRC § 501(c)(6)......................................................................................................9

**RULES**

D.C. Cir. R. 28(a)(1) ............................................................................................i

D.C. Cir. R. 28(a)(1)(C) .................................................................................... ii

Fed. R. Civ. P. 12(b)(6).........................................................................................6

Fed. R. Civ. P. 15(a)(2).......................................................................................24

**OTHER AUTHORITIES**

66 Am. Jur. 2d Restitution & Implied Contracts § 23 ...............................................28

D.C. Council Comm. On Pub. Safety and the Judiciary,
Report on Bill 17-53 (Feb. 28, 2007).......................................................................38

*Restatement (Second) Conflict of Laws § 145 (1971) .......................31, 32, 39, 40,
41, 46, 47, 49

*Restatement (Second) Conflict of Laws § 148 (1971) .......................31, 32, 39, 40,
42, 43, 44, 45,
46, 47, 49

Restatement (Second) of Contracts § 172 (1981)....................................................52

## GLOSSARY OF ABBREVIATIONS

| <u>**Term**</u> | <u>**Reference**</u> |
| --- | --- |
| APA | American Psychological Association |
| APAPO | American Psychological Association Practice Organization |
| CPPA | D.C.'s Consumer Protection Procedures Act |
| FAL | California's False Advertising Law |
| JA __ | Joint Appendix at __ |
| NJCFA | New Jersey Consumer Fraud Act |
| UCL | California's Unfair Competition Law |
| UTPCPL | Pennsylvania Unfair Trade Practices Consumer Protection Law |

# I.
## JURISDICTIONAL STATEMENT

(A)     The United States District Court for the District of Columbia had subject-matter jurisdiction over this matter under 28 U.S.C. § 1332.

(B)     Jurisdiction before this Court is conferred by 28 U.S.C. § 1291.

(C)     This appeal is from the district court's February 1, 2013 final order denying leave to amend and dismissing the action with prejudice.  Appellants timely filed their Notice of Appeal on February 26, 2013.

(D)     This is an appeal from a final order that disposed of all of Appellants' claims.

## II.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

Plaintiffs alleged that the American Psychological Association (the "APA") falsely represented (on its dues statements and elsewhere) that payment of an annual "practice assessment" or "special assessment" was required for membership in the APA even though payment of the practice assessment was not in fact a condition of APA membership. Rather, the APA funneled these funds to its lobbying arm: the American Psychological Practice Organization (the "APAPO"). The APA falsely represented that payment of the assessment was required for APA membership because it did not believe that its members would voluntarily donate sufficient funds to the APAPO to support its lobbying activities. Yet it could not require payment of funds used for lobbying purposes as a condition of APA membership without jeopardizing its tax-exempt status as a 501(c)(3) charitable organization under the Internal Revenue Code. Hence, the APA falsely told its members that payment of the practice assessment was required for APA membership, but omitted payment of the assessment as a specific membership requirement in its bylaws and rules.

1.     Plaintiffs alleged that Defendants were unjustly enriched by the APA's misrepresentations regarding payment of the practice assessment. The district court determined that reasonable people could have been misled by the APA's misrepresentations, but nonetheless held that the APA's bylaws and rules

were contracts that controlled which dues were required for APA membership and,

therefore, that Plaintiffs were foreclosed from pursuing an unjust enrichment

claim.  In so ruling, the district court acknowledged that neither the APA bylaws

and rules nor the APAPO bylaws specifically addressed the practice assessment.

Did the district court err by holding that Plaintiffs were barred from pursuing their

unjust enrichment claim due the existence of a contract between the parties?

      2.     Plaintiffs Levine and Fallenbaum are California residents who

received dues statements containing Defendants' misrepresentations about

payment of the practice assessment in California and as a result of these

misrepresentations paid the practice assessment in California.  In their complaint,

Levine and Fallenbaum alleged causes of action for violations of California's

Unfair Competition Law and False Advertising Law.  The district court conducted

a choice-of-law analysis and determined that Levine and Fallenbaum were only

entitled to bring a cause of action for violation of the District of Columbia's

Consumer Protection Procedures Act ("CCPA") and dismissed their claims

because they were barred from recovery under the CPPA.  Did the district court err

in refusing to apply California law to the claims of these California residents?

      3.     Because the district court dismissed Plaintiffs' unjust enrichment and

California statutory causes of action, Plaintiffs requested leave to amend their

complaint to allege causes of action for fraudulent inducement, rescission, and

negligent misrepresentation based on the fact that they had been wrongfully induced into entering into a contract with the APAPO.

      a.    Did the district court err in refusing to allow Plaintiffs to amend their complaint to allege a cause of action for fraudulent inducement on the basis that, as a matter of law, Plaintiffs' reliance on the APA's misrepresentations was not reasonable?

      b.    Did the district court err in holding that Plaintiffs were barred from amending their complaint to allege a cause of action for rescission of their purported membership contracts with the APAPO because Plaintiffs' reliance on the APA's misrepresentations was not reasonable and because their membership contracts had already been performed and the parties cannot be returned to the pre-contractual status quo?

      c.    Did the district court err in holding that Plaintiffs were barred from amending their complaint to allege a cause of action for negligent misrepresentation because Plaintiffs' reliance on the APA's misrepresentations was not reasonable and because they did not ask the court for leave to add this specific count in their Opposition to Defendants' Motion To Dismiss?

### III.
### STATUTES AND REGULATIONS

The relevant statutes appear in the Addendum.

4

## IV.
## STATEMENT OF THE CASE

On October 21, 2010, Plaintiff Ellen Levine, a California resident, filed a class action lawsuit in the United States District Court for the District of Columbia against Defendants APA and APAPO alleging that Defendants falsely represented that payment of an annual "practice assessment" or "special assessment" was required for membership in the APA even though payment of the assessment was only required for membership in the APAPO (the "Levine Action"). JA 14-25. The proposed class was all APA members in the United States that paid the practice assessment as part of their annual dues. JA 18. Plaintiff Levine also alleged a proposed subclass of all APA members in California who paid the practice assessment as part of their annual dues. *Id.* The Levine Action alleged causes of action for: (1) unjust enrichment; (2) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. and Prof. Code §§ 17200, *et seq.* and California's False Advertising Law ("FAL"), Cal. Bus. and Prof. Code, §§ 17500, *et seq.*; (3) fraud & deceit; and (4) negligent misrepresentation. JA 21-23. On November 4, 2010, Plaintiff Eric Engum, a Tennessee resident, filed a class action in the D.C. district court making essentially the same allegations (the "Engum Action"). JA 26-37.

On December 3, 2010, Plaintiff Ellen Levine filed her First Amended Class Action Complaint, which added five additional named Plaintiffs from different

jurisdictions—Florida, Ohio, Illinois, and New York—as class representatives.  JA
38-51.  The First Amended Complaint also alleged additional subclasses and
statutory causes of action for these new jurisdictions.  JA 43, 46-49.

On January 18, 2011, Plaintiffs filed an unopposed motion to consolidate the
Levine and Engum Actions and for leave to file a Consolidated Class Action
Complaint (the "Consolidated Complaint"), which was attached as an exhibit to the
motion.  JA 52-53.  On January 31, 2011, the district court granted the motion to
consolidate and ordered the Consolidated Complaint to be deemed filed and served
on that same day.  JA 54-55.  The Consolidated Complaint omitted the non-
California Plaintiffs, with the exception of Mr. Engum, and alleged a nationwide
class of all APA members that paid the practice assessment, as well as California
and Tennessee subclasses.  JA 56-71.  The Consolidated Complaint alleged the
following three causes of action:  (1) unjust enrichment, (2) violation of
California's UCL, and (3) violation of California's FAL.  JA 67-70.

On March 2, 2011, Defendants filed a motion to dismiss pursuant to Fed. R.
Civ. P. 12(b)(6).  JA 72-73.  In their brief, Defendants argued that the
representations on the APA's dues statements were not misleading because they
accurately reflected the APA's belief that payment of the practice assessment was
required—not for APA membership—but because APA members had a moral and

professional obligation to pay it.  Dkt. No. 16 at 1-2, 18-23.[1]  Defendants also

contended that the APA and the APAPO's bylaws and rules constituted

membership agreements between the parties that barred Plaintiffs from asserting a

quasi-contract claim of unjust enrichment.  *Id.* at 14-16.  With regard to Plaintiffs'

California statutory claims, Defendants urged the district court to apply a choice-

of-law analysis and argued that under that analysis, the District of Columbia's

CPPA should apply to the allegations in Plaintiffs' consolidated complaint, instead

of the California statutory causes of action alleged therein.  *Id.* at 23-25.

On April 1, 2011, Plaintiffs filed their Opposition to the Motion To Dismiss.

Dkt. No. 19.  In their Opposition, Plaintiffs stated that if the district court

determined that the parties had entered into a contractual arrangement that barred

Plaintiffs' unjust enrichment claim, then Plaintiffs should be allowed to amend the

Consolidated Complaint to allege claims for fraudulent inducement and rescission

because they had been wrongfully induced into entering into a contractual

relationship with the APAPO due to Defendants' misrepresentations.  *Id.* at 18.

On May 30, 2012, the district court issued an Order and Memorandum

Opinion granting Defendants' Motion To Dismiss on all three counts of the

Consolidated Complaint.  JA 282-305.  In addressing Plaintiffs' unjust enrichment

claim, the district court determined that "[i]n the context of a dues statement, a

---

[1] All docket references are to *Levine v. American Psychological Association*, *Inc.*,
No. 10-cv-1780 (Feb. 1, 2013).

reasonable person could plausibly believe that an assessment labeled 'must pay' was a condition of membership, not a simple professional obligation." JA 295. Thus, Defendants' receipt of funds based on this misrepresentation was arguably unjust. The district court also found that neither the APA bylaws or rules nor the APAPO bylaws "specifically addresse[d] the practice assessment." JA 290. The district court nonetheless concluded that the APA's rules and bylaws constituted an express contract that barred Plaintiffs from recovering under a theory of unjust enrichment. JA 292.

With respect to Plaintiffs' claims under California's UCL and FAL, the district court applied a choice-of-law analysis and concluded that the District of Columbia's CPPA should apply to the allegations in the Consolidated Complaint instead of California statutory law and that because the allegations did not state a cause of action under the CPPA, the Consolidated Complaint should be dismissed. JA 300-301.

But because the court found that the APA's representations could have been misleading, it was "unpersuaded that plaintiffs' contract-based misrepresentation claims [were] fatally deficient" and ordered supplemental briefing on Plaintiffs' proposed amendments to the Consolidated Complaint. JA 294-295, 304-305. In their supplemental brief, Plaintiffs requested leave to amend the Consolidated

Complaint to allege claims for fraudulent concealment, rescission, and negligent misrepresentation.  Dkt. No. 30 at 2, 7.

On February 1, 2013, the district court issued another Order and Memorandum Opinion denying Plaintiffs' request for leave to amend their Consolidated Complaint and dismissing the action with prejudice.  JA 306-313. Plaintiffs timely filed their notice of appeal on February 26, 2013.  Dkt. No. 34.

**V.**

**STATEMENT OF FACTS**

The APA is the world's largest organization representing psychologists. Although its principal place of business is Washington, D.C., it has thousands of members throughout the country.  JA 57, 59.  It is incorporated as a non-profit corporation and claims tax-exempt status as a charitable organization under Section 501(c)(3) of the Internal Revenue Code.  *Id.*  As a 501(c)(3) organization, the APA is not permitted to engage in lobbying and lobbying fundraising (beyond certain relatively small limits).  *Id.*  Accordingly, in 2001 the APA leadership created a lobbying arm under 501(c)(6) of the Internal Revenue Code:  the APAPO, which is operated by the same leadership as the APA from the same address in Washington, D.C., and conducts professional advocacy and lobbying on behalf of its members.  JA 57-59.

The APA knew that many of its members would not voluntarily pay to fund the APAPO, so it wanted to find another way to obtain funding for its lobbying

9

organization.  JA 57.  To that end, starting in 2001, the APA began assessing

clinicians—licensed health care psychologists who provide services in the health

or mental health field—a special fee with their annual APA dues that the APA

funneled to the APAPO.  JA 57, 59.  The APA referred to this fee as the "special

assessment" or "practice assessment."  *Id.*  The fee was not trivial.  In some years it

amounted to over 50% of the amount of the APA dues.  In 2009, for example, this

assessment was $137 per person, while the total annual APA dues themselves were

$238.  JA 61.

## A.    The APA Admitted That Payment Of The Practice Assessment Was Not Required For APA Membership And That Its Statements Misled Its Members.

The APA made representations on its annual membership dues statements

and website that payment of the practice assessment was mandatory for

membership in the APA.  JA 57, 59-61, 68-70.  This, however, was not true.  The

APA could not explicitly state in its bylaws and rules that payment of the practice

assessment was required for APA membership because it would risk running afoul

of the lobbying restrictions in 501(c)(3) and jeopardize its tax-exempt status.  JA

57, 59.  Thus, it falsely represented to its members via dues statements and its

website that payment of the practice assessment was required for membership in

the APA in order to obtain funding for the APAPO's lobbying activities, while

omitting any reference to payment of the practice assessment in its corporate

10

documents to avoid violating 501(c)(3).  JA 57, 59-60, 68-70, 144-176.  Plaintiffs did not discover—and through the exercise of reasonable due diligence could not have discovered—that payment of the practice assessment was not required for APA membership until the APA admitted this fact to its membership and removed the misleading representations from its dues statements.  JA 64, 68, 70.

On May 5, 2010, in response to "questions and comments on several lists about the practice assessment," the APA's Board of Directors issued a letter to its membership explaining that payment of the practice assessment was not required for APA membership.  Indeed, in the following statement, the Board even acknowledged that the dues statements were misleading:

> The manner in which the APA, APAPO, and Division dues have been combined on past dues statements **does not make clear** that the mandatory practice assessment payment is **required for APAPO membership but not for APA membership**.  The 2011 dues statement instructions will be modified to clarify this point.

JA 61, 178-180 (emphasis added).  Thus, in the APA's own words, the dues statements made it appear that the assessments were required (or mandatory) for membership in the APA, when in fact they were not required and that its members had been misled.

The fact that its members had been misled was no surprise to the APA because that is exactly what it intended.  Days later, on May 8, 2010, one of the nine members of the APA's Committee for the Advancement of Professional

Practice or "CAPP" (the committee responsible for governing the APAPO), Glenn

Ally, Psy.D., made a statement on an official APA list-serve purporting to justify

the imposition of a mandatory assessment for the lobbying arm of the APA.

According to Dr. Ally, the APA decided to represent that the practice assessment

was mandatory because the APA members would not make sufficient voluntary

contributions to fund the APAPO's activities:

> I'm assuming you know the statistics that psychologist[s] are at the
> bottom (AT THE BOTTOM) of the list of professions regarding
> voluntary contributions, even political advocacy contributions.  What
> you are suggesting here is to make the primary and largest advocacy
> arm of our organization dependent on the voluntary contributions of
> the cheapest profession around. . . Again, I don't mean to be
> offensive, but try running your practice on voluntary contributions and
> see if your family gets everything they want and deserve to have.  The
> PO is a business and they are in the business of advocating for
> practice.  WE have decided we need this, and we decided long ago
> that we were not getting enough advocacy when we had to depend on
> the larger "APA."  We wanted our own practice advocacy for a
> variety of reasons.  That "business" has to depend on a relatively
> stable revenue source.  Would the lobbyist for your state organization
> represent you if you told him/her that you were going to pay him/her
> differently each year based on "voluntary donations?"

JA 61-62.  Dr. Ally's comments are consistent with the APA's overall scheme to

represent to its members that payment of the practice assessment was mandatory

for APA membership and not merely voluntary, but stopping short of making it an

explicit directive based on the APA's corporate documents in order to avoid

abridging its 501(c)(3) tax-exempt status.

**B.    Defendants' False Representations That Payment Of The Practice Assessment Was Mandatory For APA Membership.**

   **1.     The APA's Annual Dues Statements.**

The APA's annual membership dues statement broke down annual dues and assessments into three different categories:  (1) regular APA dues, (2) special assessment of licensed health care professionals, and (3) division dues and assessments.  All three of these fees came preprinted on the dues form.  JA 59-60, 77-85.  For example, on the 2001 APA membership dues statement, the special assessment was $110, which was preprinted on the form.  JA 77.



(Emphasis added).

Each APA membership dues statement also came with a set of "Membership Dues Statement Instructions." JA 78-80. The instructions contained two columns entitled "Explanation" and "Action Required," which explained what each fee on the dues statement was and what an APA member's obligation was with respect to

each fee.  *Id.*  Line 10 was for the special assessment.  Under the explanation section for Line 10, the dues statement stated "LICENSED OR CERTIFIED MEMBERS, FELLOWS, AND ASSOCIATE MEMBERS WHO *MUST PAY* THE SPECIAL ASSESSMENT INCLUDE," and it then listed those types of members that were required to pay it.  (Emphasis added).  JA 79.

Moreover, in the "action required" column for Line 10, the instructions told members to "***Pay the $110 (the preprinted amount) unless*** you hold a full-time faculty position and spend less than five hours per week providing psychological services. . . ." *Id.* (emphasis added).  The instructions went on to explain that some APA members may be exempted from payment of the special assessment if they met certain specific criteria.  *Id.*

Finally, Line 19 on the dues statement was for the total amount of dues and assessments owed.  The instructions stated that this was the "**TOTAL AMOUNT PAYABLE TO APA**" and that this represented "**TOTAL APA DUES, SPECIAL ASSESSMENTS, AND CONTRIBUTIONS."**  JA 80.  The action required column directed members to calculate the total amount and enter it on Line 19 and that "[i]f you do NOT enter an amount, the total of all preprinted dues and assessments will be charged to you."  *Id.*

15



# AMERICAN PSYCHOLOGICAL ASSOCIATION

## MEMBERSHIP DUES STATEMENT INSTRUCTIONS

Questions? Call APA Membership at 1-800-374-2721; TDD: 202-336-6123;
FAX: 202-336-5568; Internet E-mail address: membership@apa.org

| LINE | EXPLANATION | ACTION REQUIRED |
|---|---|---|

\*     \*     \*

| Lines 10–12 SPECIAL ASSESSMENTS | **ASSESSMENT PHASE 1.** An annual assessment is applied to all licensed health care psychologists who provide services in the health or mental health field or who supervise those who do. Special Assessment monies are paid directly to APA's nonprofit companion organization, the APA Practice Organization. Its mission is to promote the mutual professional interests of practicing psychologists in all settings through a wide range of advocacy activities focusing on policy makers, legislatures, the legal system, purchasers and consumers of services, and the overall healthcare marketplace.<br><br>**TAX INFORMATION.** The APA Practice Organization is designated as a 501(c) (6) nonprofit organization by the IRS. The Special Assessment is not deductible as a charitable contribution, but may be deductible in part as a business expense. APA estimates that 9% of your total Special Assessment is allocable to lobbying activities of the APA Practice Organization, and therefore is not deductible for income tax purposes as ordinary and necessary business expenses.<br><br>LICENSED OR CERTIFIED MEMBERS, FELLOWS, AND ASSOCIATE MEMBERS WHO MUST PAY THE SPECIAL ASSESSMENT INCLUDE:<br><br>–Those who provide ANY health-related services on a fee-for-service basis, or through other third party reimbursement arrangements.<br>or<br>– Those whose employment, in whole or in part, involves providing health-related services or supervising those who provide such services (e.g., state hospital, VA, or CMHC psychologists).<br>or<br>– Those whose interest in providing direct health-related services has been made public (e.g., advertisement in Yellow Pages or printed announcements of practice).<br>or<br>– Those who are listed in any national register or directory of health service providers in psychology.<br><br>*A $25 reduction in the Phase 1 amount is granted to those licensed or certified members with full-time faculty positions who spend less than five hours per week providing or supervising psychological services. | *Pay $110 (the preprinted amount) unless you hold a full-time faculty position and spend less than five hours per week providing psychological services; IN THAT CASE, CROSS OUT THE $110 PREPRINTED AMOUNT AND PAY $85.<br><br>**Newly-acquired license/certification or permanent discontinuation** should be indicated in writing and sent separately to APA Membership.<br><br>Exemptions (see below) must be claimed each year.<br><br>Canadian members should see page 4 for special instructions. |
| Line 10 | **SPECIAL ASSESSMENT EXEMPTIONS.**<br>*Exemption*<br>*Code*<br>(A) NOT licensed or certified in ANY jurisdiction.<br>(B) Employment is solely as an academic administrator or faculty member and no direct health-related service or clinical supervision is provided (e.g., dean, professor).<br>(C) Employment solely involves non-health-related services to public or private organizations (e.g., research consultant, I/O consultant).<br>(D) Employment solely involves education-related services in an institutional setting with no health-related services or supervision thereof.<br>(E) An APA Dues Exempt member or Reduced Dues case.<br>(F) A 1st- or 2-year APA Member or Associate member. | If you are exempt, cross off the amount and WRITE THE APPROPRIATE CODE OF EXEMPTION ON THE DUES FORM IN THE SPACE PROVIDED.<br><br>EXEMPTIONS FOR LICENSED MEMBERS MUST BE CLAIMED EACH YEAR ON THE DUES FORM. |

\*     \*     \*

| Line 19 TOTAL AMOUNT PAYABLE TO APA | TOTAL APA DUES, SPECIAL ASSESSMENTS, AND CONTRIBUTIONS. This line is for you to enter the total amount owed. If paying by check, make check payable, in U.S. dollars, to the AMERICAN PSYCHOLOGICAL ASSOCIATION. Please write your member number on your check or money order. Checks not honored by your financial institution are subject to a $20.00 fee.<br><br>USING YOUR CREDIT CARD. You may charge the amount due to your VISA, MasterCard or American Express. To do so, you must complete the charge card information in the lower section of your dues statement. Provide the billing address as it appears on the credit card statement. Provide the name as it appears on the charge card, the account number, expiration date (required), the amount to be charged, an indication of which charge card you are using, and your signature on the bottom of the charge section. Please also provide a daytime phone number. | Add lines 14 and 18.<br><br>PLEASE SIGN THE DUES STATEMENT ON THE LINE PROVIDED. You must calculate the total amount and enter it on line 19. If you do NOT enter an amount, the total of all preprinted dues and assessments will be charged to you. |

(Emphasis added).

The dues statements and instructions contained essentially the same representations regarding payment of the assessment through 2010. JA 86-136, 186-200. Combined, they left Plaintiffs and members of the class with the unmistakable impression that payment of the assessment was required for membership in the APA.

Once it had been made public that payment of the practice assessment was not mandatory, the APA changed its dues statements and instructions in order to be less deceptive. JA 62, 137-142. On the 2011 statement, in the section relating to the practice assessment, the APA added the statement "[n]onpayment does not affect membership in the APA." JA 62, 137. The instructions were also changed. The APA removed the "Action Required" column. It also removed the words "MUST PAY" from the instructions and instead reiterated that "[n]on-payment of the Assessment does not affect membership in APA." JA 62, 141.

### 2. The APA's Website.

The APA's website in 2002 stated that members ". . . must pay the Special Assessment. . . ." This language remained on the website for a period of years. JA 60. Through 2010, the APA's website never indicated that the practice assessment was voluntary, and never suggested that APA members were not required to pay the assessment. Instead, the website repeatedly stated that all practicing APA members were billed the assessment and were expected to pay that assessment.

And when APA members tried to pay their dues online, the APA website did not allow them to pay the APA dues without also paying the assessment. *Id.*

## C.   The APA's Bylaws And Rules Say Nothing About Payment Of The Practice Assessment And Would Not Have Put A Reasonable Person On Notice That Payment Was Not Required.

One of the reasons that the APA's scheme worked so well—a majority of APA members in fact paid the practice assessment, which they would not have done if payment was voluntary—was because the APA's corporate documents were completely silent on the assessment. JA 67, 70, 179. Thus, from the members' perspective, nothing would have alerted them that there was something amiss about the dues statements saying that payment of the practice assessment was mandatory. The relevant portion of the APA's bylaws is Article XIX, entitled "Dues and Subscriptions." JA 158. Section 1 of this article states that:

> The basic Association dues to be paid annually by Members and Associate members shall be determined by Council and shall include subscriptions to such publications as may be determined by Council. In addition to basic dues, each Member shall pay a fixed amount, to be determined by Council, for each Division over and above one to which the Member belongs.

Section 3 states that "[n]onpayment of dues for one year shall be considered as equivalent to a request for resignation from the Association." The bylaws do not say what constitutes the "basic dues," just that they shall be determined by the

Council of Representatives.  And they do not say anything about the Council's authority to require payment of assessments.[2]  *Id.*

Section 10 of the APA's rules describe the obligations for membership in the association.  JA 171-176.  Subsection 10-10 is entitled "Termination of Membership" and likewise states that a member may be dropped from membership for nonpayment of dues, but does not define what is included in the dues:  "A member is dropped from membership in the Association after nonpayment of dues . . . ."  JA 174.  Subsection 10-12 relates to the obligations of members that have achieved "life membership status."  JA 174-175.  Provided that certain requirements have been met "[t]hese members will be exempt from further payment of APA dues, as well as division dues, division assessments, ***or other assessments established by the Council***."  (emphasis added).  JA 175. Accordingly, Subsection 10-12 at least suggests that the Council has the authority to institute assessments such as the practice assessment and make payment of such assessments a condition of APA membership.  The APA has never taken the position that the Council lacks this authority.

---

[2] The APAPO bylaws are even less informative.  They simply state that the APAPO "shall have two categories of members.  One category of members, who are payers of the practice assessment, shall be known as 'Practice Constituents'. The second category of members, who are payers to the Education Advocacy Trust, shall be known as 'Education Constituents.'"  JA 161.

In sum, nothing in the APA's bylaws or rules indicates that the APA does not have the authority to require payment of the practice assessment as a condition of APA membership. Indeed, the bylaws and rules suggest the opposite: that the APA had the discretion to make payment of the practice assessment mandatory for membership if it wanted to.

## VI.
## SUMMARY OF THE ARGUMENT

Defendants falsely represented on its dues statements and website that payment of the practice assessment was required for membership in the APA even though that was not the case. Then, the APA funneled those funds to its lobbying arm: the APAPO. The APA made these false representations because it was concerned that its membership would not voluntarily donate sufficient funds to the APAPO to support its lobbying and advocacy activities, which the APA paternalistically believed would benefit its members. The APA, however, could not explicitly require payment of funds to be used for lobbying purposes as a condition of APA membership because doing so could have jeopardized its tax-exempt status as a 501(c)(3) charitable organization under the Internal Revenue Code. Thus, the APA tried to have it both ways: it falsely represented in its communications to its members that payment of the practice assessment was a condition of APA membership to obtain funding for the APAPO, but did not make

20

payment of the assessment an official membership requirement to avoid abridging its federal tax-exempt status.

   ***Plaintiffs' Unjust Enrichment Claim.***  The district court indicated that as a matter of substance, Plaintiffs had arguably stated a claim for unjust enrichment because Plaintiffs could have been misled by Defendants' representations.  But it incorrectly held that Plaintiffs' unjust enrichment claim was barred because of a preexisting contract between the parties.  The only contracts at issue here, however, were Plaintiffs' membership agreements with the APA and the APAPO, which were set forth in the bylaws and rules of each organization.  Although the district court acknowledged that an unjust enrichment claim can only be barred by contract if the contract covers the same subject matter at issue in the unjust enrichment claim, and that neither contract addressed payment of the practice assessment, it still concluded that Plaintiffs' unjust enrichment claim was barred by their membership agreement with Defendants.  This ruling was erroneous because payment of the practice assessment was not covered by Defendants' bylaws and rules, and even if it was, substantial questions of fact exist as to whether the Defendants' contracts with Plaintiffs were valid and enforceable agreements precluding dismissal.

   ***Plaintiffs' California Statutory Claims.***  The district court did not find against Plaintiffs on the substance of their claims under California's UCL and

FAL, but rather applied a choice-of-law analysis and determined that instead of the
California statutory claims alleged by Plaintiffs, the District of Columbia's CPPA
should apply and that the Consolidated Complaint should be dismissed because the
allegations did not state a claim under the CPPA.  In applying its choice-of-law
analysis, the district court failed to even consider whether a "true" or "false"
conflict existed between California and District of Columbia law.  This was error
because there is false conflict between the laws of these two jurisdictions.  The
district court should have applied the California statutory causes of action because
California was the jurisdiction whose interests would have been impaired if its law
was not applied, whereas the District of Columbia had no interest because the
conduct alleged in the Consolidated Complaint fell outside the scope of the CPPA.
In addition, even if a "true" conflict existed, California still had a more substantial
interest in seeing its laws applied to the facts of this case than the District of
Columbia.  Accordingly, the district court's choice-of-law analysis was
fundamentally flawed.

***Plaintiffs' Proposed Fraudulent Inducement Claim.***  The district court
likewise committed reversible error when it concluded that Plaintiffs were not
entitled to amend the Consolidated Complaint to allege claims for fraudulent
inducement, rescission, and negligent misrepresentation because Plaintiffs could
not demonstrate that their reliance on Defendants' misrepresentations was

22

reasonable.  The district court's ruling was erroneous because reasonable reliance is not a required element of a fraudulent inducement claim involving non-commercial contracts such as the ones at issue here.  Moreover, Plaintiffs' reliance *was* reasonable under the circumstances, or at a minimum, whether Plaintiffs' reliance was reasonable is an issue of fact that should not have been resolved on a motion to dismiss.

    ***Plaintiffs' Proposed Rescission Claim.***  The district court further erred when it denied Plaintiffs leave to amend to add a rescission claim on the basis that the parties' contracts had already been fully performed and they could not be restored to their pre-contractual status.  A fully performed contract is still subject to rescission.  Nor does the fact that the parties cannot be returned to the status quo ante bar a rescission claim, particularly in circumstances where one party has engaged in fraud.

    ***Plaintiffs' Proposed Negligent Misrepresentation Claim.***  The district court similarly erred in refusing to allow Plaintiffs to amend the Consolidated Complaint to state a claim for negligent misrepresentation on the grounds that Plaintiffs' request for leave was untimely.  Leave to amend should be freely given, and undue delay is not a proper basis for denying leave to amend unless the Defendants would have been prejudiced by the amendment, which the Defendants would not be.

For these reasons, this Court should reverse the district court's May 30, 2012 Order granting Defendants' Motion To Dismiss and the district court's February 1, 2013 Order denying leave to amend and dismissing the action with prejudice.

## VII.
## ARGUMENT

### A.    Standard of Review.

The court of appeals reviews a district court's decision granting a motion to dismiss for failure to state a claim *de novo*.  *Taylor v. Reilly*, 685 F.3d 1110, 1113 (D.C. Cir. 2012) (quoting *Muir v. Navy Fed. Credit Union*, 529 F.3d 1100, 1108 (D.C. Cir. 2008)).  The appellate court must "accept as true all of the factual allegations contained in the complaint."  *Taylor*, 685 F.3d at 113 (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)).

The court of appeals reviews the district court's choice-of-law analysis under a *de novo* standard of review.  *See Washkoviak v. Student Loan Mktg. Ass'n*, 900 A.2d 168, 180 (D.C. 2006).

Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that "[t]he court should freely give leave [to amend the pleadings] when justice so requires." The court of appeals reviews a district court's decision denying a motion to amend for abuse of discretion.  *Harrison v. Rubin*, 174 F.3d 249, 252 (D.C. Cir. 1999). "Although the grant or denial of leave to amend is committed to a district court's discretion, it is an abuse of discretion to deny leave to amend unless there is

24

sufficient reason, such as 'undue delay, bad faith or dilatory motive . . . repeated failure to cure deficiencies by [previous] amendments . . . [or] futility of amendment.'" *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

## B.     The District Court Erroneously Dismissed Plaintiffs' Unjust Enrichment Claims.

The district court erred below in holding that the existence of an express contract—namely, Plaintiffs' membership contract with the APA—foreclosed Plaintiffs' unjust enrichment claims.  While the district court correctly acknowledged that an express contract does not bar an unjust enrichment claim when "the contract does not cover the issue under dispute or if the contract's validity is in doubt," JA 288, the district court nevertheless erred by failing to apply these exceptions here.

Unjust enrichment is an equitable quasi-contract claim that was created by common law courts to provide a contractual remedy for disputes between parties where no such remedy otherwise would have existed.  *4934*, *Inc. v. D.C. Dep't of Emp't Servs.*, 605 A.2d 50, 55-56 (D.C. 1992).  Although parties are precluded from bringing unjust enrichment claims to obtain extra-contractual benefits when an express contract governs the matter in dispute, dismissal of an unjust enrichment claim at the pleading stage is generally considered premature unless the existence of a controlling contract that covers the same subject matter is

25

undisputed.  *See Vertex Constr. Corp. v. T.F.J. Fitness L.L.C.*, No. 10-cv-683, 2011 WL 5884209, at *4 (E.D.N.Y. Nov. 23, 2011) ("because it is difficult to determine the validity or scope of the contract at the pleading stage, courts routinely reject arguments" to dismiss unjust enrichment claims as premature); *St. John's Univ.*, *New York v. Bolton*, 757 F. Supp. 2d 144, 184 (E.D.N.Y. 2010). Where bona fide issues are raised as to whether the contract covers the subject matter of the parties' dispute or where there are questions regarding a contract's validity, unjust enrichment claims should not be dismissed.  *See Armenian Assembly of Am.*, *Inc. v. Cafesjian*, 597 F. Supp. 2d 128, 135-36 (D.D.C. 2009); *Tolliver v. Christina Sch. Dist.*, 564 F. Supp. 2d 312, 315-16 (D. Del. 2008) (reasoning that although an express contract may ultimately bar an unjust enrichment claim, the latter "may survive a motion to dismiss . . . when the validity of the contract is in doubt or uncertain" or "where an express contract exists that does not govern exclusively the obligations or rights of the parties at issue.").

Here, because the practice assessment was not covered by the APA's bylaws or rules and because there are questions of fact regarding whether any contract that did cover the assessment was valid, the district court erred in dismissing Plaintiffs' unjust enrichment claim.

1.    **The APA's Membership Contract Cannot Bar Plaintiffs' Unjust Enrichment Claims Because It Does Not Cover The Practice Assessment.**

The district court rested its dismissal of Plaintiffs' unjust enrichment claims on the finding that the APA bylaws "explained which dues were required and the bases upon which [APA] membership could be terminated." JA 292. The district court thus reasoned that "because the terms and conditions of APA membership are defined in express contracts," these contracts were controlling with respect to the "critical issue" in the case—"what the requirements of APA membership were." JA 291-292. This holding is impossible to square with the district court's finding that "[n]either the APA bylaws, the APA rules, nor the APAPO bylaws specifically address[] the practice assessment." JA 290. Most importantly, however, the district court's analysis is fundamentally flawed due to its failure to engage in any further analysis as to whether resolution of this "critical issue" would actually resolve the Parties' dispute. Because it would not, Plaintiffs' unjust enrichment claims are not properly considered within the scope of the contracts alleged by Defendants.

Defendants admit, for example, that the "failure to pay the [practice assessment was] not grounds for termination of APA membership." Dkt. No. 16 at 17-18. In fact, as a 501(c)(3) organization, the APA ***could not*** condition its membership on the payment of this practice assessment because it would risk

violating federal tax law, which prohibits the APA from engaging in lobbying activities except in certain limited amounts. *See Regan v. Taxation with Representation*, 461 U.S. 540, 544 (1983). Thus, even when construing the formal bylaws of the APA "as a contractual agreement between the organization and its members," *Meshel v. Ohev Sholom Talmud Torah*, 869 A.2d 343, 361 (D.C. 2005), the assessment cannot be considered part of the membership contract with the APA. *See United States v. Rosen*, 487 F. Supp. 2d 721, 729 (E.D. Va. 2007) ("Since no provision in the AIPAC bylaws is made for advancement of fees, it is reasonable to conclude defendants have no contractual right to advancement of fees, as such a right should not be inferred from a right to indemnification."). Consequently, even if the district court were right in finding that the APA bylaws clearly set forth the terms of APA membership, the APA membership contract cannot bar Plaintiffs' unjust enrichment claims because it does not cover the practice assessment.

By definition, a breach of contract claim cannot be brought where a contract does not require the performance that the parties dispute, which is the very reason that unjust enrichment claims are allowed to be brought in equity. An unjust enrichment claim is, therefore, allowed unless the subject matter in dispute is "fully covered by an express contract and in direct conflict therewith." *See* 66 Am. Jur. 2d Restitution & Implied Contracts § 23; *see also Klein v. Arkoma Prod. Co.*,

28

73 F.3d 779, 786 (8th Cir. 1996) (holding that unjust enrichment claim should not be dismissed "when an express contract does not fully address a subject").

This is simply not the case here. By Defendants' own admission, and as found by the district court, the practice assessment is ***not part*** of Plaintiffs' membership contract with the APA. Consequently, no contract could have existed between Plaintiffs and the APA that required payment of the assessment. Indeed, this is the crux of Plaintiffs' unjust enrichment claim and why the district court erred in dismissing it. Plaintiffs are not able to rely on a contract for recovery—not because they intentionally entered into a contract that precludes such recovery—but because a valid and enforceable contract covering the practice assessment does not exist. In such circumstances, unjust enrichment claims are appropriately maintained.

### 2. Questions As To The Validity Of Any Contract Covering The Practice Assessment Further Preclude Dismissal of Plaintiffs' Unjust Enrichment Claims.

Plaintiffs' allegations also raise legitimate questions as to the validity of any contract covering the practice assessment that should preclude dismissal of Plaintiffs' unjust enrichment claims. *Sununu v. Philippine Airlines*, *Inc.*, 638 F. Supp. 2d 35, 40 (D.D.C. 2009) ("[T]o preclude a claim for unjust enrichment, a contract must be valid."). Defendants intentionally misrepresented the practice assessment to be mandatory even though it was not a condition of APA

29

membership, and did so for the express purpose of wrongfully inducing APA members to pay dues that they otherwise would not have paid had members known the assessment was voluntary.  As a result of these misrepresentations, Plaintiffs allege that they in fact paid the practice assessment based on their belief that not doing so would have resulted in termination of their APA membership status. These allegations alone are sufficient to state a claim for fraudulent or material misrepresentation that would entitle Plaintiffs to void any contract covering the assessment.  *See Sununu*, 638 F. Supp. 2d at 40; *Harrington v. Trotman*, 983 A.2d 342, 347 (D.C. 2009) (recognizing that unjust enrichment claims may be advanced where there is a basis to set aside a contract as unenforceable by reason of misrepresentation or mistake).

Plaintiffs' allegations also establish that, at the very least, there was no meeting of the minds with respect to whether payment of the assessment was a condition of APA membership, which is clearly a material term to any contract between the Parties, and for which Defendants should bear the loss.  *See Greene v. Gibraltar Mortg. Inv. Corp.*, 488 F. Supp. 177, 179 (D.D.C. 1980) ("Where a party's assertion not in accord with the facts induces the apparent assent of another party, there is no meeting of the minds and hence no contract[]") (internal citations omitted); *Barrer v. Women's Nat'l Bank*, 761 F.2d 752, 757 (D.C. Cir. 1985).

30

Accordingly, the district court erred in dismissing Plaintiffs' unjust enrichment claim.

**C.     The District Court Erred In Concluding That Under A Choice-of-Law Analysis, The District of Columbia Had A Greater Interest Than California In Applying Its Non-Applicable Consumer Protection Act To California Residents Harmed In California.**

The district court's conflict-of-law analysis was flawed in three respects.

***First***, the district court should have found that a false conflict existed between the laws of California and the District of Columbia. In its choice-of-law analysis, the district court compared apples to oranges when comparing the governmental interests of California and the District of Columbia. Here, California has two specific statutes designed to protect its residents from Defendants' misconduct in California, while the District of Columbia has ***no*** statutory provisions on point. Thus, a "false conflict" existed between the laws of California and the laws of the District of Columbia because California had a interest in the application of its two laws that applied under these circumstances and which existed to protect its residents from this wrongful conduct by out-of-state entities, whereas the policies of the District of Columbia would not be advanced by application of its law.

***Second***, the district court erred when it gave more emphasis to § 145 of the Restatement (Second) Conflict of Laws (1971) § 145, which applies to tort claims generally, rather than § 148, which "sets out a lengthier list of factors courts should consider in multi-state fraud and misrepresentation cases." JA 296. Here, five of

31

the six factors under § 148 are relevant, and the majority of them significantly

favor application of California law.

   ***Third***, the district court erred in its application of the factors under both

§ 148 and § 145.  Under both § 148 and § 145, the district court effectively found

that the factors were tied and, therefore, the law of the forum state, the District of

Columbia applied.  JA 300-301.  When properly analyzed, however, the six factors

under § 148 and four factors under § 145 favor the application of the laws of

California rather than the District of Columbia.

### 1.    A "False" Conflict Exists Between The Laws Of The District Of Columbia And California.

   The District of Columbia employs as its choice-of-law analysis "a modified

'governmental interests analysis' which seeks to identify the jurisdiction with the

'most significant relationship' to the dispute."  *Hercules & Co.*, *Ltd. v. Shama Rest.*

*Corp.*, 566 A.2d 31, 40-41 (D.C. 1989); *Washkoviak*, 900 A.2d at 180 (quoting

*Moore v. Ronald Hsu Constr. Co.*, 576 A.2d 734, 737 (D.C. 1990)).  Under this

analysis "the first step is to determine whether a 'true conflict' exists—that is,

whether more than one jurisdiction has a potential interest in having its law applied

and, if so, whether the law of the competing jurisdictions is different."  *GEICO v.*

*Feisoff*, 958 F.2d 1137, 1141 (D.C. Cir. 1992).  If a true conflict exists, then "the

court must go on to determine which of the relevant jurisdictions has the 'more

substantial interest' in having its law applied to the case under review."  *Id.* (citing

32

*Eli Lilly & Co. v. Home Ins. Co.*, 764 F.2d 876, 882 (D.C. Cir. 1985)).  If a false

conflict exists, the court applies the "law of the state whose policy would be

advanced by application of its law or forum law if no state's policy would be

advanced by application of its law." *Long v. Sears Roebuck & Co.*, 877 F. Supp. 8,

11 (D.D.C. 1995) (citing *Williams v. Rawlings Truck Line, Inc.*, 357 F.2d 581, 586

(D.C. Cir. 1965)).  "A false conflict exists when either (1) the laws of the interested

states are the same; (2) when those laws, though different, produce the same result

when applied to the facts at issue; or (3) when the policies of one state would be

advanced by the application of its law and the policies of the states whose laws are

claimed to be in conflict would not be advanced by application of their law." *Id.*

(citing *Biscoe v. Arlington County*, 738 F.2d 1352, 1360 (D.C. Cir. 1984)).

Here, the district court erred by failing to even consider whether a false

conflict existed.  This error was significant because a false conflict does exist

between the California and District of Columbia laws at issue here since the

policies of California would be advanced by application of California law, and the

policies of the District of Columbia would not be advanced.

California has a "'strong public policy' to 'protect consumers [and business]

against unfair and deceptive business practices.'" *Doe 1 v. AOL LLC*, 552 F.3d

1077, 1085 (9th Cir. 2009) (citing *America Online, Inc. v. Superior Court of*

*Alameda County*, 108 Cal. Rptr. 2d 699, 710 (App. 2001)).  Indeed, "the right to

33

seek class action relief in consumer cases has been extolled by California courts." *America Online*, 108 Cal. Rptr. 2d at 712; *see also id.* at 712 (noting the "importance [that] class action consumer litigation has come to play in [California]."). In this case, "[t]he fundamental policy at issue is not simply the right to pursue a class action remedy, but ***the right of California to ensure that its citizens*** have a viable forum in which to recover minor amounts of money allegedly obtained ***in violation of the UCL***." *Aral v. Earthlink*, *Inc.*, 36 Cal. Rptr. 3d 229, 244 (App. 2005) (emphasis added).

Plaintiffs Levine and Fallenbaum (the "California Plaintiffs") specifically pleaded two Counts under different applicable provisions of California's Business & Professional Code. Count II alleged a violation of California's UCL, Cal. Bus. & Prof. Code § 17200 *et seq.* Count III alleged a violation of California's FAL, Cal. Bus. & Prof. Code § 17500 *et seq.* Both § 17200 and § 17500 are broader than typical consumer protection acts in that they specifically allow businesses and non-consumers standing to sue for unfair competition and false advertising. *See Southwest Marine*, *Inc. v. Triple A Mach. Shop*, *Inc.*, 720 F. Supp. 805, 808 (N.D. Cal. 1989) (business allowed to sue under Section 17200); *Circle Click Media LLC v. Regus Mgmt. Grp. LLC*, No. 12-cv-04000, 2013 WL 1739451, at *6-7 (N.D. Cal. Apr. 22, 2013) (business allowed to sue under Section 17500).

By contrast, the D.C.'s Consumer Protection Procedures Act ("CPPA") is limited ***only to transactions between consumers and merchants*** as defined by the Act. *Busby v. Capital One*, *N.A.*, 772 F. Supp. 2d 268, 279 (D.D.C. 2011) ("Despite its broad reach, the CPPA applies only to consumer-merchant relationships[]") (citing *Snowder v. Dist. Of Columbia*, 949 A.2d 590, 599 (D.C. 2008)). The CPPA defines a "consumer" as a person "who does or would purchase, lease (from), or receive consumer goods or services . . .; as an adjective 'consumer' describes anything, without exception, which is primarily for personal, household, or family use." D.C. Code § 28-3901(a)(2). It defines "merchant" as a person "whether organized for profit or for a nonprofit purpose, who in the ordinary course of business does or would sell, lease (to), or transfer consumer goods or services." D.C. Code § 28-3901(a)(3).

Consequently applying District of Columbia law would not only prevent these California Plaintiffs from pursuing class-wide relief on behalf of a putative California class under the UCL and FAL, it would also allow what the state of California has deemed unlawful. The unlawful conduct alleged by Plaintiffs would not be actionable under the CPPA because the California Plaintiffs did not purchase or receive consumer goods or services from Defendants and Defendants did not sell consumer goods and services to Plaintiffs.

While there is no case on point in the District of Columbia, the Pennsylvania case of *Fresh Start Indus.*, *Inc. v. ATX Telecomms. Servs.*, 295 F. Supp. 2d 521 (E.D. Pa. 2003), is instructive as to why this is a false conflict.  The plaintiff in *Fresh Start* filed a complaint in Pennsylvania district court alleging violations of the New Jersey Consumer Fraud Act ("NJCFA").  The defendant argued that under a choice-of-law analysis, the Pennsylvania Unfair Trade Practices Consumer Protection Law ("UTPCPL") should apply instead.  *Id.* at 525-26.  The NJCFA—like the UCL and FAL here—protects a broader class of "persons" than the UTPCPL because the NJCFA applies to commercial entities.  *Id.* at 527.  The UTPCPL, by contrast, "only applies to goods sold or services used 'primarily for personal, family, or household purposes.'"  *Id.*  Despite the difference in the scope of the two statutes, the court held that this did not create a true conflict.  *Id.*  The court explained that while New Jersey's interest would be impaired by application of the Pennsylvania statute, "Pennsylvania has no interest in this dispute because the parties are business entities, which fall outside the scope of the Pennsylvania statute."  *Id.*

Here, as in *Fresh Start*, a false conflict exists between California and the District of Columbia's consumer protection laws.  The District of Columbia's interests would not be impacted because even if Plaintiffs were residents of the District of Columbia, the CPPA would not apply to them under the circumstances

36

of this case.  However, California has a strong interest in protecting its residents from misrepresentations made by businesses that reside in another state.  Indeed, the very purpose of the protections afforded to consumers by the California legislature would be thwarted if, as is the case here, out-of-state entities could make misrepresentations to California consumers in violation of California's consumer protection laws, but then claim that they are only subject to the consumer protection laws in the state in which they reside, where their conduct would not be deemed unlawful.

For this reason, courts have held that a choice-of-law analysis dictates that the consumer protection laws of the territory where the consumers live, not the place of the defendants' headquarters apply.  *In re Bridgestone/Firestone*, *Inc.* 288 F.3d 1012, 1018 (7th Cir. 2002); *Siegel v. Shell Oil Co.*, 256 F.R.D. 580, 585 (N.D. Ill. 2008) *aff'd*, 612 F.3d 932 (7th Cir. 2010); *In re Grand Theft Auto Video Game Consumer Litig.*, 251 F.R.D. 139, 146 (S.D.N.Y. 2008).  Accordingly, California law should apply to the claims of the California Plaintiffs, who brought their claims on behalf of other residents of California under their home state's statutory laws.

On the other hand, precluding Plaintiffs' action under California law does not foster any established policy of the District of Columbia.  The district court held that the District of Columbia has a governmental interest in regulating the

37

behavior of corporations headquartered in the District and that interest was

implicated here by the District's decision "to exempt non-profit organizations from

its consumer protection laws, except in circumstances not applicable here."  JA

299 (citing D.C. Code § 28-3905(k)(5)).  But the District of Columbia does not

have an interest in protecting non-profit organizations from *all* claims for wrongful

conduct by its members.  *See Schiff v. AARP*, 697 A.2d 1193, 1197-98 (D.C. 1997)

(finding no standing to bring a CPPA claim, but holding that common-law

fraud/misrepresentation claims could be brought if all elements were met).  In fact,

the District of Columbia's 2007 amendment to the CPPA was intended to *prevent*

universal protection of non-profits under the CPPA.  *See* Testimony of Bennett

Rushkoff Office of the Attorney General for the District of Columbia on Bill No.

17-53 Non-Profit Organizations Oversight Improvement Amended Act of 2007,

February 9, 2007, p. 7:  "By eliminating the judicially-created exemption for

nonprofits, we can provide consumers who purchase from nonprofit businesses

with the same legal protections as consumers who purchase from for-profit

businesses."  D.C. Council Comm. On Pub. Safety and the Judiciary, Report on

Bill 17-53, at 60 (Feb. 28, 2007), *available at* http://dcclims1.dccouncil.us/images/

00001/20070405100711.pdf.  Because the policies of the state of California would

be advanced by application of its law and the policies of the District of Columbia

would not be advanced, a false conflict exists between these two jurisdictions.  The

district court therefore erred in failing to apply the law of the jurisdiction whose

interests would be advanced:  California.

### 2.    The District Of Columbia's "Modified Governmental Interest" Choice-Of-Law Analysis Under Restatement (Second) Conflict Of Laws § 148 Weighs In Favor Of Applying California Law.

If a true conflict exists, then the court must determine which jurisdiction has

the more substantial interest in having its law applied to the case at hand.  *GEICO*,

958 F.2d at 1141.  The district court erred when it concluded that both California

and the District of Columbia have "equally strong" governmental interests under

the circumstances of this case.  JA 299.  The District of Columbia has adopted two

tests set forth under the Restatement (Second) Conflict of Laws—§ 145 and

§ 148—which provide general factors to consider when making the conflict-of-law

analysis.  As explained in the preceding section, because the governmental

interests are clearly stronger for California than the District of Columbia, there is a

false conflict and the Court does not need to proceed any further in consideration

of the factors under Sections § 145 and § 148.

Still, if this Court considers the § 145 and § 148 factors for determining

"which jurisdiction's policy would be more advanced by the application of its law

to the facts of the case," they also heavily favor California.  *Brannen v. Nat'l R.R.

Passenger*, *Corp.*, 403 F. Supp. 2d 89, 95 n.2 (D.D.C. 2005) (citations and

quotations omitted).

39

While § 145 applies generally to all tort claims, § 148 was specifically drafted to apply to misrepresentation claims.  The district court, however, focused on § 145, rather than § 148, because § 148 was only referenced in a footnote in the D.C. Court of Appeal's decision in *Washkoviak*, 900 A.2d at 182 n.18.  However, District of Columbia courts have continued to look to §148 in analyzing choice-of-law issues involving '"multi-state misrepresentation claims."'  *See Mobile Satellite Commc'ns, Inc. v. Intelsat USA Sales Corp.*, 646 F. Supp. 2d 124, 131 (D.D.C. 2009) (citations omitted).  Thus, in footnote 18 of *Washkoviak*, this Court noted that in the case of multi-state misrepresentation claims Restatement § 148, while "not to be mechanically applied," was a "useful framework," to measure "qualitatively rather than quantitatively" a jurisdiction's interest.  900 A.2d at 182-183.  Although the court in *Washkoviak* found that the § 148 analysis was "ambiguous" given that, under the facts of that case, two of the factors were irrelevant and therefore did not provide any insight into the analysis, nothing in the decision implied that the § 148 factors were no longer relevant for conflict-of-law analysis in the District of Columbia with respect to misrepresentation claims.  As discussed below, the factors under § 148 establish that California is the state with more interest in the application of its laws under these particular facts than the District of Columbia.

40

Section § 148(1) states that:

> When the plaintiff has suffered pecuniary harm on account of his
> reliance on the defendant's false representation and when the
> plaintiff's action in reliance took place in the state where the false
> representations were made and received, the local law of this state
> determines the rights and liabilities of the parties unless, with respect
> to the particular issue, some other state has a more significant
> relationship. . . .

Here, the California Plaintiffs suffered pecuniary harm because they relied upon

representations made by Defendants that were received and directed towards them

in California.  This alone should have been the end of any conflict-of-law inquiry.

However, even if § 148(1) is not sufficient, § 148(2) states that:

> When the plaintiff's action in reliance took place in whole or in part in
> a state other than that where the false representations were made, the
> forum will consider such of the following contacts, among others, as
> may be present in the particular case in determining the state which,
> with respect to the particular issue, has the most significant
> relationship to the occurrence and the parties.

The six factors or contacts listed in § 148(2) are as follows:

(a)    the place where the plaintiff relied on the defendant's
misrepresentation;

(b)    the place where the plaintiff received the misrepresentation;

(c)    the place where the defendant made the misrepresentation;

(d)    the domicile and place of incorporation and place of business of
the parties;

(e)    the place where the tangible thing which is the subject of the
transaction between the parties was situated at the time; and

41

(f)     the place where the plaintiff is to render performance under the contract which he has allegedly been induced to enter by fraud.

In *Washkoviak*, the court further noted that Restatement § 148 offered the following guidance:  "If any two of the above-mentioned contacts, apart from the defendant's domicil, state of incorporation or place of business, are located wholly in a single state, this will usually be the state of the applicable law with respect to most issues."  900 A.2d at 182 n.18.

Here, there can be no real dispute that factors (a), (b), (d) and (f) all favor the application of California law, factor (c) is split or minimally favoring the District of Columbia, and factor (e) is simply not relevant.  Therefore, the district court erred when it found that the District of Columbia's interest trumped those of California.

### a.     The Place Where Plaintiff Relied On Defendant's Misrepresentation.

The California Plaintiffs alleged that they relied on Defendants' misrepresentations in California.  They alleged that they paid the assessment fees in California (JA 58, 64, 67-70) and that they "relied" on misrepresentations disseminated to California (JA 69-70).  Thus, the district court did not err in finding that the California Plaintiffs relied on Defendants' misrepresentations in California.  JA 300.  The district court, however, did err in not giving ultimate weight to this factor under its choice-of-law analysis.

42

**b.      The Place Where Plaintiff Received The Misrepresentation.**

The California Plaintiffs specifically alleged that they were subject to Defendants' dues statements and other materials misrepresenting the mandatory nature of the assessments in California.  JA 58, 64, 69.  And the district court correctly found that the California Plaintiffs received Defendants' misrepresentations in California.  JA 300.

Because both factors (a) and (b) of § 148 overwhelmingly favor California, California law should apply.  *Washkoviak*, 900 A.2d at 182 n.18; *Value House, Inc. v. MCI Telecomms. Corp.*, 917 F. Supp. 5, 7 (D.D.C. 1996) ("Florida has the most significant relationship to the dispute.  While the Service Bureaus ('SBs') made the representations . . . in California, Virginia and elsewhere, plaintiffs received the negligent misrepresentations in Florida and plaintiffs acted in reliance on those misrepresentations there.").

Here, not only are *two* of the most important factors located wholly in California, the other applicable factors as discussed below also primarily favor California.

**c.      The Place Where Defendant Made The Misrepresentation.**

The district court found that "defendants engaged in the allegedly illegal conduct from their principal place of business, Washington D.C."  JA 300.  However, the district court's analysis of the place where the defendant made the

misrepresentations ignores the fact that, in addition to mailing Plaintiffs information from the District of Columbia to California, Defendants hosted a website that would be accessed by Plaintiffs in California and that made misrepresentations regarding the mandatory nature of the practice assessment.

While Defendants may have drafted the misleading material in the dues statement and on the website in the District of Columbia (discovery is necessary to determine these facts), the importance of this factor is limited.  The nature of the type of conduct causing the injury is not focused on or limited to the District of Columbia, and Defendants should not be allowed to seek protection under the District of Columbia's laws when they intended to, and did, seek out the California Plaintiffs in California.

Due to the extensive reach of Defendants' conduct—engaging in mailings to other states and providing a website accessible throughout the United States—the District of Columbia does not have sole interest in regulating this conduct.  As comment *h* to § 148 of the Restatement (Second) of Conflict of Laws states:  "The making of the representations provides a more important contact when the representations are made only in one state than when they are made in two or more."

**d.    The Domicile And Place Of Incorporation And Place Of Business Of The Parties.**

Although Defendants are incorporated and have their place of business in the District of Columbia, Plaintiffs' domicile or place of business is of more importance than that of Defendants.  Restatement (Second) of Conflict of Laws § 148 cmt. *i* ("The domicil, residence and place of business of the plaintiff are more important than are similar contacts on the part of the defendant.")  Here, the district court erred because it found a tie based upon the fact that Plaintiffs were located in California and Defendants were located in the District of Columbia.  However, as comment *i* illustrates, this situation does not constitute a tie as the residence of the Plaintiffs is entitled to more weight than the residence of the Defendant.  Instead, this is a factor that favors the application of California's law over the application of the District of Columbia's.

**e.    The Place Where The Tangible Thing Which Is The Subject Of The Transaction Between The Parties Was Situated At The Time.**

The district court did not specifically address this factor in its opinion, but instead found that the "last two factors are inapplicable here."  JA 300.  Because this factor is inapplicable, it neither favors the application of the laws of California or the District of Columbia.

45

**f.    The Place Where Plaintiff Is To Render Performance Under The Contract Which He Has Allegedly Been Induced To Enter By Fraud.**

The district court incorrectly found that this factor was inapplicable here.  *Id.* In terms of the California Plaintiffs' membership contract with Defendants, the California Plaintiffs rendered their performance under the contract in California. The California Plaintiffs' relationship with the APA was centered in California, where they interacted with the APA, and where they performed all of their membership functions and rights, including accessing the APA's website and paying their membership dues.  JA 58, 60, 64, 67-70.

Accordingly, the district court erred in its application of the § 148 factors. As demonstrated above, factors (a), (b), (d) and (f) favor California, factor (c) slightly favors the District of Columbia, and factor (e) is not applicable.  Thus, the majority of the factors—not a tie as found by the district court—favor the application of California law.

**5.    The Factors Under Restatement § 145 Also Favor California.**

The four factors enumerated in the Restatement (Second) Conflict of Laws § 145 are as follows:

(a)    the place where the injury occurred;

(b)    the place where the conduct causing the injury occurred;

(c)    the domicile, residence, nationality, place of incorporation and place of business of the parties; and

46

(d)    the place where the relationship is centered.

Even assuming the district court should have applied § 145 instead of § 148 (which it should not have done), the district court's analysis under factors (b) and (d) of § 145 was both incorrect and premature, especially as discovery was necessary to fully appreciate where Plaintiffs' relationship with Defendants was centered and where the conduct causing the injury occurred.

### a.    The Place Where The Injury Occurred.

The district court correctly held that the California Plaintiffs' injury occurred in California where they received and paid their dues statements.  Accordingly, this factor weighs in favor of applying California law.

### b.    The Place Where The Conduct Causing The Injury Occurred.

The district court held that the second factor, the place where the conduct causing the injury occurred, weighs in favor of applying D.C. law because based on the allegations in the Consolidated Complaint, "at least some of the conduct causing the injury took place in Washington, D.C. and nothing in the complaint or plaintiffs' briefing suggests any other location where the conduct could have occurred."  JA 299.  The district court's analysis under factor (b) ignores the fact that, in addition to mailing Plaintiffs information from the District of Columbia, Defendants hosted a website that would be accessed by Plaintiffs in California. Therefore, the nature of the type of conduct causing the injury is not focused on or

47

limited to the District of Columbia.  Rather, Defendants operated their website

containing false information such that it could be accessed in each state.  As such,

the District of Columbia does not have sole interest in regulating this conduct and,

therefore, this factor does not weigh heavily in Defendants' favor.

> **c.    The Domicile, Residence, Nationality, Place Of Incorporation And Place Of Business Of The Parties.**

For all of the reasons set forth above in Section VII. C. 4. d., this factor

favors the application of California law.

> **d.    The Place Where The Relationship Is Centered.**

The district court found that factor (d) did not weigh strongly in the favor of

either California or the District of Columbia.  JA 300.  However, to the extent that

it does favor any state, it favors California.  The record establishes that most, if not

all, of the California Plaintiffs' relationship with Defendants was centered in

California where they paid their membership dues and accessed Defendants'

website.  On the other hand, while Defendants may have been "centered" in the

District of Columbia in the sense that their headquarters were located there, the

District of Columbia was not the center of the relationship between the California

Plaintiffs and Defendants.

For all of the reasons set forth above, the district court erred in finding that

California did not have the stronger governmental interest in applying its laws to

the facts of this case. The vast majority of the factors under both § 148 and

§ 145—both qualitatively and quantitatively—favor California.

**D.    The District Court Erred In Refusing To Allow Plaintiffs To Amend The Consolidated Complaint To Allege A Claim For Fraudulent Inducement On The Basis That Plaintiffs' Reliance On Defendants' Misrepresentations Was Unreasonable As A Matter Of Law.**

In its Order denying leave to amend, the district court agreed (as it had in its

previous Order granting the Motion To Dismiss) that Defendants' representations

regarding payment of the practice assessment were arguably misleading. And it

also accepted as true Plaintiffs' allegation that Plaintiffs relied on Defendants'

misrepresentations and, as a consequence, paid the practice assessment and joined

the APAPO, which they would not have done had they known that payment of the

assessment was not required for APA membership. JA 309-310. The district

court, however, concluded that the allegations in the Consolidated Complaint

failed to state a claim for fraudulent inducement because it was not "reasonable"

for Plaintiffs to have relied on Defendants' misrepresentations. JA 311-312.

The district court's ruling was erroneous because the requirement that the

defrauded party's reliance be "reasonable" does not apply to non-commercial

transactions. And even if it was a required element, Plaintiffs reasonably relied on

Defendants' representations or, at a minimum, the reasonableness of Plaintiffs'

reliance is an issue of fact.

1.    **Reasonable Reliance Is Not An Element Of A Fraudulent Inducement Claim Involving Non-Commercial Transactions.**

"The elements of fraud and fraudulent inducement are the same." *In re U.S. Office Prods. Co. Secs. Litig.*, 251 F. Supp. 2d 77, 99-100 (D.D.C. 2003). In order to state a claim for common law fraud, Plaintiffs must allege: "(1) a false representation (2) made in reference to a material fact, (3) with knowledge of its falsity, (4) with the intent to deceive, and (5) an action that is taken in reliance upon the representation." *Kitt v. Capital Concerts*, *Inc.*, 742 A.2d 856, 860-61 (D.C. 1999) (citing *Hercules & Co. v. Shama Rest. Corp.*, 613 A.2d 916, 923 (D.C. 1992). "[I]n cases involving commercial contracts negotiated at arm's length, there is the further requirement . . . that the defrauded party's reliance be *reasonable*." *Hercules*, 613 A.2d at 923 (emphasis in original). Thus, "[u]nder District of Columbia law, reliance is only required to be reasonable in transactions involving commercial contracts." *In re Brown*, 319 B.R. 278 (Bankr. D.D.C. 2004). Commercial contracts in which a defrauded party is required to establish that its reliance on a misrepresentation was reasonable typically involve agreements negotiated by two sophisticated business entities with equal bargaining power. *See Hercules*, 613 A.2d at 932. By contrast, "in actions by consumers against entrepreneurs who obtain those consumers' business or money through fraud, the requirement that reliance be reasonable has been eliminated." *Id*. at 933 n.25.

50

Here, the membership contracts between Plaintiffs and Defendants are non-negotiable adhesion contracts more akin to transactions between a consumer and a business than a negotiated business agreement between two commercial enterprises.  The APA and the APAPO are business organizations that solicit individuals throughout the country to become members.  They offer to provide certain services to their members relating to professional psychology in exchange for annual fees.  Defendants' members are just ordinary consumers that presumably have an interest in professional psychology—although some also hold advanced degrees.  They are by no means business entities that have any power or ability to negotiate the terms of their membership agreement with Defendants.  The contracts between Defendants and Plaintiffs are, therefore, the type of non-commercial transactions between consumers and a business for which the element of reasonable reliance need not be proven to state a claim for fraudulent inducement.  Accordingly, the district court erred in ruling that Plaintiffs were required to make any showing that their reliance on Defendants' misrepresentations was reasonable.

### 2.   In Any Event, Plaintiffs' Reliance On Defendants' Misrepresentations Was Reasonable, Or At A Minimum, Whether Their Reliance Was Reasonable Is An Issue Of Fact.

Even assuming, *arguendo*, that Plaintiffs are required to demonstrate that their reliance on Defendants' misstatements was reasonable, Plaintiffs' allegations were sufficient to survive a motion to dismiss.

"It may be unreasonable to rely on a misrepresentation when the statement is 'preposterous or obviously false,' . . . or if there was an 'adequate opportunity to conduct an independent investigation' and the party making the representation 'did not have exclusive access to such information.'"  *In re Estate of McKenney*, 953 A.2d 336, 343 (D.C. 2008) (internal citations omitted) (quoting *Howard v. Riggs Nat'l Bank*, 432 A.2d 701, 707 (D.C. 1981)).  "Moreover, 'a recipient's fault in not knowing or discovering the facts before making the contract does not make his reliance [upon a misrepresentation] unjustified unless it amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing.'"  *Id.* (quoting Restatement (Second) of Contracts § 172 at 469 (1981)).  Finally, whether a party's reliance on a misrepresentation was reasonable is question of fact that cannot be resolved on a motion to dismiss.  *Cassidy v. Owen*, 533 A.2d 253, 256 (D.C. 1987) ("The reasonableness of the reliance upon a misrepresentation is a question of fact, for which disposition by summary judgment is generally inappropriate.").

The APA's dues statements and instructions did not make obvious that payment of the practice assessment was not required for membership in the APA. In fact, the APA acknowledged this very point in its May 8, 2010 letter to its membership and subsequently changed the dues statements to make them less misleading.  Nor was it unreasonable for Plaintiffs to believe payment of an assessment that came pre-printed on their APA dues statement, with instructions stating that licensed or certified members "MUST PAY" it, was a condition of APA membership.  The district court agreed that Plaintiffs could have so construed this statement.  A fact finder could conclude that Plaintiffs were not acting unreasonably by interpreting the dues statement to mean that payment of the practice assessment was required for APA membership.

3. **An Investigation Of The Documents Available To Plaintiffs Would Not Have Confirmed That Payment Of The Practice Assessment Was Not Required For APA Membership; It Would Have Indicated The Opposite.**

The district court found that Plaintiffs' reliance on the representations in the dues statements regarding payment of the practice assessment was not reasonable because the dues statements stated "that basic dues were required for membership, but included no such notation next to the practice assessment, creating at least some ambiguity about the practice assessment's relationship to continued membership."  JA 310.  The fact that the court acknowledged that the dues statements were at least ambiguous should have been enough to create an issue of

53

fact for the jury as to whether Plaintiffs' reliance was reasonable since any ambiguity should be resolved in favor of the Plaintiffs at the motion to dismiss stage. In addition, there was nothing inconsistent with the dues statements stating that payment of basic dues was required for membership and Plaintiffs' belief that payment of the practice assessment was also required for membership. The basic dues were what ***all*** APA members had to pay for membership. The practice assessment, by contrast, was only for "licensed or certified members." The instructions then specified in detail who qualified as a licensed or certified member. Plaintiffs' conclusion that they were required to pay both basic dues and, because they were licensed or certified members, the practice assessment was therefore not unreasonable. This is particularly true since the dues instructions also included a section explaining which licensed and certified members were ***exempt*** from payment of the practice assessment.

Despite acknowledging that the dues statements would have been at least ambiguous to a reasonable person, the district court held that Plaintiffs' reliance was unreasonable because they had an adequate opportunity to conduct an investigation and that through such an investigation they would have been able to determine that payment of the practice assessment was not required for APA membership. JA 310-311. The primary basis for the court's decision was that a review of APA's rules and bylaws would have "indicated that payment of the

practice assessment was not a condition of APA membership." But as the district court noted in its May 30, 2012 opinion, the APA's bylaws and rules do not say anything about payment of the practice assessment. JA 290. On the other hand, they do give the APA's Council of Representatives broad authority to prescribe what constitutes annual membership dues. And Section 10-12 suggests that the Council had the authority to require payment of any assessments it establishes as a condition of APA membership. JA 175. Thus, contrary to the court's holding, an APA member could have reviewed the dues statements and the APA's rules and bylaws, and reasonably come to the conclusion that even though these the bylaws and rules do not say anything specific about payment of the practice assessment, the APA had the authority to mandate payment of the assessment. At a minimum, Plaintiffs could have drawn conflicting inferences from the dues statements and the bylaws and rules and therefore the question of whether Plaintiffs' reliance was reasonable is a question for the trier of fact. *See Johns Hopkins Univ. v. Hutton*, 488 F.2d 912, 918 (4th Cir. 1973).

The district court suggests that Plaintiffs had a duty to call the APA to inquire as to whether payment of the assessment was mandatory. JA 311. This assumes Plaintiffs would have been told payment was voluntary. There is no basis for such an assumption. Accepting the allegations in the Consolidated Complaint as true, it must be presumed that the APA would have told Plaintiffs that payment

55

was mandatory.  Indeed, the APA still takes the position that payment of the

assessment was mandatory—for ethical and moral reasons.

**E.    The District Court Erred In Holding That Plaintiffs Were Barred From Amending The Consolidated Complaint To State A Rescission Claim.**

As was the case with Plaintiffs' fraudulent inducement claim, the district

court also held that Plaintiffs' proposed amendment to add a claim for rescission

would be futile because Plaintiffs were required to prove reasonable reliance on

Defendants' misrepresentations, which the Court found they were unable to do.

This ruling was erroneous for the reasons stated in Section VII. D.

In addition, the district court held that Plaintiffs' rescission claim was

"independently barred" because (1) Plaintiffs' contracts with the APAPO "have

been fully performed, and (2) the parties cannot be returned to the pre-contractual

status quo."  JA 312.  This holding was also incorrect.

"Traditionally, a person who was induced to enter into a contract by a

misrepresentation has several common law causes of action, including fraud in the

inducement sounding in tort and rescission sounding in contract."  *In re*

*McKenney*, 953 A.2d at 341.  To state a cause of action for rescission, Plaintiffs

must allege "(i) a misrepresentation, (ii) made in reference to a material fact, that

(iii) would have been likely to have induced a reasonable recipient to make the

contract."  *Fennell v. AARP*, 770 F. Supp. 2d 118, 132 (D.D.C. 2011) (citing *In re*

*McKenney*, 953 A.2d at 342).

56

Defendants tricked Plaintiffs into becoming members of the APAPO by misrepresenting that payment of the practice assessment was required for APA membership.  By way of their proposed rescission claim, Plaintiffs sought to rescind their membership contracts with the APAPO and recover special damages in the amount of the practice assessments they paid for each year of membership in reliance upon Defendants' misrepresentations.  *Dresser v. Sunderland Apts. Tenants Ass'n*, *Inc.*, 465 A.2d 835, 840 (D.C. 1983) ("rescission[] entitles the defrauded party to recover 'special damages'—'those expenditures made in reliance upon the misrepresentation . . . [as] part of the restitution which is required in order that the parties might be placed in status quo ante.'") (quoting *Kent Homes*, *Inc. v. Frankel*, 128 A.2d 444, 446 (D.C. 1957)).  This would restore Plaintiffs to their pre-contractual status quo.  Accordingly, Plaintiffs have stated a prima facie claim for rescission.

### 1.    Full Contractual Performance Does Not Bar A Rescission Claim.

The district court cited *Dean v. Garland*, 779 A.2d 911, 915 (D.C. 2001) as support for the notion that contracts that have been fully performed cannot be rescinded.  The *Dean* decision, however, does not stand for such a rule.  The plaintiffs in *Dean* entered into a contract to purchase a house from the defendant.  *Id.* at 913.  Prior to settlement, the plaintiffs became aware of moisture problems in the house's basement and requested that the defendant make repairs.  *Id.*  The

defendant ultimately failed to make the requested repairs, but the plaintiffs still went to closing. *Id.* at 913-14. After the sale had been completed and the plaintiffs had moved into their house, they filed suit against the defendant alleging that the defendant and her agents had made fraudulent representations regarding the condition of the basement and sought to rescind the purchase agreement. *Id.* at 913, 915. The court of appeals affirmed the trial court's dismissal of the plaintiff's rescission claim explaining that:

> In the present case, the Deans were aware that at least three agreed-upon repairs had not been completed before settlement, but they nevertheless proceeded with the settlement and accepted the property with these problems, in exchange for payment from appellees, and did not seek rescission for a year and a half after they had moved in. In these circumstances rescission was not an available remedy. . . ."

*Id.* at 915-16. Thus, the *Dean* decision did not say that a claim for rescission was prohibited when the underlying contract had been fully performed. To the contrary, the reasoning in *Dean* suggests that a claim for rescission may be viable even for a fully performed contract (such as the Deans' purchase agreement), but that under the circumstances at issue in that case it would have been inequitable to allow the Deans to proceed with a rescission claim. This interpretation of *Dean* is consistent with other courts that have allowed a party to seek rescission of a fully performed contract. *Kent Homes*, 128 A.2d at 446 (stating, in regards to construction contract, "[a]s far as rescission is concerned the fact that a contract is executed or executory makes no difference[]"); *Stickland v. Ayers*, 165 S.E. 387,

58

388, 392-93 (Va. 1932) (holding rescission of land sale not barred by laches for when suit several years after land purchase after recently discovered misrepresentations).  Thus, full contract performance is no bar to a rescission claim.

### 2.    Inability To Return The Parties To Their Pre-contractual Status Quo does Not Preclude A Rescission Claim Either.

As an initial matter, the district court's assertion that the parties could not be returned to their pre-contractual status quo is pure speculation.  Refunding the practice assessment fees Plaintiffs paid would have returned them to their original position prior to the contract with the APAPO.  And there is nothing in the Consolidated Complaint that establishes that the APAPO conferred any benefit upon Plaintiffs that needed to be restored in order to return the APAPO to its pre-contractual status.[3]  According to the Consolidated Complaint, the only benefit Plaintiffs sought and received in exchange for paying the practice assessment was membership in the APA.  The district court improperly went beyond the scope of the pleadings in determining that the parties could not be returned to their pre-contractual status.

---

[3] All the Consolidated Complaint says is that the APAPO conducted professional advocacy and lobbying on behalf of its members.  JA 57.  It does not allege that Plaintiffs received any benefit from these activities or from their membership in the APAPO generally that would need to be returned.  Furthermore, to the extent lobbying activities were conducted, they would have been conducted on behalf of all members and therefore the APAPO would have been in the same status regardless of whether Plaintiffs' contracts were rescinded.

But even assuming that Plaintiffs did receive some sort of benefit from the APAPO that could not have been returned, courts have still recognized that claims for rescission may proceed even if the parties cannot be restored to the status quo ante where on the particular circumstances it would be equitable to do so. *Delta Investing Corp. v. Moore*, 366 F.2d 516, 520 (6th Cir. 1966) ("While the general rule is that a party seeking to rescind must restore, or offer to restore, the consideration, or whatever he has received under the contract, the rule is not absolute, and shall not be strictly construed where restoration is impossible; but is to be applied in accordance with equitable principles."); *Baney Corp. v. Agilysys NV, LLC*, 773 F. Supp. 2d 593, 607-08 (D. Md. 2011) (while "restoring the Parties to their pre-contractual positions is the ideal and goal of rescission, it is 'not an absolute prerequisite' . . . [W]here the facts suggest that it would be most equitable to allow rescission despite the impossibility or undesirability of complete restoration, 'the modern tendency is to allow the relief.'") (internal citations omitted) (quoting *Funger v. Mayor & Council of Town of Somerset*, 223 A.2d 168, 173 (Md. 1966)).

Here, the only "benefits" Plaintiffs could have possibly received from their contract with the APAPO were lobbying and advocacy services. Because those services have already been performed, it is not possible for Plaintiffs to return them and restore the status quo ante. But since payment of the practice assessments was

60

procured through fraud by Defendants, it is equitable for Defendants to bear their

uncompensated loss.  Or at a minimum, Plaintiffs are entitled to receive back from

Defendants whatever "fair dealing" requires.  *See Motor City Bagels*, *L.L.C. v.*

*American Bagel Co.*, 50 F. Supp. 2d 460, 482-83 (D. Md. 1999).  Thus, they would

at least be entitled to reimbursement of the practice assessment fees paid minus an

offset for the value of the services they received.

For the reasons outlined above, the district court's denial of Plaintiffs'

request for leave to amend the Consolidated Complaint to add a rescission claim

was improper.

## F.     The District Court Erred In Refusing To Allow Plaintiffs To Amend The Consolidated Complaint To Allege A Claim For Negligent Misrepresentation.

In their supplemental brief, Plaintiffs also requested leave to amend the

Consolidated Complaint to allege a claim for negligent misrepresentation.

Plaintiffs explained that although they did not specifically ask to add this claim in

their Opposition to the Motion To Dismiss, the elements of the fraudulent

inducement and rescission claims overlap with the elements of a claim for

negligent misrepresentation.  The district court, however, denied Plaintiffs' request

and held that this proposed amendment was futile because reasonable reliance was

an element of negligent misrepresentation and Plaintiffs failed to show that a

reasonable person would have relied on the Defendants' misrepresentations.

61

As explained in Section VII. D. above, the district court erred in holding that, as a matter of law, it was not reasonable for Plaintiffs to rely on Defendants' misrepresentations and, therefore, its ruling that Plaintiffs' proposed amendment to add a negligent misrepresentation was futile should be reversed.

The district court also held that Plaintiffs were barred from amending the Consolidated Complaint to add a claim for negligent misrepresentation "because plaintiffs did not ask to add it in their opposition to defendants' motion to dismiss, and the request now is untimely and outside the scope of the supplemental briefing." JA 312. Where an amendment would do no more than clarify legal theories or make technical corrections, the Court of Appeals has "consistently held that delay, without a showing of prejudice, is not a sufficient ground for denying the motion." *Harrison*, 174 F.3d at 253. This is because "[u]nless a defendant is prejudiced on the merits by a change in legal theory. . . a plaintiff is not bound by the legal theory on which her or she originally relied." *Id.* (quoting *Hanson v. Hoffman*, 628 F.2d 42, 53 n.11 (D.C. Cir. 1980) (internal quotations omitted). This Court has held that a plaintiff may raise new claims even as late as in an opposition to a motion for summary judgment, as long as the new claim is "substantially similar" to claims already asserted in the complaint. *Wiley v. Glassman*, 511 F.3d 151, 159 (D.C. Cir. 2007).

Here, Plaintiffs' negligent misrepresentation claim was substantially similar to their fraudulent inducement and rescission claims. Indeed, the factual basis for the negligent misrepresentation claim is the same as the factual basis for Plaintiffs' unjust enrichment and California statutory causes of action in the Consolidated Complaint. Discovery in this case was stayed pending resolution of the Motion To Dismiss. Plaintiffs gave Defendants and the district court notice of their intent to amend the Consolidated Complaint to add a claim for negligent misrepresentation in their supplemental brief. And the Defendants did not contend that they would have been prejudiced by the addition of such a claim. Because this case was in its early stages—far from the summary judgment phase as in *Wiley*—the district court should not have concluded that Plaintiffs' request to amend the Consolidated Complaint to add a negligent misrepresentation claim was untimely.

## VIII.
## CONCLUSION

For these reasons, Plaintiffs-Appellants respectfully urge the Court to reverse the district court's May 30, 2012 Order granting Defendants' Motion To Dismiss and the district court's February 1, 2013 Order denying leave to amend and dismissing action with prejudice.

Dated:  August 8, 2013

Respectfully submitted,

/s/ Hassan A. Zavareei
Hassan A. Zavareei
Lorenzo B. Cellini
TYCKO & ZAVAREEI LLP
2000 L Street, N.W., Suite 808
Washington, D.C.  20036
(202) 973-0900 (telephone)
(202) 973-0950 (facsimile)

Edward A. Wallace
Amy E. Keller
WEXLER WALLACE LLP
55 W. Monroe Street, Suite 3300
Chicago, Illinois 60603
(312) 589-6272
eaw@wexlerwallace.com
aek@wexlerwallace.com

*Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

    [  X  ] this brief contains [*13,995*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

    [    ] this brief uses a monospaced typeface and contains [     ] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [  X  ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [14 pt Times New Roman Font]; *or*

    [  ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] in [*state size and name of font*];

Dated: <u>August 8, 2013</u>                    /s/ Hassan A. Zavareei
                                                *Counsel for Appellants*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 8th day of August, 2013, I caused this Brief of

Appellants and Joint Appendix to be filed electronically with the Clerk of the

Court using the CM/ECF System, which will send notice of such filing to the

following registered CM/ECF users:

> David W. Ogden
> WILMER CUTLER PICKERING HALE & DORR LLP
> 1875 Pennsylvania Avenue, N.W.
> Washington, DC  20006
>
> *Counsel for Appellees*

I further certify that on this 8th day of August, 2013, I caused the required

copies of the Brief of Appellants and Joint Appendix to be hand filed with the

Clerk of the Court.


> /s/ Hassan A. Zavareei
> *Counsel for Appellants*

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS

**Page**

26 U.S.C.A. § 501 ..............................................................................Add. 1

Ann. Cal. Bus. & Prof. Code § 17200 ...........................................Add. 33

Ann. Cal. Bus. & Prof. Code § 17500 ...........................................Add. 34

D.C. Code § 28-3901 .......................................................................Add. 35

D.C. Code § 28-3905 .......................................................................Add. 38

*Vertex Construction Corp. v. T.F.J. Fitness L.L.C.*,
  2011 WL 5884209 (Nov. 23, 2011) ......................................Add. 46

*Circle Click Media LLC v. Regus Management Group LLC*,
  2013 WL 1739451 (April 22, 2013) ......................................Add. 51

United States Code Annotated
  Title 26. Internal Revenue Code (Refs & Annos)
    Subtitle A. Income Taxes (Refs & Annos)
      Chapter 1. Normal Taxes and Surtaxes (Refs & Annos)
        Subchapter F. Exempt Organizations (Refs & Annos)
          Part I. General Rule (Refs & Annos)

26 U.S.C.A. § 501

§ 501. Exemption from tax on corporations, certain trusts, etc.

Effective: March 30, 2010

Currentness

**(a) Exemption from taxation.**--An organization described in subsection (c) or (d) or section 401(a) shall be exempt from taxation under this subtitle unless such exemption is denied under section 502 or 503.

**(b) Tax on unrelated business income and certain other activities.**--An organization exempt from taxation under subsection (a) shall be subject to tax to the extent provided in parts II, III, and VI of this subchapter, but (notwithstanding parts II, III, and VI of this subchapter) shall be considered an organization exempt from income taxes for the purpose of any law which refers to organizations exempt from income taxes.

**(c) List of exempt organizations.**--The following organizations are referred to in subsection (a):

(1) Any corporation organized under Act of Congress which is an instrumentality of the United States but only if such corporation--

(A) is exempt from Federal income taxes--

(i) under such Act as amended and supplemented before July 18, 1984, or

(ii) under this title without regard to any provision of law which is not contained in this title and which is not contained in a revenue Act, or

(B) is described in subsection (l).

(2) Corporations organized for the exclusive purpose of holding title to property, collecting income therefrom, and turning over the entire amount thereof, less expenses, to an organization which itself is exempt under this section. Rules similar to the rules of subparagraph (G) of paragraph (25) shall apply for purposes of this paragraph.

(3) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports

Add. 1

competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office.

**(4)(A)** Civic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare, or local associations of employees, the membership of which is limited to the employees of a designated person or persons in a particular municipality, and the net earnings of which are devoted exclusively to charitable, educational, or recreational purposes.

**(B)** Subparagraph (A) shall not apply to an entity unless no part of the net earnings of such entity inures to the benefit of any private shareholder or individual.

**(5)** Labor, agricultural, or horticultural organizations.

**(6)** Business leagues, chambers of commerce, real-estate boards, boards of trade, or professional football leagues (whether or not administering a pension fund for football players), not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual.

**(7)** Clubs organized for pleasure, recreation, and other nonprofitable purposes, substantially all of the activities of which are for such purposes and no part of the net earnings of which inures to the benefit of any private shareholder.

**(8)** Fraternal beneficiary societies, orders, or associations--

  **(A)** operating under the lodge system or for the exclusive benefit of the members of a fraternity itself operating under the lodge system, and

  **(B)** providing for the payment of life, sick, accident, or other benefits to the members of such society, order, or association or their dependents.

**(9)** Voluntary employees' beneficiary associations providing for the payment of life, sick, accident, or other benefits to the members of such association or their dependents or designated beneficiaries, if no part of the net earnings of such association inures (other than through such payments) to the benefit of any private shareholder or individual. For purposes of providing for the payment of sick and accident benefits to members of such an association and their dependents, the term "dependent" shall include any individual who is a child (as defined in section 152(f)(1)) of a member who as of the end of the calendar year has not attained age 27.

**(10)** Domestic fraternal societies, orders, or associations, operating under the lodge system--

Add. 2

**(A)** the net earnings of which are devoted exclusively to religious, charitable, scientific, literary, educational, and fraternal purposes, and

**(B)** which do not provide for the payment of life, sick, accident, or other benefits.

**(11)** Teachers' retirement fund associations of a purely local character, if--

**(A)** no part of their net earnings inures (other than through payment of retirement benefits) to the benefit of any private shareholder or individual, and

**(B)** the income consists solely of amounts received from public taxation, amounts received from assessments on the teaching salaries of members, and income in respect of investments.

**(12)(A)** Benevolent life insurance associations of a purely local character, mutual ditch or irrigation companies, mutual or cooperative telephone companies, or like organizations; but only if 85 percent or more of the income consists of amounts collected from members for the sole purpose of meeting losses and expenses.

**(B)** In the case of a mutual or cooperative telephone company, subparagraph (A) shall be applied without taking into account any income received or accrued--

**(i)** from a nonmember telephone company for the performance of communication services which involve members of the mutual or cooperative telephone company,

**(ii)** from qualified pole rentals,

**(iii)** from the sale of display listings in a directory furnished to the members of the mutual or cooperative telephone company, or

**(iv)** from the prepayment of a loan under section 306A, 306B, or 311 of the Rural Electrification Act of 1936 (as in effect on January 1, 1987).

**(C)** In the case of a mutual or cooperative electric company, subparagraph (A) shall be applied without taking into account any income received or accrued--

**(i)** from qualified pole rentals, or

**(ii)** from any provision or sale of electric energy transmission services or ancillary services if such services are provided on a nondiscriminatory open access basis under an open access transmission tariff approved or accepted by FERC or under

Add. 3

an independent transmission provider agreement approved or accepted by FERC (other than income received or accrued directly or indirectly from a member),

**(iii)** from the provision or sale of electric energy distribution services or ancillary services if such services are provided on a nondiscriminatory open access basis to distribute electric energy not owned by the mutual or electric cooperative company--

**(I)** to end-users who are served by distribution facilities not owned by such company or any of its members (other than income received or accrued directly or indirectly from a member), or

**(II)** generated by a generation facility not owned or leased by such company or any of its members and which is directly connected to distribution facilities owned by such company or any of its members (other than income received or accrued directly or indirectly from a member),

**(iv)** from any nuclear decommissioning transaction, or

**(v)** from any asset exchange or conversion transaction.

**(D)** For purposes of this paragraph, the term "qualified pole rental" means any rental of a pole (or other structure used to support wires) if such pole (or other structure)--

**(i)** is used by the telephone or electric company to support one or more wires which are used by such company in providing telephone or electric services to its members, and

**(ii)** is used pursuant to the rental to support one or more wires (in addition to the wires described in clause (i)) for use in connection with the transmission by wire of electricity or of telephone or other communications.

For purposes of the preceding sentence, the term "rental" includes any sale of the right to use the pole (or other structure).

**(E)** For purposes of subparagraph (C)(ii), the term "FERC" means the Federal Energy Regulatory Commission and references to such term shall be treated as including the Public Utility Commission of Texas with respect to any ERCOT utility (as defined in section 212(k)(2)(B) of the Federal Power Act (16 U.S.C. 824k(k)(2)(B))).

**(F)** For purposes of subparagraph (C)(iv), the term "nuclear decommissioning transaction" means--

**(i)** any transfer into a trust, fund, or instrument established to pay any nuclear decommissioning costs if the transfer is in connection with the transfer of the mutual or cooperative electric company's interest in a nuclear power plant or nuclear power plant unit,

**(ii)** any distribution from any trust, fund, or instrument established to pay any nuclear decommissioning costs, or

Add. 4

**(iii)** any earnings from any trust, fund, or instrument established to pay any nuclear decommissioning costs.

**(G)** For purposes of subparagraph (C)(v), the term "asset exchange or conversion transaction" means any voluntary exchange or involuntary conversion of any property related to generating, transmitting, distributing, or selling electric energy by a mutual or cooperative electric company, the gain from which qualifies for deferred recognition under section 1031 or 1033, but only if the replacement property acquired by such company pursuant to such section constitutes property which is used, or is to be used, for--

**(i)** generating, transmitting, distributing, or selling electric energy, or

**(ii)** producing, transmitting, distributing, or selling natural gas.

**(H)(i)** In the case of a mutual or cooperative electric company described in this paragraph or an organization described in section 1381(a)(2)(C), income received or accrued from a load loss transaction shall be treated as an amount collected from members for the sole purpose of meeting losses and expenses.

**(ii)** For purposes of clause (i), the term "load loss transaction" means any wholesale or retail sale of electric energy (other than to members) to the extent that the aggregate sales during the recovery period do not exceed the load loss mitigation sales limit for such period.

**(iii)** For purposes of clause (ii), the load loss mitigation sales limit for the recovery period is the sum of the annual load losses for each year of such period.

**(iv)** For purposes of clause (iii), a mutual or cooperative electric company's annual load loss for each year of the recovery period is the amount (if any) by which--

**(I)** the megawatt hours of electric energy sold during such year to members of such electric company are less than

**(II)** the megawatt hours of electric energy sold during the base year to such members.

**(v)** For purposes of clause (iv)(II), the term "base year" means--

**(I)** the calendar year preceding the start-up year, or

**(II)** at the election of the mutual or cooperative electric company, the second or third calendar years preceding the start-up year.

**(vi)** For purposes of this subparagraph, the recovery period is the 7-year period beginning with the start-up year.

Add. 5

**(vii)** For purposes of this subparagraph, the start-up year is the first year that the mutual or cooperative electric company offers nondiscriminatory open access or the calendar year which includes the date of the enactment of this subparagraph, if later, at the election of such company.

**(viii)** A company shall not fail to be treated as a mutual or cooperative electric company for purposes of this paragraph or as a corporation operating on a cooperative basis for purposes of section 1381(a)(2)(C) by reason of the treatment under clause (i).

**(ix)** For purposes of subparagraph (A), in the case of a mutual or cooperative electric company, income received, or accrued, indirectly from a member shall be treated as an amount collected from members for the sole purpose of meeting losses and expenses.

**(13)** Cemetery companies owned and operated exclusively for the benefit of their members or which are not operated for profit; and any corporation chartered solely for the purpose of the disposal of bodies by burial or cremation which is not permitted by its charter to engage in any business not necessarily incident to that purpose and no part of the net earnings of which inures to the benefit of any private shareholder or individual.

**(14)(A)** Credit unions without capital stock organized and operated for mutual purposes and without profit.

**(B)** Corporations or associations without capital stock organized before September 1, 1957, and operated for mutual purposes and without profit for the purpose of providing reserve funds for, and insurance of shares or deposits in--

　**(i)** domestic building and loan associations,

　**(ii)** cooperative banks without capital stock organized and operated for mutual purposes and without profit,

　**(iii)** mutual savings banks not having capital stock represented by shares, or

　**(iv)** mutual savings banks described in section 591(b) [1]

**(C)** Corporations or associations organized before September 1, 1957, and operated for mutual purposes and without profit for the purpose of providing reserve funds for associations or banks described in clause (i), (ii), or (iii) of subparagraph (B); but only if 85 percent or more of the income is attributable to providing such reserve funds and to investments. This subparagraph shall not apply to any corporation or association entitled to exemption under subparagraph (B).

**(15)(A)** Insurance companies (as defined in section 816(a)) other than life (including interinsurers and reciprocal underwriters) if--

　**(i)(I)** the gross receipts for the taxable year do not exceed $600,000, and

Add. 6

**(II)** more than 50 percent of such gross receipts consist of premiums, or

**(ii)** in the case of a mutual insurance company--

**(I)** the gross receipts of which for the taxable year do not exceed $150, 000, and

**(II)** more than 35 percent of such gross receipts consist of premiums.

Clause (ii) shall not apply to a company if any employee of the company, or a member of the employee's family (as defined in section 2032A(e)(2)), is an employee of another company exempt from taxation by reason of this paragraph (or would be so exempt but for this sentence).

**(B)** For purposes of subparagraph (A), in determining whether any company or association is described in subparagraph (A), such company or association shall be treated as receiving during the taxable year amounts described in subparagraph (A) which are received during such year by all other companies or associations which are members of the same controlled group as the insurance company or association for which the determination is being made.

**(C)** For purposes of subparagraph (B), the term "controlled group" has the meaning given such term by section 831(b)(2)(B)(ii), except that in applying section 831(b)(2)(B)(ii) for purposes of this subparagraph, subparagraphs (B) and (C) of section 1563(b)(2) shall be disregarded.

**(16)** Corporations organized by an association subject to part IV of this subchapter or members thereof, for the purpose of financing the ordinary crop operations of such members or other producers, and operated in conjunction with such association. Exemption shall not be denied any such corporation because it has capital stock, if the dividend rate of such stock is fixed at not to exceed the legal rate of interest in the State of incorporation or 8 percent per annum, whichever is greater, on the value of the consideration for which the stock was issued, and if substantially all such stock (other than nonvoting preferred stock, the owners of which are not entitled or permitted to participate, directly or indirectly, in the profits of the corporation, on dissolution or otherwise, beyond the fixed dividends) is owned by such association, or members thereof; nor shall exemption be denied any such corporation because there is accumulated and maintained by it a reserve required by State law or a reasonable reserve for any necessary purpose.

**(17)(A)** A trust or trusts forming part of a plan providing for the payment of supplemental unemployment compensation benefits, if--

**(i)** under the plan, it is impossible, at any time prior to the satisfaction of all liabilities, with respect to employees under the plan, for any part of the corpus or income to be (within the taxable year or thereafter) used for, or diverted to, any purpose other than the providing of supplemental unemployment compensation benefits,

**(ii)** such benefits are payable to employees under a classification which is set forth in the plan and which is found by the Secretary not to be discriminatory in favor of employees who are highly compensated employees (within the meaning of section 414(q)), and

Add. 7

**(iii)** such benefits do not discriminate in favor of employees who are highly compensated employees (within the meaning of section 414(q)). A plan shall not be considered discriminatory within the meaning of this clause merely because the benefits received under the plan bear a uniform relationship to the total compensation, or the basic or regular rate of compensation, of the employees covered by the plan.

**(B)** In determining whether a plan meets the requirements of subparagraph (A), any benefits provided under any other plan shall not be taken into consideration, except that a plan shall not be considered discriminatory--

**(i)** merely because the benefits under the plan which are first determined in a nondiscriminatory manner within the meaning of subparagraph (A) are then reduced by any sick, accident, or unemployment compensation benefits received under State or Federal law (or reduced by a portion of such benefits if determined in a nondiscriminatory manner), or

**(ii)** merely because the plan provides only for employees who are not eligible to receive sick, accident, or unemployment compensation benefits under State or Federal law the same benefits (or a portion of such benefits if determined in a nondiscriminatory manner) which such employees would receive under such laws if such employees were eligible for such benefits, or

**(iii)** merely because the plan provides only for employees who are not eligible under another plan (which meets the requirements of subparagraph (A)) of supplemental unemployment compensation benefits provided wholly by the employer the same benefits (or a portion of such benefits if determined in a nondiscriminatory manner) which such employees would receive under such other plan if such employees were eligible under such other plan, but only if the employees eligible under both plans would make a classification which would be nondiscriminatory within the meaning of subparagraph (A).

**(C)** A plan shall be considered to meet the requirements of subparagraph (A) during the whole of any year of the plan if on one day in each quarter it satisfies such requirements.

**(D)** The term "supplemental unemployment compensation benefits" means only--

**(i)** benefits which are paid to an employee because of his involuntary separation from the employment of the employer (whether or not such separation is temporary) resulting directly from a reduction in force, the discontinuance of a plant or operation, or other similar conditions, and

**(ii)** sick and accident benefits subordinate to the benefits described in clause (i).

**(E)** Exemption shall not be denied under subsection (a) to any organization entitled to such exemption as an association described in paragraph (9) of this subsection merely because such organization provides for the payment of supplemental unemployment benefits (as defined in subparagraph (D)(i)).

**(18)** A trust or trusts created before June 25, 1959, forming part of a plan providing for the payment of benefits under a pension plan funded only by contributions of employees, if--

Add. 8

**(A)** under the plan, it is impossible, at any time prior to the satisfaction of all liabilities with respect to employees under the plan, for any part of the corpus or income to be (within the taxable year or thereafter) used for, or diverted to, any purpose other than the providing of benefits under the plan,

**(B)** such benefits are payable to employees under a classification which is set forth in the plan and which is found by the Secretary not to be discriminatory in favor of employees who are highly compensated employees (within the meaning of section 414(q)),

**(C)** such benefits do not discriminate in favor of employees who are highly compensated employees (within the meaning of section 414(q)). A plan shall not be considered discriminatory within the meaning of this subparagraph merely because the benefits received under the plan bear a uniform relationship to the total compensation, or the basic or regular rate of compensation, of the employees covered by the plan, and

**(D)** in the case of a plan under which an employee may designate certain contributions as deductible--

**(i)** such contributions do not exceed the amount with respect to which a deduction is allowable under section 219(b)(3),

**(ii)** requirements similar to the requirements of section 401(k)(3)(A)(ii) are met with respect to such elective contributions,

**(iii)** such contributions are treated as elective deferrals for purposes of section 402(g), and

**(iv)** the requirements of section 401(a)(30) are met.

For purposes of subparagraph (D)(ii), rules similar to the rules of section 401(k)(8) shall apply. For purposes of section 4979, any excess contribution under clause (ii) shall be treated as an excess contribution under a cash or deferred arrangement.

**(19)** A post or organization of past or present members of the Armed Forces of the United States, or an auxiliary unit or society of, or a trust or foundation for, any such post or organization--

**(A)** organized in the United States or any of its possessions,

**(B)** at least 75 percent of the members of which are past or present members of the Armed Forces of the United States and substantially all of the other members of which are individuals who are cadets or are spouses, widows,[2] widowers, ancestors, or lineal descendants of past or present members of the Armed Forces of the United States or of cadets, and

**(C)** no part of the net earnings of which inures to the benefit of any private shareholder or individual.

Add. 9

**(20)** an [3] organization or trust created or organized in the United States, the exclusive function of which is to form part of a qualified group legal services plan or plans, within the meaning of section 120. An organization or trust which receives contributions because of section 120(c)(5)(C) shall not be prevented from qualifying as an organization described in this paragraph merely because it provides legal services or indemnification against the cost of legal services unassociated with a qualified group legal services plan.

**(21)(A)** A trust or trusts established in writing, created or organized in the United States, and contributed to by any person (except an insurance company) if--

  **(i)** the purpose of such trust or trusts is exclusively--

    **(I)** to satisfy, in whole or in part, the liability of such person for, or with respect to, claims for compensation for disability or death due to pneumoconiosis under Black Lung Acts,

    **(II)** to pay premiums for insurance exclusively covering such liability,

    **(III)** to pay administrative and other incidental expenses of such trust in connection with the operation of the trust and the processing of claims against such person under Black Lung Acts, and

    **(IV)** to pay accident or health benefits for retired miners and their spouses and dependents (including administrative and other incidental expenses of such trust in connection therewith) or premiums for insurance exclusively covering such benefits; and

  **(ii)** no part of the assets of the trust may be used for, or diverted to, any purpose other than--

    **(I)** the purposes described in clause (i),

    **(II)** investment (but only to the extent that the trustee determines that a portion of the assets is not currently needed for the purposes described in clause (i)) in qualified investments, or

    **(III)** payment into the Black Lung Disability Trust Fund established under section 9501, or into the general fund of the United States Treasury (other than in satisfaction of any tax or other civil or criminal liability of the person who established or contributed to the trust).

**(B)** No deduction shall be allowed under this chapter for any payment described in subparagraph (A)(i)(IV) from such trust.

**(C)** Payments described in subparagraph (A)(i)(IV) may be made from such trust during a taxable year only to the extent that the aggregate amount of such payments during such taxable year does not exceed the excess (if any), as of the close of the preceding taxable year, of--

**(i)** the fair market value of the assets of the trust, over

**(ii)** 110 percent of the present value of the liability described in subparagraph (A)(i)(I) of such person.

The determinations under the preceding sentence shall be made by an independent actuary using actuarial methods and assumptions (not inconsistent with the regulations prescribed under section 192(c)(1)(A)) each of which is reasonable and which are reasonable in the aggregate.

**(D)** For purposes of this paragraph:

**(i)** The term "Black Lung Acts" means part C of title IV of the Federal Mine Safety and Health Act of 1977, and any State law providing compensation for disability or death due to that pneumoconiosis.

**(ii)** The term "qualified investments" means--

**(I)** public debt securities of the United States,

**(II)** obligations of a State or local government which are not in default as to principal or interest, and

**(III)** time or demand deposits in a bank (as defined in section 581) or an insured credit union (within the meaning of section 101(7) of the Federal Credit Union Act, 12 U.S.C. 1752(7)) located in the United States.

**(iii)** The term "miner" has the same meaning as such term has when used in section 402(d) of the Black Lung Benefits Act (30 U.S.C. 902(d)).

**(iv)** The term "incidental expenses" includes legal, accounting, actuarial, and trustee expenses.

**(22)** A trust created or organized in the United States and established in writing by the plan sponsors of multiemployer plans if--

**(A)** the purpose of such trust is exclusively--

**(i)** to pay any amount described in section 4223(c) or (h) of the Employee Retirement Income Security Act of 1974, and

**(ii)** to pay reasonable and necessary administrative expenses in connection with the establishment and operation of the trust and the processing of claims against the trust,

**(B)** no part of the assets of the trust may be used for, or diverted to, any purpose other than--

Add. 11

    **(i)** the purposes described in subparagraph (A), or

    **(ii)** the investment in securities, obligations, or time or demand deposits described in clause (ii) of paragraph (21)(D),

  **(C)** such trust meets the requirements of paragraphs (2), (3), and (4) of section 4223(b), 4223(h), or, if applicable, section 4223(c) of the Employee Retirement Income Security Act of 1974, and

  **(D)** the trust instrument provides that, on dissolution of the trust, assets of the trust may not be paid other than to plans which have participated in the plan or, in the case of a trust established under section 4223(h) of such Act, to plans with respect to which employers have participated in the fund.

**(23)** Any association organized before 1880 more than 75 percent of the members of which are present or past members of the Armed Forces and a principal purpose of which is to provide insurance and other benefits to veterans or their dependents.

**(24)** A trust described in section 4049 of the Employee Retirement Income Security Act of 1974 (as in effect on the date of the enactment of the Single-Employer Pension Plan Amendments Act of 1986).

**(25)(A)** Any corporation or trust which--

  **(i)** has no more than 35 shareholders or beneficiaries,

  **(ii)** has only 1 class of stock or beneficial interest, and

  **(iii)** is organized for the exclusive purposes of--

    **(I)** acquiring real property and holding title to, and collecting income from, such property, and

    **(II)** remitting the entire amount of income from such property (less expenses) to 1 or more organizations described in subparagraph (C) which are shareholders of such corporation or beneficiaries of such trust.

For purposes of clause (iii), the term "real property" shall not include any interest as a tenant in common (or similar interest) and shall not include any indirect interest.

**(B)** A corporation or trust shall be described in subparagraph (A) without regard to whether the corporation or trust is organized by 1 or more organizations described in subparagraph (C).

**(C)** An organization is described in this subparagraph if such organization is--

**(i)** a qualified pension, profit sharing, or stock bonus plan that meets the requirements of section 401(a),

**(ii)** a governmental plan (within the meaning of section 414(d)),

**(iii)** the United States, any State or political subdivision thereof, or any agency or instrumentality of any of the foregoing, or

**(iv)** any organization described in paragraph (3).

**(D)** A corporation or trust shall in no event be treated as described in subparagraph (A) unless such corporation or trust permits its shareholders or beneficiaries--

**(i)** to dismiss the corporation's or trust's investment adviser, following reasonable notice, upon a vote of the shareholders or beneficiaries holding a majority of interest in the corporation or trust, and

**(ii)** to terminate their interest in the corporation or trust by either, or both, of the following alternatives, as determined by the corporation or trust:

**(I)** by selling or exchanging their stock in the corporation or interest in the trust (subject to any Federal or State securities law) to any organization described in subparagraph (C) so long as the sale or exchange does not increase the number of shareholders or beneficiaries in such corporation or trust above 35, or

**(II)** by having their stock or interest redeemed by the corporation or trust after the shareholder or beneficiary has provided 90 days notice to such corporation or trust.

**(E)(i)** For purposes of this title--

**(I)** a corporation which is a qualified subsidiary shall not be treated as a separate corporation, and

**(II)** all assets, liabilities, and items of income, deduction, and credit of a qualified subsidiary shall be treated as assets, liabilities, and such items (as the case may be) of the corporation or trust described in subparagraph (A).

**(ii)** For purposes of this subparagraph, the term "qualified subsidiary" means any corporation if, at all times during the period such corporation was in existence, 100 percent of the stock of such corporation is held by the corporation or trust described in subparagraph (A).

**(iii)** For purposes of this subtitle, if any corporation which was a qualified subsidiary ceases to meet the requirements of clause (ii), such corporation shall be treated as a new corporation acquiring all of its assets (and assuming all of its liabilities) immediately before such cessation from the corporation or trust described in subparagraph (A) in exchange for its stock.

**(F)** For purposes of subparagraph (A), the term "real property" includes any personal property which is leased under, or in connection with, a lease of real property, but only if the rent attributable to such personal property (determined under the rules of section 856(d)(1)) for the taxable year does not exceed 15 percent of the total rent for the taxable year attributable to both the real and personal property leased under, or in connection with, such lease.

**(G)(i)** An organization shall not be treated as failing to be described in this paragraph merely by reason of the receipt of any otherwise disqualifying income which is incidentally derived from the holding of real property.

**(ii)** Clause (i) shall not apply if the amount of gross income described in such clause exceeds 10 percent of the organization's gross income for the taxable year unless the organization establishes to the satisfaction of the Secretary that the receipt of gross income described in clause (i) in excess of such limitation was inadvertent and reasonable steps are being taken to correct the circumstances giving rise to such income.

**(26)** Any membership organization if--

**(A)** such organization is established by a State exclusively to provide coverage for medical care (as defined in section 213(d)) on a not-for-profit basis to individuals described in subparagraph (B) through--

**(i)** insurance issued by the organization, or

**(ii)** a health maintenance organization under an arrangement with the organization,

**(B)** the only individuals receiving such coverage through the organization are individuals--

**(i)** who are residents of such State, and

**(ii)** who, by reason of the existence or history of a medical condition--

**(I)** are unable to acquire medical care coverage for such condition through insurance or from a health maintenance organization, or

**(II)** are able to acquire such coverage only at a rate which is substantially in excess of the rate for such coverage through the membership organization,

**(C)** the composition of the membership in such organization is specified by such State, and

**(D)** no part of the net earnings of the organization inures to the benefit of any private shareholder or individual.

Add. 14

A spouse and any qualifying child (as defined in section 24(c)) of an individual described in subparagraph (B) (without regard to this sentence) shall be treated as described in subparagraph (B).

**(27)(A)** Any membership organization if--

**(i)** such organization is established before June 1, 1996, by a State exclusively to reimburse its members for losses arising under workmen's compensation acts,

**(ii)** such State requires that the membership of such organization consist of--

**(I)** all persons who issue insurance covering workmen's compensation losses in such State, and

**(II)** all persons and governmental entities who self-insure against such losses, and

**(iii)** such organization operates as a non-profit organization by--

**(I)** returning surplus income to its members or workmen's compensation policyholders on a periodic basis, and

**(II)** reducing initial premiums in anticipation of investment income.

**(B)** Any organization (including a mutual insurance company) if--

**(i)** such organization is created by State law and is organized and operated under State law exclusively to--

**(I)** provide workmen's compensation insurance which is required by State law or with respect to which State law provides significant disincentives if such insurance is not purchased by an employer, and

**(II)** provide related coverage which is incidental to workmen's compensation insurance,

**(ii)** such organization must provide workmen's compensation insurance to any employer in the State (for employees in the State or temporarily assigned out-of-State) which seeks such insurance and meets other reasonable requirements relating thereto,

**(iii)**(I) the State makes a financial commitment with respect to such organization either by extending the full faith and credit of the State to the initial debt of such organization or by providing the initial operating capital of such organization, and (II) in the case of periods after the date of enactment of this subparagraph, the assets of such organization revert to the State upon dissolution or State law does not permit the dissolution of such organization, and

(iv) the majority of the board of directors or oversight body of such organization are appointed by the chief executive officer or other executive branch official of the State, by the State legislature, or by both.

**(28)** The National Railroad Retirement Investment Trust established under section 15(j) of the Railroad Retirement Act of 1974.

**(29) CO-OP health insurance issuers.**--

**(A) In general.**--A qualified nonprofit health insurance issuer (within the meaning of section 1322 of the Patient Protection and Affordable Care Act) which has received a loan or grant under the CO-OP program under such section, but only with respect to periods for which the issuer is in compliance with the requirements of such section and any agreement with respect to the loan or grant.

**(B) Conditions for exemption.**--Subparagraph (A) shall apply to an organization only if--

(i) the organization has given notice to the Secretary, in such manner as the Secretary may by regulations prescribe, that it is applying for recognition of its status under this paragraph,

(ii) except as provided in section 1322(c)(4) of the Patient Protection and Affordable Care Act, no part of the net earnings of which inures to the benefit of any private shareholder or individual,

(iii) no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, and

(iv) the organization does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office.

**(d) Religious and apostolic organizations.**--The following organizations are referred to in subsection (a): Religious or apostolic associations or corporations, if such associations or corporations have a common treasury or community treasury, even if such associations or corporations engage in business for the common benefit of the members, but only if the members thereof include (at the time of filing their returns) in their gross income their entire pro rata shares, whether distributed or not, of the taxable income of the association or corporation for such year. Any amount so included in the gross income of a member shall be treated as a dividend received.

**(e) Cooperative hospital service organizations.**--For purposes of this title, an organization shall be treated as an organization organized and operated exclusively for charitable purposes, if--

**(1)** such organization is organized and operated solely--

**(A)** to perform, on a centralized basis, one or more of the following services which, if performed on its own behalf by a hospital which is an organization described in subsection (c)(3) and exempt from taxation under subsection (a), would constitute activities in exercising or performing the purpose or function constituting the basis for its exemption: data processing, purchasing (including the purchasing of insurance on a group basis), warehousing, billing and collection (including the purchase of patron accounts receivable on a recourse basis), food, clinical, industrial engineering, laboratory, printing, communications, record center, and personnel (including selection, testing, training, and education of personnel) services; and

**(B)** to perform such services solely for two or more hospitals each of which is--

   **(i)** an organization described in subsection (c)(3) which is exempt from taxation under subsection (a),

   **(ii)** a constituent part of an organization described in subsection (c)(3) which is exempt from taxation under subsection (a) and which, if organized and operated as a separate entity, would constitute an organization described in subsection (c)(3), or

   **(iii)** owned and operated by the United States, a State, the District of Columbia, or a possession of the United States, or a political subdivision or an agency or instrumentality of any of the foregoing;

**(2)** such organization is organized and operated on a cooperative basis and allocates or pays, within 8 ½ months after the close of its taxable year, all net earnings to patrons on the basis of services performed for them; and

**(3)** if such organization has capital stock, all of such stock outstanding is owned by its patrons.

For purposes of this title, any organization which, by reason of the preceding sentence, is an organization described in subsection (c)(3) and exempt from taxation under subsection (a), shall be treated as a hospital and as an organization referred to in section 170(b)(1)(A)(iii).

**(f) Cooperative service organizations of operating educational organizations.**--For purposes of this title, if an organization is--

**(1)** organized and operated solely to hold, commingle, and collectively invest and reinvest (including arranging for and supervising the performance by independent contractors of investment services related thereto) in stocks and securities, the moneys contributed thereto by each of the members of such organization, and to collect income therefrom and turn over the entire amount thereof, less expenses, to such members,

**(2)** organized and controlled by one or more such members, and

**(3)** comprised solely of members that are organizations described in clause (ii) or (iv) of section 170(b)(1)(A)--

   **(A)** which are exempt from taxation under subsection (a), or

**(B)** the income of which is excluded from taxation under section 115(a),

then such organization shall be treated as an organization organized and operated exclusively for charitable purposes.

**(g) Definition of agricultural.**--For purposes of subsection (c)(5), the term "agricultural" includes the art or science of cultivating land, harvesting crops or aquatic resources, or raising livestock.

**(h) Expenditures by public charities to influence legislation.--**

**(1) General rule.**--In the case of an organization to which this subsection applies, exemption from taxation under subsection (a) shall be denied because a substantial part of the activities of such organization consists of carrying on propaganda, or otherwise attempting, to influence legislation, but only if such organization normally--

**(A)** makes lobbying expenditures in excess of the lobbying ceiling amount for such organization for each taxable year, or

**(B)** makes grass roots expenditures in excess of the grass roots ceiling amount for such organization for each taxable year.

**(2) Definitions.**--For purposes of this subsection--

**(A) Lobbying expenditures.**--The term "lobbying expenditures" means expenditures for the purpose of influencing legislation (as defined in section 4911(d)).

**(B) Lobbying ceiling amount.**--The lobbying ceiling amount for any organization for any taxable year is 150 percent of the lobbying nontaxable amount for such organization for such taxable year, determined under section 4911.

**(C) Grass roots expenditures.**--The term "grass roots expenditures" means expenditures for the purpose of influencing legislation (as defined in section 4911(d) without regard to paragraph (1)(B) thereof).

**(D) Grass roots ceiling amount.**--The grass roots ceiling amount for any organization for any taxable year is 150 percent of the grass roots nontaxable amount for such organization for such taxable year, determined under section 4911.

**(3) Organizations to which this subsection applies.**--This subsection shall apply to any organization which has elected (in such manner and at such time as the Secretary may prescribe) to have the provisions of this subsection apply to such organization and which, for the taxable year which includes the date the election is made, is described in subsection (c)(3) and--

**(A)** is described in paragraph (4), and

Add. 18

**(B)** is not a disqualified organization under paragraph (5).

**(4) Organizations permitted to elect to have this subsection apply.**--An organization is described in this paragraph if it is described in--

**(A)** section 170(b)(1)(A)(ii) (relating to educational institutions),

**(B)** section 170(b)(1)(A)(iii) (relating to hospitals and medical research organizations),

**(C)** section 170(b)(1)(A)(iv) (relating to organizations supporting government schools),

**(D)** section 170(b)(1)(A)(vi) (relating to organizations publicly supported by charitable contributions),

**(E)** section 509(a)(2) (relating to organizations publicly supported by admissions, sales, etc.), or

**(F)** section 509(a)(3) (relating to organizations supporting certain types of public charities) except that for purposes of this subparagraph, section 509(a)(3) shall be applied without regard to the last sentence of section 509(a).

**(5) Disqualified organizations.**--For purposes of paragraph (3) an organization is a disqualified organization if it is--

**(A)** described in section 170(b)(1)(A)(i) (relating to churches),

**(B)** an integrated auxiliary of a church or of a convention or association of churches, or

**(C)** a member of an affiliated group of organizations (within the meaning of section 4911(f) (2)) if one or more members of such group is described in subparagraph (A) or (B).

**(6) Years for which election is effective.**--An election by an organization under this subsection shall be effective for all taxable years of such organization which--

**(A)** end after the date the election is made, and

**(B)** begin before the date the election is revoked by such organization (under regulations prescribed by the Secretary).

**(7) No effect on certain organizations.**--With respect to any organization for a taxable year for which--

**(A)** such organization is a disqualified organization (within the meaning of paragraph (5)), or

Add. 19

**(B)** an election under this subsection is not in effect for such organization,

nothing in this subsection or in section 4911 shall be construed to affect the interpretation of the phrase, "no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation," under subsection (c)(3).

**(8) Affiliated organizations.--**

For rules regarding affiliated organizations, see section 4911(f).

**(i) Prohibition of discrimination by certain social clubs.**--Notwithstanding subsection (a), an organization which is described in subsection (c)(7) shall not be exempt from taxation under subsection (a) for any taxable year if, at any time during such taxable year, the charter, bylaws, or other governing instrument, of such organization or any written policy statement of such organization contains a provision which provides for discrimination against any person on the basis of race, color, or religion. The preceding sentence to the extent it relates to discrimination on the basis of religion shall not apply to--

**(1)** an auxiliary of a fraternal beneficiary society if such society--

**(A)** is described in subsection (c)(8) and exempt from tax under subsection (a), and

**(B)** limits its membership to the members of a particular religion, or

**(2)** a club which in good faith limits its membership to the members of a particular religion in order to further the teachings or principles of that religion, and not to exclude individuals of a particular race or color.

**(j) Special rules for certain amateur sports organizations.--**

**(1) In general.**--In the case of a qualified amateur sports organization--

**(A)** the requirement of subsection (c)(3) that no part of its activities involve the provision of athletic facilities or equipment shall not apply, and

**(B)** such organization shall not fail to meet the requirements of subsection (c)(3) merely because its membership is local or regional in nature.

**(2) Qualified amateur sports organization defined.**--For purposes of this subsection, the term "qualified amateur sports organization" means any organization organized and operated exclusively to foster national or international amateur sports competition if such organization is also organized and operated primarily to conduct national or international competition in sports or to support and develop amateur athletes for national or international competition in sports.

**(k) Treatment of certain organizations providing child care.**--For purposes of subsection (c)(3) of this section and sections 170(c)(2), 2055(a)(2), and 2522(a)(2), the term "educational purposes" includes the providing of care of children away from their homes if--

**(1)** substantially all of the care provided by the organization is for purposes of enabling individuals to be gainfully employed, and

**(2)** the services provided by the organization are available to the general public.

**(l) Government corporations exempt under subsection (c)(1).**--For purposes of subsection (c)(1), the following organizations are described in this subsection:

**(1)** The Central Liquidity Facility established under title III of the Federal Credit Union Act (12 U.S.C. 1795 et seq.).

**(2)** The Resolution Trust Corporation established under section 21A of the Federal Home Loan Bank Act.

**(3)** The Resolution Funding Corporation established under section 21B of the Federal Home Loan Bank Act.

**(4)** The Patient-Centered Outcomes Research Institute established under section 1181(b) of the Social Security Act.

**(m) Certain organizations providing commercial-type insurance not exempt from tax.--**

**(1) Denial of tax exemption where providing commercial-type insurance is substantial part of activities.**--An organization described in paragraph (3) or (4) of subsection (c) shall be exempt from tax under subsection (a) only if no substantial part of its activities consists of providing commercial-type insurance.

**(2) Other organizations taxed as insurance companies on insurance business.**--In the case of an organization described in paragraph (3) or (4) of subsection (c) which is exempt from tax under subsection (a) after the application of paragraph (1) of this subsection--

**(A)** the activity of providing commercial-type insurance shall be treated as an unrelated trade or business (as defined in section 513), and

**(B)** in lieu of the tax imposed by section 511 with respect to such activity, such organization shall be treated as an insurance company for purposes of applying subchapter L with respect to such activity.

**(3) Commercial-type insurance.**--For purposes of this subsection, the term "commercial-type insurance" shall not include--

**(A)** insurance provided at substantially below cost to a class of charitable recipients,

**(B)** incidental health insurance provided by a health maintenance organization of a kind customarily provided by such organizations,

**(C)** property or casualty insurance provided (directly or through an organization described in section 414(e)(3)(B)(ii)) by a church or convention or association of churches for such church or convention or association of churches,

**(D)** providing retirement or welfare benefits (or both) by a church or a convention or association of churches (directly or through an organization described in section 414(e)(3)(A) or 414(e)(3)(B)(ii)) for the employees (including employees described in section 414(e)(3)(B)) of such church or convention or association of churches or the beneficiaries of such employees, and

**(E)** charitable gift annuities.

**(4) Insurance includes annuities.**--For purposes of this subsection, the issuance of annuity contracts shall be treated as providing insurance.

**(5) Charitable gift annuity.**--For purposes of paragraph (3)(E), the term "charitable gift annuity" means an annuity if--

**(A)** a portion of the amount paid in connection with the issuance of the annuity is allowable as a deduction under section 170 or 2055, and

**(B)** the annuity is described in section 514(c)(5) (determined as if any amount paid in cash in connection with such issuance were property).

**(n) Charitable risk pools.--**

**(1) In general.**--For purposes of this title--

**(A)** a qualified charitable risk pool shall be treated as an organization organized and operated exclusively for charitable purposes, and

**(B)** subsection (m) shall not apply to a qualified charitable risk pool.

**(2) Qualified charitable risk pool.**--For purposes of this subsection, the term "qualified charitable risk pool" means any organization--

Add. 22

**(A)** which is organized and operated solely to pool insurable risks of its members (other than risks related to medical malpractice) and to provide information to its members with respect to loss control and risk management,

**(B)** which is comprised solely of members that are organizations described in subsection (c)(3) and exempt from tax under subsection (a), and

**(C)** which meets the organizational requirements of paragraph (3).

**(3) Organizational requirements.**--An organization (hereinafter in this subsection referred to as the "risk pool") meets the organizational requirements of this paragraph if--

**(A)** such risk pool is organized as a nonprofit organization under State law provisions authorizing risk pooling arrangements for charitable organizations,

**(B)** such risk pool is exempt from any income tax imposed by the State (or will be so exempt after such pool qualifies as an organization exempt from tax under this title),

**(C)** such risk pool has obtained at least $1,000,000 in startup capital from nonmember charitable organizations,

**(D)** such risk pool is controlled by a board of directors elected by its members, and

**(E)** the organizational documents of such risk pool require that--

**(i)** each member of such pool shall at all times be an organization described in subsection (c)(3) and exempt from tax under subsection (a),

**(ii)** any member which receives a final determination that it no longer qualifies as an organization described in subsection (c)(3) shall immediately notify the pool of such determination and the effective date of such determination, and

**(iii)** each policy of insurance issued by the risk pool shall provide that such policy will not cover the insured with respect to events occurring after the date such final determination was issued to the insured.

An organization shall not cease to qualify as a qualified charitable risk pool solely by reason of the failure of any of its members to continue to be an organization described in subsection (c)(3) if, within a reasonable period of time after such pool is notified as required under subparagraph (E)(ii), such pool takes such action as may be reasonably necessary to remove such member from such pool.

**(4) Other definitions.**--For purposes of this subsection--

Add. 23

(A) **Startup capital.**--The term "startup capital" means any capital contributed to, and any program-related investments (within the meaning of section 4944(c)) made in, the risk pool before such pool commences operations.

(B) **Nonmember charitable organization.**--The term "nonmember charitable organization" means any organization which is described in subsection (c)(3) and exempt from tax under subsection (a) and which is not a member of the risk pool and does not benefit (directly or indirectly) from the insurance coverage provided by the pool to its members.

(o) **Treatment of hospitals participating in provider-sponsored organizations.**--An organization shall not fail to be treated as organized and operated exclusively for a charitable purpose for purposes of subsection (c)(3) solely because a hospital which is owned and operated by such organization participates in a provider-sponsored organization (as defined in section 1855(d) of the Social Security Act), whether or not the provider-sponsored organization is exempt from tax. For purposes of subsection (c)(3), any person with a material financial interest in such a provider-sponsored organization shall be treated as a private shareholder or individual with respect to the hospital.

(p) **Suspension of tax-exempt status of terrorist organizations.**--

(1) **In general.**--The exemption from tax under subsection (a) with respect to any organization described in paragraph (2), and the eligibility of any organization described in paragraph (2) to apply for recognition of exemption under subsection (a), shall be suspended during the period described in paragraph (3).

(2) **Terrorist organizations.**--An organization is described in this paragraph if such organization is designated or otherwise individually identified--

(A) under section 212(a)(3)(B)(vi)(II) or 219 of the Immigration and Nationality Act as a terrorist organization or foreign terrorist organization,

(B) in or pursuant to an Executive order which is related to terrorism and issued under the authority of the International Emergency Economic Powers Act or section 5 of the United Nations Participation Act of 1945 for the purpose of imposing on such organization an economic or other sanction, or

(C) in or pursuant to an Executive order issued under the authority of any Federal law if--

(i) the organization is designated or otherwise individually identified in or pursuant to such Executive order as supporting or engaging in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act) or supporting terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989); and

(ii) such Executive order refers to this subsection.

(3) **Period of suspension.**--With respect to any organization described in paragraph (2), the period of suspension--

**(A)** begins on the later of--

**(i)** the date of the first publication of a designation or identification described in paragraph (2) with respect to such organization, or

**(ii)** the date of the enactment of this subsection, and

**(B)** ends on the first date that all designations and identifications described in paragraph (2) with respect to such organization are rescinded pursuant to the law or Executive order under which such designation or identification was made.

**(4) Denial of deduction.**--No deduction shall be allowed under any provision of this title, including sections 170, 545(b)(2), 556(b)(2), 642(c), 2055, 2106(a)(2), and 2522, with respect to any contribution to an organization described in paragraph (2) during the period described in paragraph (3).

**(5) Denial of administrative or judicial challenge of suspension or denial of deduction.**--Notwithstanding section 7428 or any other provision of law, no organization or other person may challenge a suspension under paragraph (1), a designation or identification described in paragraph (2), the period of suspension described in paragraph (3), or a denial of a deduction under paragraph (4) in any administrative or judicial proceeding relating to the Federal tax liability of such organization or other person.

**(6) Erroneous designation.**--

**(A) In general.**--If--

**(i)** the tax exemption of any organization described in paragraph (2) is suspended under paragraph (1),

**(ii)** each designation and identification described in paragraph (2) which has been made with respect to such organization is determined to be erroneous pursuant to the law or Executive order under which such designation or identification was made, and

**(iii)** the erroneous designations and identifications result in an overpayment of income tax for any taxable year by such organization, credit or refund (with interest) with respect to such overpayment shall be made.

**(B) Waiver of limitations.**--If the credit or refund of any overpayment of tax described in subparagraph (A)(iii) is prevented at any time by the operation of any law or rule of law (including res judicata), such credit or refund may nevertheless be allowed or made if the claim therefor is filed before the close of the 1-year period beginning on the date of the last determination described in subparagraph (A)(ii).

**(7) Notice of suspensions.**--If the tax exemption of any organization is suspended under this subsection, the Internal Revenue Service shall update the listings of tax-exempt organizations and shall publish appropriate notice to taxpayers of such suspension and of the fact that contributions to such organization are not deductible during the period of such suspension.

**(q) Special rules for credit counseling organizations.**--

**(1) In general.**--An organization with respect to which the provision of credit counseling services is a substantial purpose shall not be exempt from tax under subsection (a) unless such organization is described in paragraph (3) or (4) of subsection (c) and such organization is organized and operated in accordance with the following requirements:

  **(A)** The organization--

    **(i)** provides credit counseling services tailored to the specific needs and circumstances of consumers,

    **(ii)** makes no loans to debtors (other than loans with no fees or interest) and does not negotiate the making of loans on behalf of debtors,

    **(iii)** provides services for the purpose of improving a consumer's credit record, credit history, or credit rating only to the extent that such services are incidental to providing credit counseling services, and

    **(iv)** does not charge any separately stated fee for services for the purpose of improving any consumer's credit record, credit history, or credit rating.

  **(B)** The organization does not refuse to provide credit counseling services to a consumer due to the inability of the consumer to pay, the ineligibility of the consumer for debt management plan enrollment, or the unwillingness of the consumer to enroll in a debt management plan.

  **(C)** The organization establishes and implements a fee policy which--

    **(i)** requires that any fees charged to a consumer for services are reasonable,

    **(ii)** allows for the waiver of fees if the consumer is unable to pay, and

    **(iii)** except to the extent allowed by State law, prohibits charging any fee based in whole or in part on a percentage of the consumer's debt, the consumer's payments to be made pursuant to a debt management plan, or the projected or actual savings to the consumer resulting from enrolling in a debt management plan.

  **(D)** At all times the organization has a board of directors or other governing body--

(i) which is controlled by persons who represent the broad interests of the public, such as public officials acting in their capacities as such, persons having special knowledge or expertise in credit or financial education, and community leaders,

(ii) not more than 20 percent of the voting power of which is vested in persons who are employed by the organization or who will benefit financially, directly or indirectly, from the organization's activities (other than through the receipt of reasonable directors' fees or the repayment of consumer debt to creditors other than the credit counseling organization or its affiliates), and

(iii) not more than 49 percent of the voting power of which is vested in persons who are employed by the organization or who will benefit financially, directly or indirectly, from the organization's activities (other than through the receipt of reasonable directors' fees).

(E) The organization does not own more than 35 percent of--

(i) the total combined voting power of any corporation (other than a corporation which is an organization described in subsection (c)(3) and exempt from tax under subsection (a)) which is in the trade or business of lending money, repairing credit, or providing debt management plan services, payment processing, or similar services,

(ii) the profits interest of any partnership (other than a partnership which is an organization described in subsection (c)(3) and exempt from tax under subsection (a)) which is in the trade or business of lending money, repairing credit, or providing debt management plan services, payment processing, or similar services, and

(iii) the beneficial interest of any trust or estate (other than a trust which is an organization described in subsection (c)(3) and exempt from tax under subsection (a)) which is in the trade or business of lending money, repairing credit, or providing debt management plan services, payment processing, or similar services.

(F) The organization receives no amount for providing referrals to others for debt management plan services, and pays no amount to others for obtaining referrals of consumers.

(2) **Additional requirements for organizations described in subsection (c)(3).**--

(A) **In general.**--In addition to the requirements under paragraph (1), an organization with respect to which the provision of credit counseling services is a substantial purpose and which is described in paragraph (3) of subsection (c) shall not be exempt from tax under subsection (a) unless such organization is organized and operated in accordance with the following requirements:

(i) The organization does not solicit contributions from consumers during the initial counseling process or while the consumer is receiving services from the organization.

**(ii)** The aggregate revenues of the organization which are from payments of creditors of consumers of the organization and which are attributable to debt management plan services do not exceed the applicable percentage of the total revenues of the organization.

**(B) Applicable percentage.**--

**(i) In general.**--For purposes of subparagraph (A)(ii), the applicable percentage is 50 percent.

**(ii) Transition rule.**--Notwithstanding clause (i), in the case of an organization with respect to which the provision of credit counseling services is a substantial purpose and which is described in paragraph (3) of subsection (c) and exempt from tax under subsection (a) on the date of the enactment of this subsection, the applicable percentage is--

**(I)** 80 percent for the first taxable year of such organization beginning after the date which is 1 year after the date of the enactment of this subsection, and

**(II)** 70 percent for the second such taxable year beginning after such date, and

**(III)** 60 percent for the third such taxable year beginning after such date.

**(3) Additional requirement for organizations described in subsection (c)(4).**--In addition to the requirements under paragraph (1), an organization with respect to which the provision of credit counseling services is a substantial purpose and which is described in paragraph (4) of subsection (c) shall not be exempt from tax under subsection (a) unless such organization notifies the Secretary, in such manner as the Secretary may by regulations prescribe, that it is applying for recognition as a credit counseling organization.

**(4) Credit counseling services; debt management plan services.**--For purposes of this subsection--

**(A) Credit counseling services.**--The term "credit counseling services" means--

**(i)** the providing of educational information to the general public on budgeting, personal finance, financial literacy, saving and spending practices, and the sound use of consumer credit,

**(ii)** the assisting of individuals and families with financial problems by providing them with counseling, or

**(iii)** a combination of the activities described in clauses (i) and (ii).

**(B) Debt management plan services.**--The term "debt management plan services" means services related to the repayment, consolidation, or restructuring of a consumer's debt, and includes the negotiation with creditors of lower interest rates, the waiver or reduction of fees, and the marketing and processing of debt management plans.

Add. 28

**(r) Additional requirements for certain hospitals.**--

**(1) In general.**--A hospital organization to which this subsection applies shall not be treated as described in subsection (c)(3) unless the organization--

**(A)** meets the community health needs assessment requirements described in paragraph (3),

**(B)** meets the financial assistance policy requirements described in paragraph (4),

**(C)** meets the requirements on charges described in paragraph (5), and

**(D)** meets the billing and collection requirement described in paragraph (6).

**(2) Hospital organizations to which subsection applies.**--

**(A) In general.**--This subsection shall apply to--

**(i)** an organization which operates a facility which is required by a State to be licensed, registered, or similarly recognized as a hospital, and

**(ii)** any other organization which the Secretary determines has the provision of hospital care as its principal function or purpose constituting the basis for its exemption under subsection (c)(3) (determined without regard to this subsection).

**(B) Organizations with more than 1 hospital facility.**--If a hospital organization operates more than 1 hospital facility--

**(i)** the organization shall meet the requirements of this subsection separately with respect to each such facility, and

**(ii)** the organization shall not be treated as described in subsection (c)(3) with respect to any such facility for which such requirements are not separately met.

**(3) Community health needs assessments.**--

**(A) In general.**--An organization meets the requirements of this paragraph with respect to any taxable year only if the organization--

**(i)** has conducted a community health needs assessment which meets the requirements of subparagraph (B) in such taxable year or in either of the 2 taxable years immediately preceding such taxable year, and

Add. 29

(ii) has adopted an implementation strategy to meet the community health needs identified through such assessment.

(B) **Community health needs assessment.**--A community health needs assessment meets the requirements of this paragraph if such community health needs assessment--

(i) takes into account input from persons who represent the broad interests of the community served by the hospital facility, including those with special knowledge of or expertise in public health, and

(ii) is made widely available to the public.

(4) **Financial assistance policy.**--An organization meets the requirements of this paragraph if the organization establishes the following policies:

(A) **Financial assistance policy.**--A written financial assistance policy which includes--

(i) eligibility criteria for financial assistance, and whether such assistance includes free or discounted care,

(ii) the basis for calculating amounts charged to patients,

(iii) the method for applying for financial assistance,

(iv) in the case of an organization which does not have a separate billing and collections policy, the actions the organization may take in the event of non-payment, including collections action and reporting to credit agencies, and

(v) measures to widely publicize the policy within the community to be served by the organization.

(B) **Policy relating to emergency medical care.**--A written policy requiring the organization to provide, without discrimination, care for emergency medical conditions (within the meaning of section 1867 of the Social Security Act (42 U.S.C. 1395dd)) to individuals regardless of their eligibility under the financial assistance policy described in subparagraph (A).

(5) **Limitation on charges.**--An organization meets the requirements of this paragraph if the organization--

(A) limits amounts charged for emergency or other medically necessary care provided to individuals eligible for assistance under the financial assistance policy described in paragraph (4)(A) to not more than the amounts generally billed to individuals who have insurance covering such care, and

**(B)** prohibits the use of gross charges.

**(6) Billing and collection requirements.**--An organization meets the requirement of this paragraph only if the organization does not engage in extraordinary collection actions before the organization has made reasonable efforts to determine whether the individual is eligible for assistance under the financial assistance policy described in paragraph (4)(A).

**(7) Regulatory authority.**--The Secretary shall issue such regulations and guidance as may be necessary to carry out the provisions of this subsection, including guidance relating to what constitutes reasonable efforts to determine the eligibility of a patient under a financial assistance policy for purposes of paragraph (6).

**(s) Cross reference.--**

For nonexemption of Communist-controlled organizations, see section 11(b) of the Internal Security Act of 1950 (64 Stat. 997; 50 U.S.C. 790(b)).

## CREDIT(S)

(Aug. 16, 1954, c. 736, 68A Stat. 163; Mar. 13, 1956, c. 83, § 5(2), 70 Stat. 49; Apr. 22, 1960, Pub.L. 86-428, § 1, 74 Stat. 54; July 14, 1960, Pub.L. 86-667, § 1, 74 Stat. 534; Oct. 16, 1962, Pub.L. 87-834, § 8(d), 76 Stat. 997; Feb. 2, 1966, Pub.L. 89-352, § 1, 80 Stat. 4; Nov. 8, 1966, Pub.L. 89-800, § 6(a), 80 Stat. 1515; June 28, 1968, Pub.L. 90-364, Title I, § 109(a), 82 Stat. 269; Dec. 30, 1969, Pub.L. 91-172, Title I, §§ 101(j)(3) to (6), 121(b)(5)(A), (6)(A), 83 Stat. 526, 527, 541; Dec. 31, 1970, Pub.L. 91-618, § 1, 84 Stat. 1855; Aug. 29, 1972, Pub.L. 92-418, § 1(a), 86 Stat. 656; June 8, 1974, Pub.L. 93-310, § 3(a), 88 Stat. 235; Jan. 3, 1975, Pub.L. 93-625, § 10(c), 88 Stat. 2119; Oct. 4, 1976, Pub.L. 94-455, Title XIII, §§ 1307(a)(1), (d)(1)(A), 1312(a), 1313(a), Title XIX, § 1906(b)(13)(A), Title XXI, §§ 2113(a), 2134(b), 90 Stat. 1720, 1727, 1730, 1834, 1907, 1927; Oct. 20, 1976, Pub.L. 94-568, §§ 1(a), 2(a), 90 Stat. 2697; Feb. 10, 1978, Pub.L. 95-227, § 4(a), 92 Stat. 15; Aug. 15, 1978, Pub.L. 95-345, § 1(a), 92 Stat. 481; Nov. 6, 1978, Pub.L. 95-600, Title VII, § 703(b)(2), (g)(2)(B), 92 Stat. 2939, 2940; Apr. 1, 1980, Pub.L. 96-222, Title I, § 108(b)(2)(B), 94 Stat. 226; Sept. 26, 1980, Pub.L. 96-364, Title II, § 209(a), 94 Stat. 1290; Dec. 24, 1980, Pub.L. 96-601, § 3(a), 94 Stat. 3496; Dec. 28, 1980, Pub.L. 96-605, Title I, § 106(a), 94 Stat. 3523; Dec. 29, 1981, Pub.L. 97-119, Title I, § 103(c)(1), 95 Stat. 1638; Sept. 3, 1982, Pub.L. 97-248, Title II, § 286(a), Title III, § 354(a), (b), 96 Stat. 569, 640, 641; Jan. 12, 1983, Pub.L. 97-448, Title III, § 306(b)(5), 96 Stat. 2406; July 18, 1984, Pub.L. 98-369, Div. A, Title X, §§ 1032(a), 1079, Div. B, Title VIII, § 2813(b), 98 Stat. 1033, 1056, 1206; Apr. 7, 1986, Pub.L. 99-272, Title XI, § 11012(b), 100 Stat. 260; Oct. 22, 1986, Pub.L. 99-514, Title X, §§ 1012(a), 1024(b), Title XI, §§ 1109(a), 1114(b) (14), Title XVI, § 1603(a), Title XVIII, §§ 1879(k)(1), 1899A(15), 100 Stat. 2390, 2406, 2435, 2451, 2768, 2909, 2959; Dec. 22, 1987, Pub.L. 100-203, Title X, § 10711(a)(2), 101 Stat. 1330-464; Nov. 10, 1988, Pub.L. 100-647, Title I, §§ 1010(b)(4), 1011(c)(7)(D), 1016(a)(1)(A), (2) to (4), 1018(u)(14), (15), (34), Title II, § 2003(a)(1), (2), Title VI, § 6202(a), 102 Stat. 3451, 3458, 3573, 3574, 3590, 3592, 3597 to 3598, 3730; Aug. 9, 1989, Pub.L. 101-73, Title XIV, § 1402(a), 103 Stat. 550; Oct. 24, 1992, Pub.L. 102-486, Title XIX, § 1940(a), 106 Stat. 3034; Aug. 10, 1993, Pub.L. 103-66, Title XIII, § 13146(a), (b), 107 Stat. 443; July 30, 1996, Pub.L. 104-168, Title XIII, § 1311(b)(1), 110 Stat. 1478; Aug. 20, 1996, Pub.L. 104-188, Title I, §§ 1114(a), 1704(j)(5), 110 Stat. 1759, 1882; Aug. 21, 1996, Pub.L. 104-191, Title III, §§ 341(a), 342(a), 110 Stat. 2070; Aug. 5, 1997, Pub.L. 105-33, Title IV, § 4041(a), 111 Stat. 360; Aug. 5, 1997, Pub.L. 105-34, Title I, § 101(c), Title IX, §§ 963(a), (b), 974(a), 111 Stat. 799, 892, 898; July 22, 1998, Pub.L. 105-206, Title VI, § 6023(c), (7), 112 Stat. 825; June 7, 2001, Pub.L. 107-16, Title VI, § 611(d)(3)(C), 115 Stat. 98; Dec. 21, 2001, Pub.L. 107-90, Title II, § 202, 115 Stat. 890; Nov. 11, 2003, Pub.L. 108-121, Title I, § 105(a), 108(a), 117 Stat. 1338, 1339; Apr. 10, 2004, Pub.L. 108-218, Title II, § 206(a), (b), 118 Stat. 610, 611; Oct. 22, 2004, Pub.L. 108-357, Title III, § 319(a), (b), 118 Stat. 1470, 1471; Aug. 8, 2005, Pub.L. 109-58, Title XIII, § 1304(a), (b), 119 Stat. 997; Dec. 21, 2005, Pub.L. 109-135, Title IV, § 412(bb), (cc), 119 Stat. 2639; Aug. 17, 2006, Pub.L. 109-280, Title VIII, § 862(a), Title XII, § 1220(a), 120 Stat. 1021, 1086; Mar. 23, 2010, Pub.L. 111-148, Title I,

§ 1322(h)(1), Title VI, § 6301(f), Title IX, § 9007(a), Title X, § 10903(a), 124 Stat. 191, 747, 855, 1016; Mar. 30, 2010, Pub.L. 111-152, Title I, § 1004(d)(4), 124 Stat. 1035.)

Notes of Decisions (659)

Footnotes

1        So in original. Probably should be followed by a period.

2        So in original. The second comma probably should not appear.

3        So in original. Probably should be "An".

26 U.S.C.A. § 501, 26 USCA § 501

Current through P.L. 113-13 approved 6-3-13

---

**End of Document**                                      © 2013 Thomson Reuters. No claim to original U.S. Government Works.

Add. 32

West's Annotated California Codes
    Business and Professions Code (Refs & Annos)
        Division 7. General Business Regulations (Refs & Annos)
            Part 2. Preservation and Regulation of Competition (Refs & Annos)
                Chapter 5. Enforcement (Refs & Annos)

West's Ann.Cal.Bus. & Prof.Code § 17200

§ 17200. Unfair competition; prohibited activities

Currentness

As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code.

**Credits**

(Added by Stats.1977, c. 299, p. 1202, § 1. Amended by Stats.1992, c. 430 (S.B.1586), § 2.)

**Editors' Notes**

**VALIDITY**

*This section is recognized as preempted by federal law, as to credit reporting agencies, in Howard v. Blue Ridge Bank, N.D.Cal.2005, 371 F.Supp.2d 1139.*

*This statute was held preempted, as to claims involving interstate sales of wholesale electricity, by the Federal Power Act, under which the Federal Energy Regulatory Commission was granted exclusive jurisdiction over interstate sales of wholesale electricity, in the decision of In re Enron Corp., 2005, 328 B.R. 75.*

*This section was held preempted by the Home Owners' Loan Act (HOLA), in the case of Silvas v. E\*Trade Mortg. Corp., S.D.Cal.2006, 421 F.Supp.2d 1315, affirmed 514 F.3d 1001.*

*This section was held preempted by the Fair Credit Reporting Act (FCRA) with respect to alleged injuries arising from the reporting of credit information to a credit reporting agency in the decision of Johnson v. JP Morgan Chase Bank DBA Chase Manhattan, E.D.Cal.2008, 536 F.Supp.2d 1207.*

*This section was held preempted by the Federal Communications Act of 1934 with respect to rates and market entry of commercial mobile service providers in the decision of In re Apple iPhone 3G Products Liability Litigation, N.D.Cal.2010, 728 F.Supp.2d 1065, leave to file for reconsideration denied 2010 WL 3119789.*

Notes of Decisions (3075)

West's Ann. Cal. Bus. & Prof. Code § 17200, CA BUS & PROF § 17200
Current with urgency legislation through Ch. 70 of 2013 Reg.Sess,

West's Annotated California Codes
Business and Professions Code (Refs & Annos)
Division 7. General Business Regulations (Refs & Annos)
Part 3. Representations to the Public (Refs & Annos)
Chapter 1. Advertising (Refs & Annos)
Article 1. False Advertising in General (Refs & Annos)

West's Ann.Cal.Bus. & Prof.Code § 17500

§ 17500. False or misleading statements; penalty

Currentness

It is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this state, or to make or disseminate or cause to be made or disseminated from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement, concerning that real or personal property or those services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading, or for any person, firm, or corporation to so make or disseminate or cause to be so made or disseminated any such statement as part of a plan or scheme with the intent not to sell that personal property or those services, professional or otherwise, so advertised at the price stated therein, or as so advertised. Any violation of the provisions of this section is a misdemeanor punishable by imprisonment in the county jail not exceeding six months, or by a fine not exceeding two thousand five hundred dollars ($2,500), or by both that imprisonment and fine.

**Credits**

(Added by Stats.1941, c. 63, p. 727, § 1. Amended by Stats.1955, c. 1358, p. 2443, § 1; Stats.1976, c. 1125, p. 5029, § 4; Stats.1979, c. 492, p. 1660, § 1; Stats.1998, c. 599 (S.B.597), § 2.5.)

**Editors' Notes**

### VALIDITY

*This section was held preempted by the Home Owners' Loan Act (HOLA), in the case of Silvas v. E\*Trade Mortg. Corp., S.D.Cal.2006, 421 F.Supp.2d 1315, affirmed 514 F.3d 1001.*

*This section was limited on preemption grounds by the National Bank Act (NBA) in its application to unfair competition and false advertising claims in the decision of In re Countrywide Financial Corp. Mortg. Marketing and Sales Practices Litigation, S.D.Cal.2009, 601 F.Supp.2d 1201.*

Notes of Decisions (456)

West's Ann. Cal. Bus. & Prof. Code § 17500, CA BUS & PROF § 17500
Current with urgency legislation through Ch. 70 of 2013 Reg.Sess,

West's District of Columbia Code Annotated 2001 Edition
Division V. Local Business Affairs
Title 28. Commercial Instruments and Transactions. (Refs & Annos)
Subtitle II. Other Commercial Transactions.
Chapter 39. Consumer Protection Procedures.

DC ST § 28-3901
Formerly cited as DC ST 1981 §28-3901

§ 28-3901. Definitions and purposes.

Effective: April 23, 2013
Currentness

(a) As used in this chapter, the term-

(1) "person" means an individual, firm, corporation, partnership, cooperative, association, or any other organization, legal entity, or group of individuals however organized;

(2) "consumer" means:

(A) When used as a noun, a person who, other than for purposes of resale, does or would purchase, lease (as lessee), or receive consumer goods or services, including as a co-obligor or surety, or does or would otherwise provide the economic demand for a trade practice;

(B) When used as an adjective, describes anything, without exception, that:

(i) A person does or would purchase, lease (as lessee), or receive and normally use for personal, household, or family purposes; or

(ii) A person described in § 28-3905(k)(1)(B) or (C) purchases or receives in order to test or evaluate qualities pertaining to use for personal, household, or family purposes.

(3) "merchant" means a person, whether organized or operating for profit or for a nonprofit purpose, who in the ordinary course of business does or would sell, lease (to), or transfer, either directly or indirectly, consumer goods or services, or a person who in the ordinary course of business does or would supply the goods or services which are or would be the subject matter of a trade practice;

(4) "complainant" means one or more consumers who took part in a trade practice, or one or more persons acting on behalf of (not the legal representative or other counsel of) such consumers, or the successors or assigns of such consumers or persons, once such consumers or persons complain to the Department about the trade practice;

Add. 35

(5) "respondent" means one or more merchants alleged by a complainant to have taken part in or carried out a trade practice, or the successors or assigns of such merchants, and includes other persons who may be deemed legally responsible for the trade practice;

(6) "trade practice" means any act which does or would create, alter, repair, furnish, make available, provide information about, or, directly or indirectly, solicit or offer for or effectuate, a sale, lease or transfer, of consumer goods or services;

(7) "goods and services" means any and all parts of the economic output of society, at any stage or related or necessary point in the economic process, and includes consumer credit, franchises, business opportunities, real estate transactions, and consumer services of all types;

(8) "Department" means the Department of Consumer and Regulatory Affairs;

(9) "Director" means the Director of the Department of Consumer and Regulatory Affairs;

(10) "Chief of the Office of Compliance" means the senior administrative officer of the Department's Office of Compliance who is delegated the responsibility of carrying out certain duties specified under section 28-3905;

(11) "Office of Adjudication" means the Department's Office of Adjudication which is responsible for carrying out certain duties specified under section 28-3905;

(12) "Office of Consumer Protection" means the Department's Office of Consumer Protection which is responsible for carrying out the statutory requirements set forth in § 28-3906; and

(13) "Committee" means the Advisory Committee on Consumer Protection which is responsible for carrying out the statutory requirements set forth in section 28-3907.

(14) "nonprofit organization" means a person who:

    (A) Is not an individual; and

    (B) Is neither organized nor operating, in whole or in significant part, for profit.

(15) "public interest organization" means a nonprofit organization that is organized and operating, in whole or in part, for the purpose of promoting interests or rights of consumers.

(b) The purposes of this chapter are to:

Add. 36

(1) assure that a just mechanism exists to remedy all improper trade practices and deter the continuing use of such practices;

(2) promote, through effective enforcement, fair business practices throughout the community; and

(3) educate consumers to demand high standards and seek proper redress of grievances.

(c) This chapter shall be construed and applied liberally to promote its purpose. This chapter establishes an enforceable right to truthful information from merchants about consumer goods and services that are or would be purchased, leased, or received in the District of Columbia.

**Credits**

(July 22, 1976, D.C. Law 1-76, § 2, 23 DCR 1185; enacted, Sept. 6, 1980, D.C. Law 3-85, § 3(a), (d), 27 DCR 2900; Mar. 8, 1991, D.C. Law 8-234, § 2(b), 38 DCR 296; Feb. 5, 1994, D.C. Law 10-68, § 27(b), 40 DCR 6311; Apr. 9, 1997, D.C. Law 11-255, § 27(u), 44 DCR 1271; Oct. 19, 2000, D.C. Law 13-172, § 1402(b), 47 DCR 6308; Oct. 20, 2005, D.C. Law 16-33, § 2032(b), 52 DCR 7503; June 12, 2007, D.C. Law 17-4, § 2(a), 54 DCR 4085; Apr. 23, 2013, D.C. Law 19-282, § 2(b)(1), 60 DCR 2132.)

Notes of Decisions (99)

Copyright © 2012 By the District of Columbia. Content previously published in the District of Columbia Official Code, 2001 Edition is used with permission. Copyright © 2013 Thomson Reuters.
DC CODE § 28-3901
Current through June 3, 2013

West's District of Columbia Code Annotated 2001 Edition
  Division V. Local Business Affairs
    Title 28. Commercial Instruments and Transactions. (Refs & Annos)
      Subtitle II. Other Commercial Transactions.
        Chapter 39. Consumer Protection Procedures.

DC ST § 28-3905
Formerly cited as DC ST 1981 §28-3905

§ 28-3905. Complaint procedures.

Effective: April 23, 2013
Currentness

(a) A case is begun by filing with the Department a complaint plainly describing a trade practice and stating the complainant's (and, if different, the consumer's) name and address, the name and address (if known) of the respondent, and such other information as the Director may require. The complaint must be in or reduced by the Director to writing. The filing of a complaint with the Department shall toll the periods for limitation of time for bringing an action as set out in section 12-301 until the complaint has been resolved through an administrative order, consent decree, or dismissal in accordance with this section or until an opportunity to arbitrate has been provided in Chapter 5 of Title 50.

(b)(1) Except as provided in paragraph (2) of this subsection, the Director shall investigate each such complaint and determine:

    (A) What trade practice actually occurred; and

    (B) Whether the trade practice which occurred violates any statute, regulation, rule of common law, or other law of the District of Columbia.

  (2) The Director may, in his or her discretion, decline to prosecute certain cases as necessary to manage the Department's caseload and control program costs.

(b-1) In carrying out an investigation and determination pursuant to subsection (b) of this section, the Director shall consult the respondent and such other available sources of information, and make such other efforts, as are appropriate and necessary to carry out such duties.

(c) If at any time the Director finds that the trade practice complained of may, in whole or in part, be a violation of law other than a law of the District of Columbia or a law within the jurisdiction of the Department, the Director may in writing so inform the complainant, respondent and officials of the District, the United States, or other jurisdiction, who would properly enforce such law.

(d) The director shall determine that there are, or are not, reasonable grounds to believe that a trade practice, in violation of a law of the District of Columbia within the jurisdiction of the Department, has occurred in any part or all of the case. The Director may find that there are not such reasonable grounds for any of the following reasons:

Add. 38

(1) any violation of law which may have occurred is of a law not of the District of Columbia or not within the jurisdiction of the Department, or occurred more than three years prior to the filing of the complaint;

(2) in case paragraph (1) of this subsection does not apply, no trade practice occurred in violation of any law of the District;

(3) the respondent cannot be identified or located, or would not be subject to the personal jurisdiction of a District of Columbia court;

(4) the complainant, to the Director's knowledge, no longer seeks redress in the case;

(5) the complainant and respondent, to the Director's knowledge, have themselves reached an agreement which settles the case; or

(6) the complainant can no longer be located.

(d-1) The Director may dismiss any part or all of a case to which one or more of the reasons stated in subsection (d) of this section apply. The Director shall inform all parties in writing of the determination, and, if any part or all of the case is dismissed, shall specify which of the reasons in this subsection applies to which part of the case, and such other detail as is necessary to explain the dismissal.

(e) The Director may attempt to settle, in accordance with subsection (h) of this section, each case for which reasonable grounds are found in accordance with subsection (d-1) of this section. After the Director's determination as to whether the complaint is within the Department's jurisdiction, in accordance with subsection (d-1) of this section, the Director shall:

(1) effect a consent decree;

(2) dismiss the case in accordance with subsection (h)(2) of this section;

(3) through the Chief of the Office of Compliance present to the Office of Adjudication, with copies to all parties, a brief and plain statement of each trade practice that occurred in violation of District law, the law the trade practice violates, and the relief sought from the Office of Adjudication for violation; or

(4) notify all parties of another action taken, with the reasons therefor stated in detail and supported by fact. Reasons may include:

(A) any reason listed in subsections (d)(1) through (d)(6) of this section; and

(B) that the presentation of a charge to the Office of Adjudication would not serve the purposes of this chapter.

(5) Repealed.

(f) When the case is transmitted to the Office of Adjudication, the Chief of the Office of Compliance shall sign, and serve the respondent, the Department's summons to answer or appear before the Office of Adjudication. Not less than 15 nor more than 90 days after such transmittal, the case shall be heard. The case shall proceed under section 10 of the District of Columbia Administrative Procedure Act (section 2-509). The Office of Adjudication may, without delaying its hearing or decision, attempt to settle the case pursuant to subsection (h) of this section, and has discretion to permit any stipulation or consent decree the parties agree to. The Director shall be a party on behalf of the complainant. Applications to intervene shall be decided as may be proper or required by law or rule. Reasonable discovery shall be freely allowed. Any finding or decision may be modified or set aside, in whole or part, before a notice of appeal is filed in the case, or the time to so file has run out.

(g) If, after hearing the evidence, the Office of Adjudication decides a trade practice occurred in which the respondent violated a law of the District of Columbia within the jurisdiction of the Department, such Office of Adjudication shall issue an order which:

(1) shall require the respondent to cease and desist from such conduct;

(2) shall, if such Office of Adjudication also decides that the consumer has been injured by the trade practice, order redress through contract damages, restitution for money, time, property or other value received from the consumer by the respondent, or through rescission, reformation, repair, replacement, or other just method;

(3) shall state the number of trade practices the respondent performed in violation of law;

(4) shall, absent good cause found by the Office of Adjudication, require the respondent to pay the Department its costs for investigation, negotiation, and hearing;

(5) may include such other findings, stipulations, conditions, directives, and remedies including punitive damages, treble damages, or reasonable attorney's fees, as are reasonable and necessary to identify, correct, or prevent the conduct which violated District law; and

(6) may be based, in whole or part, upon a violation of a law establishing or regulating a type of business, occupational or professional license or permit, and may refer the case for further proceedings to an appropriate board or commission, but may not suspend or revoke a license or permit if there is a board or commission which oversees the specific type of license or permit.

(h)(1) At any time after reasonable grounds are found in accordance with subsection (d) of this section, the respondent, the Department (represented by (i) the Director prior to transmittal to the Office of Adjudication and after an order issued pursuant to subsection (f) of this section has been appealed, and (ii) the Office of Adjudication after transmittal to the Office of Adjudication and prior to such appeal), and the complainant, may agree to settle all or part of the case by a written consent decree which may:

(A) include any provision described in subsection (g)(2) through (6) of this section;

(B) not contain an assertion that the respondent has violated a law;

(C) contain an assurance that the respondent will refrain from a trade practice;

(D) bar the Department from further action in the case, or a part thereof; or

(E) contain such other provisions or considerations as the parties agree to.

(2) The representative of the Department shall administer the settlement proceedings, and may utilize the good offices of the Advisory Committee on Consumer Protection. All settlement proceedings shall be informal and include all interested parties and such representatives as the parties may choose to represent them. Such proceedings shall be private, and nothing said or done, except a consent decree, shall be made public by the Department, any party, or the Advisory Committee, unless the parties agree thereto in writing. The representative of the Department may call settlement conferences. For persistent and unreasonable failure by the complainant to attend such conferences or to take part in other settlement proceedings, the Director, prior to transmittal to the Office of Adjudication, may dismiss the case.

(3) A consent decree described in paragraph (1) of this subsection may be modified by agreement of the Department, complainant and respondent.

(i)(1) An aggrieved party may appeal to the District of Columbia Court of Appeals after:

(A) the Office of Adjudication decides a case pursuant to subsection (f) of this section;

(B) all parts of a case have been dismissed by operation of subsection (d) or (e) of this section; or

(C) the Director dismisses an entire case in accordance with subsection (h)(2) of this section.

(1A) Such appeals shall be conducted in accordance with the procedures and standards of section 11 of the District of Columbia Administrative Procedure Act (section 2-510), and take into account the procedural duties placed upon the Department in this section and all actions taken by the Department in the case.

(2) An aggrieved party may appeal any ruling of the Office of Adjudication under subsection (j) of this section to the Superior Court of the District of Columbia.

(3)(A) Any person found to have executed a trade practice in violation of a law of the District of Columbia within the jurisdiction of the Department:

Add. 41

(i) shall be liable to the Department for a civil penalty of not exceeding $1000.00 for each violation enumerated in an order pursuant to subsection (g)(3) of this section; and

(ii) may be assessed and made liable to the Department for a civil penalty of not exceeding $1000.00 for each violation or failure to adhere to a provision, of an order described in subsection (f), (g), or (j) of this section or a consent decree described in subsection (h) of this section.

(B) The Department, the complainant, or the respondent may sue in the Superior Court of the District of Columbia for a remedy, enforcement, or assessment or collection of a civil penalty, when any violation, or failure to adhere to a provision of a consent decree described in subsection (h) of this section, or an order described in subsection (f), (g), or (j) of this section, has occurred. The Department shall sue in that Court for assessment of a civil penalty when an order described in subsection (g) of this section has been issued and become final. A failure by the Department or any person to file suit or prosecute under this subparagraph in regard to any provision or violation of a provision of any consent decree or order, shall not constitute a waiver of such provision or any right under such provision. The Court shall levy the appropriate civil penalties, and may order, if supported by evidence, temporary, preliminary, or permanent injunctions, damages, treble damages, reasonable attorney's fees, consumer redress, or other remedy. The Court may set aside the final order if the Court determines that the Department of Consumer and Regulatory Affairs lacked jurisdiction over the respondent or that the complaint was frivolous. If, after considering an application to set aside an order of the Department of Consumer and Regulatory Affairs, the Court determines that the application was frivolous or that the Department of Consumer and Regulatory Affairs lacked jurisdiction, the Court shall award reasonable attorney's fees.

(C) Application to the Court to enforce an order shall be made at no cost to the District of Columbia or the complainant.

(4) The Corporation Counsel shall represent the Department in all proceedings described in this subsection.

(j) If, at any time before notice of appeal from a decision made according to subsection (f) of this section is filed or the time to so file has run out, the Director believes that legal action is necessary to preserve the subject matter of the case, to prevent further injury to any party, or to enable the Department ultimately to order a full and fair remedy in the case, the Chief of the Office of Compliance shall present the matter to the Office of Adjudication, which may issue a cease and desist order to take effect immediately, or grant such other relief as will assure a just adjudication of the case, in accordance with such beliefs of the Director which are substantiated by evidence. The Office of Adjudication's ruling may be appealed to court within 7 days of notice thereof on the Director, respondent, and complainant.

(k)(1)(A) A consumer may bring an action seeking relief from the use of a trade practice in violation of a law of the District.

(B) An individual may, on behalf of that individual, or on behalf of both the individual and the general public, bring an action seeking relief from the use of a trade practice in violation of a law of the District when that trade practice involves consumer goods or services that the individual purchased or received in order to test or evaluate qualities pertaining to use for personal, household, or family purposes.

(C) A nonprofit organization may, on behalf of itself or any of its members, or on any such behalf and on behalf of the general public, bring an action seeking relief from the use of a trade practice in violation of a law of the District, including

Add. 42

a violation involving consumer goods or services that the organization purchased or received in order to test or evaluate qualities pertaining to use for personal, household, or family purposes.

(D)(i) Subject to sub-subparagraph (ii) of this subparagraph, a public interest organization may, on behalf of the interests of a consumer or a class of consumers, bring an action seeking relief from the use by any person of a trade practice in violation of a law of the District if the consumer or class could bring an action under subparagraph (A) of this paragraph for relief from such use by such person of such trade practice.

(ii) An action brought under sub-subparagraph (i) of this subparagraph shall be dismissed if the court determines that the public interest organization does not have sufficient nexus to the interests involved of the consumer or class to adequately represent those interests.

(2) Any claim under this chapter shall be brought in the Superior Court of the District of Columbia and may recover or obtain the following remedies:

(A) Treble damages, or $1,500 per violation, whichever is greater, payable to the consumer;

(B) Reasonable attorney's fees;

(C) Punitive damages;

(D) An injunction against the use of the unlawful trade practice;

(E) In representative actions, additional relief as may be necessary to restore to the consumer money or property, real or personal, which may have been acquired by means of the unlawful trade practice; or

(F) Any other relief which the court determines proper.

(3) Any written decision made pursuant to subsection (f) of this section is admissible as prima facie evidence of the facts stated therein.

(4) If a merchant files in any court a suit seeking to collect a debt arising out of a trade practice from which has also arisen a complaint filed with the Department by the defendant in the suit either before or after the suit was filed, the court shall dismiss the suit without prejudice, or remand it to the Department.

(5) An action brought by a person under this subsection against a nonprofit organization shall not be based on membership in such organization, membership services, training or credentialing activities, sale of publications of the nonprofit organization, medical or legal malpractice, or any other transaction, interaction, or dispute not arising from the purchase or sale of consumer goods or services in the ordinary course of business.

Add. 43

(l) The Director and Office of Adjudication may use any power granted to the Department in section 28-3903, as each reasonably deems will aid in carrying out the functions assigned to each in this section. Each, while holding the primary responsibility of the Department for decision in a certain case, may join such case with others then before the Department. No case may be disposed of in a manner not expressly authorized in this section. Every complaint case filed with the Department and within its jurisdiction shall be decided in accordance with the procedures and sanctions of this section, notwithstanding that a given trade practice, at issue in the case, may be governed in whole or in part by another law which has different enforcement procedures and sanctions.

(m)(1) Whenever requested, the Department will make available to the complainant and respondent an explanation, and any other information helpful in understanding, the provisions of any consent decree to which the Department agrees, and any order or decision which the Department makes.

(2) The Director shall maintain a public index for all the cases on which the Department has made a final action or a consent decree, organized by:

(A) name of complainant;

(B) name of respondent;

(C) industry of the merchant involved;

(D) nature of the violation of District law alleged or found to exist (for example, subsection of section 28-3904 involved, or section of a licensing law involved);

(E) final disposition.

(n) There shall be established a Consumer Protection Education Fund ("Fund"). All monies awarded to or paid to the Department by operation of this section, including final judgements, consent decrees, or settlements reduced to final judgements, shall be paid into the Fund in order to further the purpose of this chapter as enumerated in § 28-3901.

(o) Every complaint case that is before the Department in accordance with this section shall proceed in confidence, except for hearings and meetings before the Office of Adjudication, until the Department makes a final action or a consent decree.

(p) The Director may file a complaint in accordance with subsection (a) of this section, on behalf of one or more consumers or as complainant, based on evidence and information gathered by the Department in carrying out this chapter. Persons not parties to but directly or indirectly intended as beneficiaries of an order described in subsection (f), (g), or (j) of this section, or a consent decree described in subsection (h) of this section, arising out of a complaint filed by the Director, may enforce such order or decree in the manner provided in subsection (i)(3)(B) of this section.

Add. 44

(q) At any hearing pursuant to subsection (f) or (j) of this section, a witness has the right to be advised by counsel present at such hearing. In any process under this section, the complainant and respondent may have legal or other counsel for representation and advice.

(r) All cases for which complaints were filed before March 5, 1981, may be presented to and heard by the Office of Adjudication notwithstanding the time limits previously provided in section 28-3905(d), 28-3905(e), and 28-3905(f) for the investigation and transmittal of cases to the Office of Adjudication, and for the hearing of cases by the Office of Adjudication.

**Credits**

(July 22, 1976, D.C. Law 1-76, § 6, 23 DCR 1185; June 11, 1977, D.C. Law 2-8, § 4(b), 24 DCR 726; enacted, Sept. 6, 1980, D.C. Law 3-85, § 3(a), (d), 27 DCR 2900; Mar. 5, 1981, D.C. Law 3-159, §§ 2(b), (c), 3, 27 DCR 5147; Mar. 8, 1991, D.C. Law 8-234, § 2(f), 38 DCR 296; Feb. 5, 1994, D.C. Law 10-68, § 27(f), 40 DCR 6311; Apr. 9, 1997, D.C. Law 11-255, § 27(y), 44 DCR 1271; Apr. 29, 1998, D.C. Law 12-86, § 1301(c), 45 DCR 1172; Oct. 19, 2000, D.C. Law 13-172, § 1402(d), 47 DCR 6308; Oct. 20, 2005, D.C. Law 16-33, § 2032(d), 52 DCR 7503; June 12, 2007, D.C. Law 17-4, § 2(b), 54 DCR 4085; Apr. 23, 2013, D.C. Law 19-282, § 2(b)(3), 60 DCR 2132.)

Notes of Decisions (129)

Copyright © 2012 By the District of Columbia. Content previously published in the District of Columbia Official Code, 2001 Edition is used with permission. Copyright © 2013 Thomson Reuters
DC CODE § 28-3905
Current through June 3, 2013

2011 WL 5884209
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court,
E.D. New York.

VERTEX CONSTRUCTION CORP., Plaintiff,

v.

T.F.J. FITNESS L.L.C. d/b/a Retro
Fitness, Retrofitness LLC, Robert
Berlin, and Edward Levin, Defendants.

No. 10–CV–683 (CBA)(ALC).    |    Nov. 23, 2011.

**Attorneys and Law Firms**

Andrew Plotkin, Alan Gary Karmazin, Angiuli Katkin &
Gentile, LLP, Staten Island, NY, for Plaintiff.

Robert P. Sharron, Robert P. Sharron & Associates, P.C.,
New York, NY, Kevin M. Eppinger, Justin M. Klein, Marks
& Klein, LLP, Red Bank, NJ, for Defendants.

**Opinion**

### MEMORANDUM & ORDER

AMON, Chief Judge.

 **\*1**  One of the defendants in the above-captioned case,
Retrofitness LLC ("Retrofitness")—a franchisor whose
franchisee entered into and allegedly breached a contract
with the plaintiff to build out a fitness center in Margate,
Florida—has moved to dismiss the plaintiff's claim for unjust
enrichment. The unjust enrichment claim is the only claim
asserted against Retrofitness.

Retrofitness argues that the complaint fails to state a claim
for unjust enrichment, Fed.R.Civ.P. 12(b)(6), and that venue
does not lie in the Eastern District of New York, Fed.R.Civ.P.
12(b)(3) and 28 U.S.C. § 1391(a). The motion to dismiss for
failure to state a claim is granted. The Court therefore need
not decide the venue motion.

### BACKGROUND

**I. Facts**

The following facts are drawn from the second amended
complaint (D.E.# 26), which is the currently operative
complaint in this action.

**A. Parties**

Defendant Retrofitness is a franchisor of fitness facilities
throughout the United States. (2d Am.Compl.¶ 9.) It is a
Delaware limited liability company with its principal place
of business in New Jersey. (Letter by Retrofitness (Sept. 20,
2011), D.E. # 35.) Its sole member is Retrofitness Holding
Corp., a Delaware corporation with its principal place of
business in Illinois.

Defendant T.F.J. Fitness L.L.C. ("TFJ"), doing business as
Retro Fitness, is a franchisee of Retrofitness that operates a
gym facility in Margate, Florida. (2d Am.Compl.¶ 6.) It is
a Florida limited liability company with its principal place
of business in Florida. (Letter by Robert Berlin, Edward
Levin, and TFJ (Sept. 20, 2011), D.E. # 37.) Its members,
including individual defendant Edward Levin, are citizens of
New Jersey. (Id.)

Individual defendant Robert Berlin is a principal of TFJ. He
is a citizen of New Jersey. (Id.)

Plaintiff Vertex Construction Corp. ("Vertex") is a New York
corporation with its principal place of business in Staten
Island, New York. (2d Am.Compl.¶ 4.)

**B. Contract**

In November 2008, TFJ entered into a construction contract
with Vertex, pursuant to which Vertex would perform certain
work on TFJ's fitness center in Margate, Florida. (Id. ¶
10.) TFJ agreed to pay Vertex $849,528.69 for its work.
(Id. ¶ 11.) Retrofitness, the franchisor, was not a party to
the construction contract. There are no facts alleged that
indicate it was involved in the formation or performance of
the contract, or that it was otherwise aware of the contract's
existence.

Vertex alleges that, at various points not specified, TFJ
"requested and initiated numerous change orders, additional
finishes and additional work." (Id. ¶ 13.) These "were
estimated to cost an additional" $150,000. (Id. ¶ 14.)

Vertex alleges that it completed all of the work required of it
by the contract and the additional change orders, finishes, and
other directions. (Id. ¶ 16.) It alleges that TFJ has not fully

**Vertex Const. Corp. v. T.F.J. Fitness L.L.C., Not Reported in F.Supp.2d (2011)**

paid for these services. Further, it alleges that it is owed in excess of $350,000. (*Id.* ¶ 24.)

## II. Procedural History

**\*2** On December 24, 2009, Vertex filed suit in New York Supreme Court against TFJ, Retrofitness, and two individual defendants alleged to be owners of TFJ. The state court complaint alleged seven causes of action. The first six alleged (1) breach of contract against TFJ; (2) New York Lien Law trust fund violations against TFJ; (3) quantum meruit against TFJ; (4) unjust enrichment against TFJ; and (5) and (6) New York Lien Law trust fund violations against the individual owners of TFJ. The seventh claim, and the most relevant for purposes of this motion, alleged a claim for unjust enrichment against Retrofitness.

With respect to this defendant and claim, Vertex alleged only that Retrofitness exists as franchisor and that it "has been unjustly enriched as a consequence of using Vertex's work and services and causing Vertex to incur overhead, costs, and expenses, without paying Vertex for same." (Compl.¶¶ 4, 68.) There were no allegations about Retrofitness's participation (or even knowledge) of the construction contract and project, and there was no explanation of how it benefited from the contract or work performed.

TFJ and the individual defendants filed a notice of removal on February 17, 2010. They asserted federal jurisdiction based upon diversity.

On May 26, 2010, Vertex amended its complaint. The amended complaint asserted the same seven claims against the same defendants. It also alleged that TFJ was a New York *corporation,* notwithstanding the fact that it is called "T.F.J. Fitness *L.L.C."* (Am.Compl.¶ 6.) The original complaint had alleged, apparently in the alternative, that TFJ was both a Florida and New York corporation. The notice of removal identified TFJ as a Florida "citizen," which it thought that it had to do to establish diversity jurisdiction, the only possible jurisdictional basis for this action.

On September 1, 2010, Retrofitness submitted a fully briefed motion to dismiss the unjust enrichment claim. Judge Trager, who was then assigned to this case, denied TFJ, which had not yet answered or otherwise responded to the complaint, an opportunity to submit papers in support of Retrofitness's motion. (D.E. # 19.)

On September 20, 2010, Judge Trager ordered Vertex to submit proof establishing that, as alleged, TFJ was a New York limited liability company. (D.E.# 20.) Judge Trager appears to have been concerned about the fact that Vertex had alleged a fact in its amended complaint—that TFJ was, like Vertex, a New York citizen—destroying diversity jurisdiction or rendering removal improper under 28 U.S.C. § 1441(b).

On September 27, 2010 Vertex submitted an affidavit in which it stated that the allegation that TFJ was a New York corporation "was an allegation based upon negotiations and the eventual signature of the Contract between Vertex, both occurring in New York." (D.E.# 22, ¶ 2(c).)

This case was reassigned to this Court in January 2011. The Court held a status conference on April 21, 2011. There, when the Court asked about TFJ's citizenship, Vertex clarified that it had not intended to render continuation of this action in federal court improper by alleging in the amended complaint that TFJ was a New York corporation. It indicated that it would amend the complaint if it planned to continue against TFJ, who had mentioned that the claims against it might be subject to mandatory arbitration (Vertex did not know whether an arbitration provision barred some or all of this litigation because it had apparently not consulted the contract before filing suit).

**\*3** In a letter dated April 28, 2011, Vertex wrote the Court to say that it had reviewed the contract that is the subject of this litigation and "confirm [ed] the language" of the contract that apparently required arbitration. It said that it would contact TFJ to "discuss the terms of arbitration" but that it planned to proceed against Retrofitness, which it said was not bound by the contract or its arbitration provision. (D.E.# 25.)

On May 23, 2011, Vertex filed the second amended complaint in this case, which (as indicated) is the currently operative complaint. It differs from the first amended complaint only in that it alleges that TFJ was a Florida "corporation," again notwithstanding the fact that it is called "T.F.J. Fitness *L.L.C."* On May 27, 2011, pursuant to the Court's May 17, 2011 order, Retrofitness resubmitted its fully briefed motion to dismiss and directed it at the second amended complaint.

On September 6, 2011, the Court issued an order directing the parties to clarify the facts supporting federal diversity jurisdiction. The parties submitted letters on September 20, 2011 complying with this order. Finally satisfied of the

Add. 47

complete diversity of the parties, the Court now considers Retrofitness's motion to dismiss the unjust enrichment claim against it for failure to state a claim under Fed.R.Civ.P. 12(b)(6).

## DISCUSSION

### I. Standard on Motion to Dismiss

To withstand a motion to dismiss for failure to state a claim under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007)). A complaint that contains only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 127 S.Ct. at 1965. Neither will a complaint that contains only "naked assertion[s]" without "further factual enhancement." *Id.* at 1966.

*Iqbal* identifies a "two-pronged" approach to determining the sufficiency of a complaint. 129 S.Ct. at 1950. Courts "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* They then identify whether the complaint, stripped of its conclusory pleadings, "plausibly give[s] rise to an entitlement to relief." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

### II. Motion to Dismiss Unjust Enrichment Claim

Vertex's sole claim against Retrofitness is for unjust enrichment .[1] "The theory of unjust enrichment lies as a quasi-contract. It is an obligation the law creates in the absence of any agreement ." *Goldman v. Metro. Life Ins. Co.,* 5 N.Y.3d 561, 572, 807 N.Y.S.2d 583, 841 N.E.2d 742 (2005). "In order to succeed on a claim for unjust enrichment under New York law, a plaintiff must prove that '(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover.' " *Diesel Props S.r.L. v. Greystone Bus. Credit II LLC,* 631

F.3d 42, 55 (2d Cir.2011) (quoting *Briarpatch Ltd. v. Phoenix Pictures, Inc.,* 373 F.3d 296, 306 (2d Cir.2004)).

**\*4** Retrofitness argues that Vertex's unjust enrichment claim fails because (a) Vertex has not alleged that "Retrofitness obligated itself in any way to Plaintiff" or that "the performance of the work was for Retrofitness," and (b) the construction contract between TFJ and Vertex forecloses the claim. (Def. Br. at 4–7.)

As to the latter argument, Retrofitness relies on the well-settled rule that "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter," *Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.,* 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987). Recent cases have consistently held that this rule applies to claims against third party non-signatories to the contract. *See Network Enters. Inc. v. Reality Racing, Inc.,* 2010 WL 3529237, \*7 (S.D.N.Y.2010) ("Today, 'the existence of a valid and binding contract governing the subject matter at issue in a particular case *does* act to preclude a claim for unjust enrichment even against a third party non-signatory to the agreement.' ") (quoting *Law Debenture v. Maverick Tube Corp.,* 2008 WL 4615896, at \*12 (S.D.N.Y.2008)); *Air Atlanta Aero Eng'g Ltd. v. SP Aircraft Owner I, LLC,* 637 F.Supp.2d 185, 196–97 (S.D.N.Y.2009).

Vertex correctly counters that "where ... there is a bona fide dispute as to the existence of a contract or where the contract does not cover the dispute in issue, a plaintiff may proceed upon a theory of quantum meruit as well as contract, and will not be required to elect his or her remedies," *Sforza v. Health Ins. Plan of Greater N.Y.,* 210 A.D.2d 214, 619 N.Y.S.2d 734, 736 (2d Dep't 1994). (Pl. Br. at 7–10.) And because it is difficult to determine the validity or scope of the contract at the pleading stage, courts routinely reject arguments like Retrofitness's as premature. *See St. John's Univ. v. Bolton,* 757 F.Supp.2d 144, 183–85 (E.D.N.Y.2010) (analyzing case law). The Court agrees that it cannot determine at this point whether any party will contest the validity of the contract or the extent to which the contract covers all work allegedly performed.

Retrofitness's other argument, however, has merit, and Vertex has done little to refute it. Retrofitness relies on the principle that "in order to recover under a theory of quasi contract, a plaintiff must be able to prove that performance was rendered

USCA Case #13-7032     Document #1450720     Filed: 08/08/2013     Page 132 of 142

**Vertex Const. Corp. v. T.F.J. Fitness L.L.C., Not Reported in F.Supp.2d (2011)**

for the defendant, resulting in its unjust enrichment." *Metro. Elec. Mfg. Co. v. Herbert Constr. Co.,* 183 N.Y.S.2d 497, 497 (2d Dep't 1992) (citing *Kagan v. K–Tel Entm't,* 172 A.D.2d 375, 568 N.Y.S.2d 756, 757 (1st Dep't 1991)). Because any benefit conferred was for TFJ, not Retrofitness, Vertex cannot sustain a claim.

Courts have long been divided over "whether New York law imposes a nexus requirement to state a claim for unjust enrichment," *Bildstein v. MasterCard Intl., Inc.,* 2005 WL 1324972, *5 (S.D.N.Y.2005). *See Georgia Malone & Co., Inc. v. Rieder,* 926 N.Y.S.2d 494, *2–4 (1st Dep't 2011); *id.* at *5–12 (Acosta, J., dissenting). *Compare Kagan v. K–Tel Entm't,* 172 A.D.2d 375, 568 N.Y.S.2d 756, 757 (1 st Dep't 1991) ("It is not enough that the defendant received a benefit from the activities of the plaintiff; if services were performed at the behest of someone other than the defendant, the plaintiff must look to that person for recovery.") (citing *Citrin v. Columbia Broad. Sys., Inc.,* 29 A.D.2d 740, 286 N.Y.S.2d 706, 740–41 (1st Dep't 1968)), and *Michele Pommier Models, Inc. v. Men Women N.Y. Model Mgmt., Inc.,* 14 F.Supp.2d 331, 338–39 (S.D.N.Y.1998) (similar), *with Aetna Cas. & Sur. Co. v. LFO Constr. Corp.,* 207 A.D.2d 274, 615 N.Y.S.2d 389, 389 (1st Dep't 1994) ("The unjust enrichment claim does not require that the party enriched take an active role in obtaining the benefit."), and *Dreieck Finanz AG v. Sun,* 1989 WL 96626, at *4 (S.D.N.Y.1989) ("Nor is it necessary for plaintiff and defendant to have had direct dealings with one another.").

 **\*5** In its most recent statement on the issue, however, the New York Court of Appeals made clear that "[a]lthough privity is not required for an unjust enrichment claim, a claim will not be supported if the connection between the parties is too attenuated." *Mandarin Trading Ltd. v. Wildenstein,* 16 N.Y.3d 173, 919 N.Y.S.2d 465, 944 N.E.2d 1104 (2011) (citing *Sperry v. Crompton Corp.,* 8 N.Y.3d 204, 215, 831 N.Y.S.2d 760, 863 N.E.2d 1012 (2007)). Accordingly, it is beyond dispute that a plaintiff must plead "allegations that would indicate a relationship between the parties, or at least an awareness by [the defendant] of [the plaintiff's] existence." *Mandarin Trading Ltd.,* 16 N.Y.3d at 182, 919 N.Y.S.2d 465, 944 N.E.2d 1104; *see Georgia Malone & Co., Inc. v. Rieder,* 86 A.D.3d 406, 926 N.Y.S.2d 494, 498 (1st Dep't 2011).

This principle controls this case. As Retrofitness points out, the complaint does not allege that Retrofitness requested, approved, supervised, agreed to pay for, or assumed any other obligations with respect to the build-out. Indeed, for all it

appears from Vertex's allegations, Retrofitness and Vertex are total strangers.[2] Such a relationship is too attenuated to support a cause of action for unjust enrichment.

Although not clearly asserted by Retrofitness, Vertex's claim fails for another reason: Vertex has not alleged facts giving rise to a plausible inference that Retrofitness benefitted from the construction work performed at its franchisee's property at all, much less in a manner sufficient to support a claim for unjust enrichment. The complaint does not, for example, contain any allegation that Retrofitness owns an interest in the improved property that would benefit directly from the construction work.

The Court could imagine an allegation that Retrofitness stood to benefit in some way from an increase in the value of TFJ's operations—royalties tied to TFJ's revenues, for instance—and that Vertex's work enhanced the value of TFJ's operations. Allegations to that effect do not appear in the Second Amended Complaint, and even if they did they would likely not be sufficient. Such an indirect benefit would not establish the sort of "specific and direct," *Kaye v. Grossman,* 202 F.3d 611, 616 (2d Cir.2000), benefit that New York law requires to sustain a claim for unjust enrichment. Cf. *Denenberg v. Rosen,* 71 A.D.3d 187, 897 N.Y.S.2d 391 (1st Dep't 2010) (individual who purchased life insurance policies from bank cannot recover from defendants who received commissions and other benefits as a result of the bank's sale of those insurance policies, even though purchases were part of an effort to implement a supposedly tax-favorable pension plan designed by the defendants); *Doe I v. Wal–Mart Stores, Inc.,* 572 F.3d 677, 685 (9th Cir.2009) (factory workers who alleged that employer maintained illegal work conditions cannot recover from retailer who benefitted from employer's wrongdoing by securing supply of low-cost goods) (citing *Sperry v. Crompton Corp.,* 8 N.Y.3d 204, 831 N.Y.S.2d 760, 863 N.E.2d 1012 (2007)).

For either of the reasons stated, the motion to dismiss is granted.

### CONCLUSION

 **\*6** Retrofitness's motion to dismiss under Rule 12(b)(6) is granted. Vertex has not requested leave to re-plead and there is no suggestion that Vertex could plead any facts that would change the result. *See McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 200 (2d Cir.2007).

Add. 49

USCA Case #13-7032    Document #1450720    Filed: 08/08/2013    Page 133 of 142

**Vertex Const. Corp. v. T.F.J. Fitness L.L.C., Not Reported in F.Supp.2d (2011)**

SO ORDERED.

Footnotes

1    Retrofitness's motion to dismiss assumes that New York law applies to this dispute. In its papers, Vertex argued affirmatively that
     New York law applies. The Court therefore applies New York law to this diversity action. *See Krumme v. WestPoint Stevens Inc.,*
     238 F.3d 133, 138 (2d Cir.2000).

2    Even if the Court were to read between Vertex's scant allegations to find that Retrofitness was aware of the contract for the build-
     out, and even if the Court were to find that such bare awareness is enough to satisfy any nexus requirement, Vertex's claim would
     still fail. This is because "there [is] no indicia of an enrichment that was unjust where the pleadings fail[ ] to indicate a relationship
     between the parties that could have caused reliance or inducement." *Mandarin Trading,* 16 N.Y.3d at 182, 919 N.Y.S.2d 465, 944
     N.E.2d 1104; *see Georgia Malone,* 86 A.D.3d 406, 926 N.Y.S.2d 494. The unsupported allegation that Retrofitness "caus[ed] Vertex
     to incur overhead, costs, and expenses" is exactly the sort of naked assertion that does not satisfy the standard in *Twombly* and *Iqbal.*

---

**End of Document**                                    © 2013 Thomson Reuters. No claim to original U.S. Government Works.

Add. 50

2013 WL 1739451
Only the Westlaw citation is currently available.
United States District Court,
N.D. California.

CIRCLE CLICK MEDIA LLC, Metro
Talent, LLC, CTNY Insurance Group
LLC, on behalf of themselves and all
others similarly situated, Plaintiffs,
v.

REGUS MANAGEMENT GROUP LLC,
Regus Business Centre LLC, Regus
PLC, HQ Global Workplaces LLC,
and Does 1 through 50, Defendants.

No. 12–04000 SC.    |    April 22, 2013.

**Attorneys and Law Firms**

Ali Ari Aalaei, Bo Zeng, Ari Law, P.C., Joseph Allen Garofolo, Garofolo Law Group, P.C., San Francisco, CA, for Plaintiffs.

Bahareh Maryam Mostajelean, Daniel Thomas Rockey, Meryl Macklin, Kenneth Lee Marshall, Bryan Cave LLP, San Francisco, CA, for Defendants.

**Opinion**

*ORDER GRANTING IN PART AND
DENYING IN PART MOTION TO DISMISS*

SAMUEL CONTI, District Judge.

**I. INTRODUCTION**

*\*1* Plaintiffs Circle Click Media LLC ("Circle Click"), Metro Talent, LLC ("Metro Talent"), and CTNY Insurance Group LLC ("CTNY") (collectively, "Plaintiffs") bring this putative class action against Regus Management Group LLC, Regus Business Centre LLC, Regus plc, and HQ Global Workplaces LLC (collectively "Defendants"). Defendants previously moved to dismiss for failure to state a claim. That motion was granted in part and denied in part, and a number of Plaintiffs' claims were dismissed with leave to amend. ECF No. 59 ("Jan. 3 Order"). In accordance with the Court's January 3 Order, Plaintiffs recently filed a Second Amended Complaint. ECF No. 65 ("SAC"). Defendants now move to dismiss the SAC for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). ECF No. 69 ("MTD"). The

motion is fully briefed, EFC Nos. 71 ("Opp'n"), 73 ("Reply"), and appropriate for determination without oral argument pursuant to Civil Local Rule 7–1(b). For the reasons set forth below, the motion is GRANTED in part and DENIED in part.

**II. *BACKGROUND***

Defendants are in the business of leasing commercial office space throughout California and New York. Jan. 3 Order at 2. In 2011, Plaintiffs entered into identical office agreements with Defendants (collectively, the "Office Agreement(s)") for commercial office space in California and New York. *Id.* Plaintiffs allege that Defendants impose unauthorized and unreasonable charges on Plaintiffs and other customers, and that they employ numerous unlawful policies and practices to collect unfair fees. SAC ¶ 1. For example, Plaintiffs allege that Defendants routinely assessed Circle Click for charges relating to kitchen amenities, various telecommunication services, "business continuity service," taxes, and penalties, which bore no reasonable relationship to the services purportedly rendered by Defendants. *Id.* ¶ 52.

Plaintiffs allege that the Office Agreement does not disclose a number of the charges assessed by Defendants. *Id.* ¶ 26. The Office Agreement, which was drafted by Defendants, is only one page and merely identifies the location of the office space, the monthly office fee, the term of the agreement, and the parties to it. *See* ECF No. 34 ("Bishop Decl.") Ex. A ("Office Agreement"). The Office Agreement also states: "This Agreement incorporates our terms of business set out on attached Terms and Conditions which you confirm you have read and understood." *Id.* The Terms and Conditions, which are attached hereto, are also only one page, but are printed in small type that is no larger than five-point Tahoma. SAC ¶ 27; Bishop Decl. Ex. B ("Terms & Conditions"). Due to its small font size and overall blurriness, the copy of the Terms and Conditions filed with the Court is almost illegible. The Terms and Conditions provide: "This agreement is composed of the front page describing the accommodation(s), the present terms and conditions, and the House Rules." *Id.* § 1.1. The House Rules are not referenced in the pleadings and, in their opposition papers, Plaintiffs claim that they never received a copy of them. *See* Opp'n at 10. The House Rules disclose a number of fees, including a mandatory "Kitchen Amenities / Beverage Fee"; a "[s]tandard services" fee, including a fee "billed upon service activation for applicable telecom and internet services"; an "Office Set Up Fee"; and a "Business Continuity Fee." Bishop Decl. Ex. C ("House Rules") §§ 13, 34, 36, 38. The House Rules also reference a Service Price Guide, *id.* § 35, which lists the prices for a variety

Add. 51

of services, including kitchen amenities and phone and IT services, Bishop Decl. Ex. D ("Service Price Guide").

**\*2** Plaintiffs allege that, in light of Defendants' billing practices, Defendants' advertising is false and misleading. *See* SAC ¶ 73. Plaintiffs specifically point to advertisements posted to Defendants' website from 2003 through 2012. These advertisements represent that customers "could save up to 78 % [sic] compared to traditional office costs," that Defendants' onepage contract "takes just 10 minutes to complete," and that Defendants' services were "[s]imple, easy[,] and flexible." *Id.* ¶¶ 37–41. Plaintiffs also point to an email sent to potential clients on September 30, 2011, which represents that Defendants provide a one-page contract, "[a]fully equipped [o]ffice," "[a]fully stocked kitchen," "[p]hone lines with a local phone number," and "A WELL EQUIPPED OFFICE," "ALL ... for one low monthly price." *Id.* ¶ 42. Additionally, Plaintiffs point to a broadcast commercial by Defendants, wherein an actress states:

> I don't have a lease so I don't have to budget for stuff like phones, IT guys, and artwork for the lobby. Instead, I pay one low monthly rate that gives me a beautiful lobby that impresses my clients, a friendly receptionist, a fully furnished office, a place to meet, and a place to brainstorm with my fellow new way workers. We wonder why more people don't realize that the new way to work is the best way to work.

*Id.* ¶ 43. Plaintiffs also point to Defendants' Craigslist advertisements, though they do not describe their content or when they were posted. *Id.* ¶ 44.

Plaintiffs filed the instant action in state court in May 2012 and Defendants subsequently removed. ECF No. 1. In their First Amended Complaint ("FAC"), which was filed after removal, Plaintiffs sought to represent a class of all persons who paid for Defendants' office space in California and New York and were assessed charges by Defendants over the monthly payments indicated in the Office Agreement or any similar agreement. ECF No. 24 ("FAC") ¶ 71. Plaintiffs asserted six counts on behalf of the California class, which is represented by Circle Click and Metro Talent: (1) violation of California Business and Professions Code section 17200 (the California Unfair Competition Law ("UCL")); (2) violation of California Business and Professions Code section 17500 (the California False Advertising Law ("FAL"));

(3) "concealment/ suppression"; (4) & (5) negligent and intentional misrepresentation; and (6) unjust enrichment. Plaintiffs also asserted the following claims on behalf of the New York class, which is represented by CTNY: (7) & (8) violation of New York State General Business Law ("NYSGBL") sections 349 and 350; and (9) unjust enrichment.

Defendants subsequently filed a motion to dismiss, which the Court granted in part and denied in part on January 13, 2013. Plaintiffs filed their SAC on February 11, 2013. Like the FAC, the SAC asserts causes of action for unfair, unlawful, and fraudulent practices under the UCL; false advertising under the UCL and FAL; intentional misrepresentation; and unjust enrichment. Additionally, the SAC asserts new claims for violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and RICO conspiracy. As part of their FAL and UCL claims, Plaintiffs also assert new, independent violations of California Business and Professions Code section 17509 and California Public Utilities Code ("CPUC") section 2890, respectively.

**\*3** Defendants now move to dismiss the SAC pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

### III. *LEGAL STANDARD*

A Rule 12(b)(6) motion to dismiss "tests the legal sufficiency of a claim." *Navarro v. Block,* 250 F.3d 729, 732 (9th Cir.2001). "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir.1988). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal,* 556 U.S. 662, 664, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 663 (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The allegations made in a complaint must be both "sufficiently detailed to give fair notice to the opposing party of the nature of the claim so that the party may effectively defend against it" and "sufficiently plausible" such that "it is not unfair to require the opposing party to be subjected to the expense of discovery." *Starr v. Baca,* 633 F.3d 1191, 1204 (9th Cir.2011).

Add. 52

**Circle Click Media LLC v. Regus Management Group LLC, Slip Copy (2013)**

## IV. *DISCUSSION*

### A. *Plaintiffs' New Claims*

In its January 13 Order, the Court granted Plaintiffs leave to amend to correct specifically identified deficiencies in their pleading. In their SAC, Plaintiffs have taken steps to address the Court's concerns. However, they have also asserted wholly new claims which were not included in their FAC. Specifically, they have asserted new claims for RICO and RICO conspiracy, and as part of their FAL claim, an independent violation of California Business and Professions Code section 17509. Further, as part of their UCL claim for unlawful practices, Plaintiffs allege new predicate violations of CPUC section 2890.

Defendants argue that because the Court did not specifically grant Plaintiffs leave to add these new claims, Plaintiffs' amendments constitute a violation of Federal Rule of Civil Procedure 15. MTD at 6–7. Rule 15(a)(1) provides that a party may amend its pleading as a matter of course within twenty-one days after serving it or twenty-one days after the filing of a responsive pleading or a Rule 12(b), (e), or (f) motion. Thereafter, "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed.R.Civ.P. 15(a)(2). Rule 15(a)(2) provides that courts should "freely give leave [to amend] when justice so requires," and the Ninth Circuit has stressed Rule 15's policy of favoring amendments. *Ascon Props., Inc. v. Mobil Oil Co. ., 866 F.2d 1149, 1160 (9th Cir.1989).*

Here, Plaintiffs have already amended once, and the Court did not specifically grant them leave to add new claims in its January 13 Order. Plaintiffs' new allegations regarding violations of CPUC section 2890 and Business and Professions Code section 17509 claim are components of claims that were previously dismissed with leave to amend. However, the scope of that leave was limited, and it did not include leave to allege wholly new legal theories or violations of different statutes. *See* Jan. 13 Order at 15–16, 21. Further, RICO was never mentioned in Plaintiffs' FAC or the Court's January 13 Order. Accordingly, Plaintiffs' assertion of these new claims and theories in the SAC constitutes a violation of Rule 15.

**\*4** Nevertheless, judicial economy counsels against dismissing these new claims on procedural grounds. There is no indication that Defendants would be prejudiced by the assertion of these new claims, especially since no discovery

has yet taken place. Thus, if the claims were now dismissed on procedural grounds, Plaintiffs could raise them again through a Rule 15 motion and the Court would need to address the substantive issues raised in Defendants' motion to dismiss at a later date. This would be unfair to the parties, including Defendants, who would need to brief the substantive issues on Plaintiffs' new claims for a second time.

Accordingly, the Court declines to dismiss Plaintiffs' new claims on procedural grounds. However, the Court warns Plaintiffs that they should seek leave to amend in accordance with Rule 15 prior to asserting new claims in the future. Dismissal of one claim with leave to amend should not be considered an open invitation to assert a brand new claim.

### B. *Intentional Misrepresentation*

Plaintiffs' third cause of action is for intentional misrepresentation, also known as common law fraud. Plaintiffs allege that Defendants intentionally misrepresented the monthly payments to be assessed in connection with Plaintiffs' office space by failing to disclose a number of unauthorized charges. SAC ¶ 142. In its January 3 Order, the Court dismissed Plaintiffs' prior claim for intentional misrepresentation on the ground that the Office Agreement expressly provides that the stated monthly office fees exclude taxes and services. Jan. 3 Order at 21–22. The Court granted Plaintiffs leave to amend to allege "what was not disclosed in the agreements they signed with Defendants and/or what Defendants misrepresented to them about their monthly fees and why it was reasonable for Plaintiffs to rely on those misrepresentations despite the language of the agreements." *Id.* at 22.

Plaintiffs now allege that Defendants failed to disclose charges for kitchen amenities, telephone lines, telecom handsets, local telephone services, internet access and activation, taxes, and penalties. SAC ¶¶ 101. They further allege that these fees are not disclosed in the Terms and Conditions, although others charges are, and that these fees are arbitrary because Defendants do not assess charges for a number of other goods and services. *Id.* Defendants argue that these fees were disclosed in the House Rules, which are referenced in the Terms and Conditions, and the Service Price Guide, which is referenced in the House Rules. MTD at 8–10.

There are at least four circumstances in which nondisclosure may constitute actionable fraud: "(1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts

Add. 53

not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts." *OCM Principal Opportunities Fund v. CIBC World Markets Corp.,* 157 Cal.4th 835, 859, 68 Cal.Rptr.3d 828 (Cal.Ct.App.2007). None apply here.

 **\*5** Though Plaintiffs do not directly address this issue in their briefing, their position appears to be that Defendants had exclusive knowledge of the fees that would be assessed in connection with the Office Agreement. However, the judicially noticeable documents submitted by Defendants show that Plaintiffs had at least constructive knowledge of these fees. The House Rules expressly disclose that Defendants would assess a mandatory "kitchen amenities / beverage fee." House Rules ¶ 13. The "Fees" section of the House Rules also indicates that the telecommunications services provided by Defendants were not free. *Id.* ¶¶ 34–41, 68 Cal.Rptr.3d 828. Further, the Service Price Guide, which is expressly referenced in paragraph 35 of the House Rules, discloses the amounts that Defendants would assess for a variety of the services targeted by Plaintiffs, including kitchen amenities and internet and phone services.

Plaintiffs argue that the Court should not take judicial notice of the House Rules or the Service Price Guide because those documents are not referenced in the complaint. Opp'n at 9–10. The Court may take judicial notice of facts that are not subject to reasonable dispute. Fed. R. Ev. 201(b). The Court may also take judicial notice of a written instrument that is incorporated by reference into the pleading because the document forms the basis of the plaintiff's claim. *United States v. Ritchie,* 342 F.3d 903, 908 (9th Cir.2003). Here, Plaintiffs' intentional misrepresentation claim is predicated on what is disclosed or not disclosed in the Office Agreement and the Terms and Conditions. The Terms and Conditions expressly provide that Plaintiffs' agreement with Defendant is composed of the Office Agreement, the Terms and Conditions, and the House Rules. Further, the House Rules expressly reference the Service Price Guide. Accordingly, the Court may properly take judicial notice of all four documents.

Plaintiffs also argue that they never received the House Rules or Service Price Guide. Opp'n at 9. They further suggest that, although the House Rules are referenced in the Terms and Conditions, they could not read the Terms and Conditions because of its small font size. *Id.* at 1. These arguments are unavailing. Plaintiffs have yet to allege that they did not receive the House Rules or the Service Price Guide, although

this issue was raised in Defendants' last motion to dismiss. Further, for the purposes of their fraud claim, Plaintiffs cannot complain that they could not understand the Terms and Conditions. By signing the Office Agreement, Plaintiffs confirmed that they had "read and understood" the Terms and Conditions. Plaintiffs cannot now claim that Defendants had exclusive knowledge of various fees when those fees were disclosed in documents referenced in the parties' agreements.

For these reasons, the Court GRANTS Defendants' motion to dismiss with respect to Plaintiffs' claim for intentional misrepresentation. Since Plaintiffs have already had an opportunity to amend this claim once before, and judicially noticeable documents belie Plaintiffs' allegations, this cause of action is DISMISSED WITH PREJUDICE.

### C. *UCL–Fraudulent Practices*
 **\*6** Plaintiffs also assert a claim for fraud under the UCL based on facts identical to those recited in the Court's discussion of Plaintiffs' claim for intentional misrepresentation. *See* Section IV.B *supra.* Defendants argue that Plaintiffs' UCL fraud claim should be dismissed for the same reasons as their claim for intentional misrepresentation. MTD at 8, 10. However, the fraudulent business practice prong of the UCL is distinct from common law fraud claims like intentional misrepresentation. *In re Tobacco II Cases,* 46 Cal.4th 298, 312, 93 Cal.Rptr.3d 559, 207 P.3d 20 (Cal.2009). To state a claim for UCL fraud, a plaintiff need not show that a defendant's representations were actually false or were reasonably relied upon by the plaintiff. *Id.* Rather, "it is necessary only to show that members of the public are likely to be deceived." *Id.* (quotations omitted).

For example, in *People v. Dollar Rent–A–Car Systems,* Inc., the defendant car rental agencies represented that collision damage waivers were insurance and failed to advise customers that they were liable for damages cause by their own negligence. 211 Cal.App.3d 119, 123, 259 Cal.Rptr. 191 (Cal.Ct.App.1989). Customers brought suit under the UCL. *Id.* The trial court entered judgment against the defendants and the Court of Appeal affirmed. *Id.* at 132, 259 Cal.Rptr. 191. The court reasoned that "[t]he [collision damage waiver's] complex language, the miniscule print size and format, combined with defendants' knowledge that its own trained agents give erroneous explanations, provide ample evidence to support the trial court's finding" that the defendants engaged in deceptive practices. *Id.* at 131, 259 Cal.Rptr. 191.

Add. 54

Likewise, in the instant action, Plaintiffs allege that Defendants failed to adequately disclose a variety of fees that were later assessed against Plaintiffs. SAC ¶¶ 110–113. Plaintiffs further allege that they were deceived because they were unable to read the miniscule font used in Defendants' Terms and Conditions, *id.* ¶ 27–, 259 Cal.Rptr. 191a font that the Court can barely decipher, even with the aid of a magnifying glass. As a result of these allegedly deceptive practices, Plaintiffs entered into an agreement that they could not cancel prior to its expiration and were charged a variety of fees of which they allegedly had no prior knowledge. *See id.* ¶¶ 29–31, 259 Cal.Rptr. 191. The Court finds that these allegations are sufficient to state a claim for fraudulent practices under the UCL.

Accordingly, Defendants' motion to dismiss Plaintiffs' claim for fraudulent practices under the UCL is DENIED.

### D. *UCL–Unfair Practices*
The UCL has two other prongs, one for unfair practices and the other for unlawful practices. Cal. Bus. & Prof.Code § 17200. Plaintiffs assert claims under both. The Court turns to the unfairness prong here. California courts have enunciated multiple standards for evaluating a claim for unfair practices under the UCL. Plaintiffs attempt to invoke the standards enunciated in *South Bay Chevrolet v. General Motors Acceptance Corp.,* 72 Cal.App.4th 861, 85 Cal.Rptr.2d 301 (Cal.Ct.App.1999) and *Cel–Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.,* 20 Cal.4th 163, 83 Cal.Rptr.2d 548, 973 P.2d 527 (Cal.1999) by alleging that Defendants' practices are "immoral, unethical, oppressive, unscrupulous, or substantially injurious to customers," SAC ¶ 100, as well as a violation "of the policy and spirit of the Unfair Practices Act, the Cartwright Act, and the Sherman Act and other antitrust laws," *id.* ¶ 106, 83 Cal.Rptr.2d 548, 973 P.2d 527.

**\*7** Defendants argue that Plaintiffs have failed to satisfy the unfairness prong of the UCL because Plaintiffs are consumers, not competitors, and because Defendants have not engaged in anticompetitive behavior. MTD at 19–20. But the UCL unfairness prong is broad and does more than proscribe monopolistic behavior. *See South Bay,* 72 Cal.App.4th at 886, 85 Cal.Rptr.2d 301. Under *South Bay,* "[t]he test of whether a business practice is unfair involves an examination of [that practice's] impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer." *Id.* (quotations omitted). As discussed in Section IV.C. *supra,* Plaintiffs have alleged sufficient facts to establish that

Defendants' failure to adequately disclose certain fees may confuse consumers. The impact on customers can be severe, as they may commit themselves to one-year agreements without knowledge of the costs involved. At this stage, it is unclear whether Defendants have any justification for failing to conspicuously disclose the mandatory fees associated with their Office Agreements.

Accordingly, the Court finds that Plaintiffs have alleged sufficient facts to support a claim under the unfairness prong of the UCL.

### E. *UCL–Unlawful Practices*
The last prong of the UCL prohibits "unlawful" practices. Cal. Bus. & Prof.Code § 17200. Under this prong, violations of other laws, when committed pursuant to business activity, are independently actionable under the UCL. *Farmers Ins. Exch. v.Super. Ct.,* 2 Cal.4th 377, 383, 6 Cal.Rptr.2d 487, 826 P.2d 730 (Cal.1992). In connection with their UCL claim for unlawful practices, Plaintiffs assert predicate violations of California Civil Code section 1671(b), CPUC section 2890(a), RICO, and California Business and Professions Code sections 17500 and 17509. SAC ¶¶ 95–99. Defendants now move to dismiss Plaintiffs' claim as it relates to RICO and CPUC section 2890(a). MTD at 17–18.

For the reasons set forth in Section IV.F *infra,* the Court finds that Plaintiffs cannot state a UCL claim based on a predicate violation of the RICO statute. Accordingly, this aspect of Plaintiffs' UCL claim is DISMISSED WITH PREJUDICE.

As to CPUC section 2890, Plaintiffs allege that Defendants violated the statute by invoicing them for unauthorized charges and by failing to obtain a written order "on a separate document from any solicitation material that is unambiguous and in a minimum 10–point font." SAC ¶ 97 (citing CPUC § 2890(a)-(b)). Defendants argue that Plaintiffs cannot state a UCL claim under CPUC section 2890 because section 2890 only applies to telephone corporations. MTD at 17–18.

CPUC section 2890 sets forth a number of requirements for the contents of telephone bills. The provision falls under Chapter 10 of part 2 of the CPUC, which pertains to "Telephone Corporations." CPUC section 234(b) provides that a "telephone corporation" does not include "[a]ny hospital, hotel, motel, or similar place of temporary accommodation...." *Id.* Defendants argue that the office space rented by Plaintiffs constitutes a temporary accommodation

Add. 55

**Circle Click Media LLC v. Regus Management Group LLC, Slip Copy (2013)**

for the purposes of the statute, pointing to section 1 .1 of the Terms and Conditions, which provides:

> **\*8** This agreement is the commercial equivalent of an agreement for accommodation(s) in a hotel. The whole of the Center remains in Regus' possession and control. THE CLIENT ACCEPTS THAT THIS AGREEMENT CREATES NO TENANCY INTEREST, LEASEHOLD ESTATE, OR OTHER REAL PROPERTY INTEREST IN THE CLENT'S FAVOUR WITH RESPECT TO THE ACCOMODATIONS.

The Court is not convinced. The fact that the Office Agreements do not create a tenancy interest does not necessarily mean that Defendants only provide temporary accommodations. In fact, the Office Agreements at issue in this case are alleged to have terms of at least one year. This makes Defendants' services different from those of a hospital, hotel or motel. As does the fact that Defendants provided business accommodations, as opposed to the types of short-term housing and accommodations generally associated with hospitals, hotels, and motels.

Accordingly, Defendants motion to dismiss Plaintiffs' claims for unlawful practices under the UCL is GRANTED with respect to Defendants' alleged RICO violations and DENIED with respect to Defendants' alleged CPUC violations.

### F. *RICO*

Plaintiffs assert that Defendants practice of collecting unauthorized charges from its customers constitutes a pattern of racketeering subject to RICO. SAC ¶¶ 164–195. The RICO statute is be read "broadly" and "should be liberally construed to effectuate its remedial purposes." *Odom v. Microsoft Corp.,* 486 F.3d 541, 547 (9th Cir.2007). To state a claim under the RICO statute, a plaintiff must allege: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Id.*

Defendants argue that Plaintiffs cannot state a claim under RICO because they have failed to allege the required predicate acts and a distinct RICO enterprise. MTD at 21–24. The Court agrees with the first point and, therefore, does not reach the second. The definition of racketeering

activity is expansive and includes a long list of federal and state crimes which could serve as predicate acts. *See* 18 U.S.C. § 1961(1). Here, Plaintiffs allege predicate acts of wire fraud and financial institution fraud. SAC ¶ 165. Specifically, Plaintiffs allege that Defendants "participated in the process of obtaining, transmitting, billing, and collecting Unauthorized Charges on [Defendants'] wireline bills to Plaintiffs." *Id.* ¶ 174.

As discussed in Section IV.B *supra,* Plaintiffs cannot state a claim for fraud because the unauthorized charges that they complain of were disclosed in their agreements with Defendants. As such, Plaintiffs also cannot state a claim for wire fraud or financial institution fraud. While Plaintiffs may be able to show that Defendants' practices are likely to deceive consumers for the purposes of the UCL, *see* Section IV.C *supra,* the Court is aware of no authority which holds that violation of such a consumer protection statute can serve as a predicate act under RICO. [1]

**\*9** For these reasons, the Court DISMISSES Plaintiffs' RICO claims WITH PREJUDICE.

### G. *False Advertising Claims*

Plaintiffs assert claims for false advertising under the UCL and FAL. The UCL prohibits "unfair, deceptive, untrue or misleading advertising," Cal. Bus. & Prof.Code § 17200, and the FAL makes it unlawful to induce the public to enter into any obligation through the dissemination of "untrue or misleading" statements, *id.* § 17500. These statutes have been "interpreted broadly to embrace not only advertising which is false, but also advertising which although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public." *Leoni v. State Bar,* 39 Cal.3d 609, 626, 217 Cal.Rptr. 423, 704 P.2d 183 (Cal.1985).

Plaintiffs' UCL and FAL claims are predicated on representations made in Defendants' advertisements and promotional materials between 2003 and 2012. See SAC ¶ 115. The Court dismissed Plaintiffs' prior false advertising claims on the grounds that Plaintiffs failed to plead reliance on Defendants' advertisements or why those advertisements are false and misleading. Jan. 3 Order at 20–21. In their SAC, Plaintiffs generally allege which advertisements they saw and when they saw them, and that they were exposed to Defendants' long-term advertising campaign. SAC ¶¶ 46, 57, 72, 116. Plaintiffs also allege that the following

Add. 56

representations are false and misleading: (1) Defendants' offices are "fully furnished and equipped"; (2) Defendants have a "simple one page agreement"; (3) Defendants offer "[o]ne monthly invoice," "[a]ll inclusive simple monthly payments," "ALL THIS for one low monthly price," and customers can "[g]et one simple monthly bill with everything included." [2] *Id.* ¶¶ 115, 127, 217 Cal.Rptr. 423, 704 P.2d 183. Plaintiffs explain that these statements are deceptive because "[Defendants'] offices are not fully equipped without having to pay the [u]nauthorized [c]harges," and the Office Agreement and Terms and Conditions exceed one page. *Id.*

Defendants move to dismiss Plaintiffs' false advertising claims in their entirety, again arguing that Plaintiffs have failed to plead reliance with the required specificity. MTD at 10–11. As Defendants point out, it is not always clear what advertisements Plaintiffs viewed. For example, Plaintiffs allege that Plaintiff Circle Click viewed Defendants' website on June 28, 2010, but do not specifically allege what the website represented at that time. *See* SAC ¶ 46. Plaintiffs further allege that Circle Click or its principal was exposed to Defendants' extensive and long-term advertising campaign, but do not allege when this exposure began. *See id.*

Plaintiffs invoke *Tobacco II* for the proposition that they need not plead reliance with specificity. Opp'n at 18, 21. In *Tobacco II,* the California Supreme Court held that where a plaintiff alleges exposure to a long-term advertising campaign, "the plaintiff is not required to plead with an unrealistic degree of specificity that the plaintiff relied on particular advertisements or statements." 46 Cal.4th at 328, 93 Cal.Rptr.3d 559, 207 P.3d 20. Defendants argue that most of the misrepresentations alleged by Plaintiffs appeared on Defendants' website and, "[i]f maintaining a website was sufficient, then nearly every company would fall into the *Tobacco II* exception." Reply at 3. But Plaintiffs' reliance allegations are just that Defendants maintained a website. Plaintiffs also allege that Defendants have been making substantially similar representations on that website for the last decade. Accordingly, the Court finds that the *Tobacco II* exception applies here, at least for the purpose of the instant motion.

**\*10** Even if the *Tobacco II* exception did not apply, Plaintiffs have specifically alleged reliance as to Plaintiff Metro Talent. Plaintiffs allege that Metro Talent received an email from Defendants on September 30, 2011, one month prior to Metro Talent's Office Agreement with Defendants. SAC ¶¶ 56–57. Plaintiffs also allege that the September 30,

2011 email represented that Defendants provided "[a] fully equipped Office ... for one low monthly price" and that Defendants' Office Agreements "are one page." *Id.* ¶ 42.

Defendants also move to dismiss Plaintiffs' false advertising claims to the extent that they are premised on the Craigslist advertisements described in paragraph 44 of the SAC. MTD at 12–13. As Defendants point out, the date and content of these advertisements are unclear. Plaintiffs do not describe when these advertisements were posted or what they said, other than to allege that the advertisements "suggest[ ] that the price listed [by Defendants] is all inclusive." SAC ¶ 44. To the extent that Plaintiffs' claims are predicated on these Craigslist advertisements, they fail to meet the minimum pleading requirements set forth by *Iqbal* and *Twombly,* let alone the particularity requirements of Federal Rule of Civil Procedure 9(b).

Defendants also argue that the representations targeted by Plaintiffs are puffery. The Court agrees that a number of statements listed in the SAC, including Defendants' representations that their prices are "low," that their services provide "flexibility for your business," and that their agreements are "simple," amount to puffing statements. These statements are not actionable because they are vague, highly subjective, and generally incapable of being controverted. *See Haskell v. Time, Inc.,* 857 F.Supp. 1392, 1399 (E.D.Cal.1994).

However, the Court reaches a different conclusion with respect to Defendants' representations that their Office Agreements are one page, their offices are fully equipped, and their bills are allinclusive. As Plaintiffs point out, Defendants' agreements are not actually one page. The one-page Office Agreement incorporates by reference the Terms and Conditions, which are also one page, but would be several pages if they were not printed in a miniscule font. The Terms and Conditions also incorporate by reference the House Rules, which are at least five pages. Further, when read in conjunction with the "fully-equipped" and "all inclusive billing" representations, Defendants' statement that their Office Agreements are only one page could possibly lead customers to ignore the Terms and Conditions and the House Rules altogether. They could also potentially deceive consumers into believing that the monthly rent listed in the Office Agreement is all=inclusive. [3]

Accordingly, the Court GRANTS in part and DENIES in part Defendants' motion to dismiss Plaintiffs' false advertising

Add. 57

claims under the UCL and FAL. Plaintiffs' false advertising claims are dismissed to the extent that they are based on Defendants' representations that their prices are "low," their services are "flexible," and their agreements are "simple." They are also dismissed to the extent that they are predicated on advertisements that are not specifically identified in the SAC. If Plaintiffs wish to amend their complaint to identify additional advertisements, then they should file a motion for leave pursuant to Rule 15. Plaintiffs' false advertising claims remain undisturbed in all other respects.

### H. *California Business and Professions Code Section 17509*

**\*11**  As part of their FAL claim, Plaintiffs also plead an independent violation of California Business and Professions Code section 17509. *See* SAC ¶¶ 131–40. Section 17509(a) provides in pertinent part:

> Any advertisement, including any advertisement over the Internet, soliciting the purchase or lease of a product or service, or any combination thereof, that requires, as a condition of sale, the purchase or lease of a different product or service, or any combination thereof, shall conspicuously disclose in the advertisement the price of all those products or services.

Plaintiffs allege that Defendants violated this provision by advertising office space while failing to disclose that renters would also be required to purchase kitchen amenities, office restoration, and business continuity service in connection with that office space. *See* SAC ¶ 132.

Defendants argue that Plaintiffs cannot state a claim under section 17509 because they have not pled reliance on a particular advertisement as to price. MTD at 15–16. However, nothing in the plain language of the statute suggests that an advertisement must list the price of a product or service in order to trigger section 17509. The statute relates to "[a]ny advertisement ... that requires, as a condition of sale, the purchase or lease of a different product or service." Cal. Bus. & Prof.Code § 17509(a).

Defendants argue that the legislative history of section 17509 shows that the statute was intended to have a more limited scope. Reply at 10. The enrolled bill report cited by Defendants shows that the author of the bill wanted to

target advertisements that "do not disclose the price of the product or service the customer must purchase if he or she wishes to purchase the advertised product or service at the sale price." Consum. Affairs Comm. Enrolled Bill Rep., Assem. Bill No. 4032, Stats.1984, ch. 643. However, the report also indicates that the bill encompasses other types of advertisements. Specifically, it states that the bill "would require *any advertisement* for a tie-in sale to specify the price of the tie-in product or service." *Id.* In any event, the Court need not consult the legislative history since the plain language of the statute is unambiguous.

Accordingly, Defendants' motion to dismiss is DENIED as to Plaintiffs' claim under California Business and Professions Code section 17509.

### I. *Unjust Enrichment*

Plaintiffs assert claims for unjust enrichment on the grounds that Defendants engaged in unlawful, unfair, and fraudulent acts and practices in violation of the UCL and FAL and billed for unauthorized charges. SAC ¶¶ 154–163. Defendants move to dismiss these claims on the ground that there is nothing unjust about charging fees for services both disclosed and performed. MTD at 16. This argument fails for the reasons set forth in Sections IV .C–E, G *supra.* Accordingly, Defendants' motion to dismiss is DENIED as to Plaintiffs' unjust enrichment claims.

### V. *CONCLUSION*

**\*12**  For the reasons set forth above, Regus Management Group LLC, Regus Business Centre LLC, Regus plc, HQ Global Workplaces LLC's motion to dismiss Circle Click Media LLC, Metro Talent, LLC, CTNY Insurance Group LLC's Second Amended Complaint is GRANTED in part and DENIED in part.

- Plaintiffs' claim for intentional misrepresentation is DISMISSED WITH PREJUDICE.

- Plaintiffs' claims for unfair and fraudulent practices under the UCL remain undisturbed.

- Plaintiffs' claim for unlawful practices under the UCL is DISMISSED WITH PREJUDICE to the extent that it is predicated on Defendants' alleged RICO violation, but remains undisturbed in all other respects.

- Plaintiffs' RICO claims are DISMISSED WITH PREJUDICE.

Add. 58

• Plaintiffs' false advertising claims under the UCL and FAL are dismissed to the extent they are predicated on the puffing statements identified above and the Craigslist advertisements that are not specifically identified in the SAC. Plaintiffs' false advertising claims are otherwise undisturbed.

• Plaintiffs' unjust enrichment claims remain undisturbed.

IT IS SO ORDERED.

Footnotes

1    Further, finding that a UCL violation can serve as a predicate act for the purposes of RICO would lead to a circular result here, since Plaintiffs have alleged that Defendants' RICO violations are predicate acts for the purposes of their UCL claims.

2    Plaintiffs claim that Defendants' Office Agreement and Terms and Conditions also constitute false advertising under the statue. *Id.* ¶ 114. Defendants move to dismiss this claim on the ground that a contract is not an advertisement. MTD at 15–16. This argument has merit. Plaintiffs have not pled a single fact suggesting that these agreements were used as part of Defendants' promotional activities or that the contracts were made available to anyone other than the contracting parties. Accordingly, the Court finds that these documents cannot independently support Plaintiffs' claims for false advertising under the UCL or FAL.

3    Defendants argue that, as of June 28, 2010, their website included a disclaimer that all prices are exclusive of "IT, telecoms, services, and applicable taxes." MTD at 12. The Court finds that the content of Defendants' website on that particular day is a factual matter not appropriate for a motion to dismiss. Further, it is unclear whether all of Defendants advertisements were accompanied by such disclaimers.

---

**End of Document**

© 2013 Thomson Reuters. No claim to original U.S. Government Works.

Add. 59